# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNIS WILSON, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>LSB INDUSTRIES, INC., BARRY H. GOLSEN, MARK T. BEHRMAN, TONY M. SHELBY, and HAROLD L. RIEKER, JR.<br><br>      Defendants. | Case No. 1:15-cv-07614-RA<br><br>ECF Case |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>TABLE OF CONTENTS</u>

I.  NATURE OF THE ACTION ........................................................................................ 1

II. JURISDICTION AND VENUE .................................................................................... 5

III. PARTIES ................................................................................................................. 5

IV. STATEMENT OF FACTS .......................................................................................... 7

A.  The Use of Ammonia As a Feedstock to Produce Nitrogen-Based
    Compounds ....................................................................................................... 7

B.  LSB's Corporate Formation and Structure ...................................................... 8

C.  LSB's Chemical Facilities ............................................................................... 9

D.  The Company Announces the Construction of a New Nitric Acid Plant at the El
    Dorado Facility to Replace a Plant That Had Exploded .................................. 10

E.  The Company Announces That It Will Construct an Ammonia Plant at the El
    Dorado Facility to Increase Profitability and Margins at the Facility ............... 10

F.  The Company Issues Senior Secured Notes to Fund the El Dorado Facility
    Expansion ......................................................................................................... 11

G.  Instead of Building a New Ammonia Plant at the El Dorado Facility, LSB
    Purchases a Long-Shuttered Facility in Another State, Disassembles It, Moves It
    to the El Dorado Facility, and Then Hires Leidos to Attempt to Put It Back
    Together Using Outdated Schematics and Substantially Worn Piping ............. 12

H.  Defendants Are Informed That Construction on the Ammonia Facility Is
    Significantly Over Budget ................................................................................ 14

    1.  The Individual Defendants Received Weekly Reports and Participated in
        Weekly Meetings Regarding the Capital Expenditures for the El Dorado
        Expansion Project ..................................................................................... 15

    2.  Prior to the Class Period, Defendants Are Informed That the El Dorado
        Expansion Project Is Significantly Over Budget ...................................... 16

I.  Confidential Witnesses Confirm That the Large Bore Pipes Brought from the
    Donaldsonville Facility Were Dismantled and Relocated in a Not Useful
    Manner, Many of These Pipes Were Unusable, and Construction Was Hindered
    by the Attempted Use of Almost 50-Year-Old Engineering Plans .................... 17

J.      After the Board of Directors Replaces Defendant Barry Golsen As the CEO, the New Interim CEO Admits That the Company Had Failed to Conduct the Detailed Engineering Needed to Properly Calculate the True Cost of the Project .................................................................................................20

V.      DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD REGARDING THE ESTIMATED COST AND THE SCHEDULE FOR THE EL DORADO EXPANSION ..............................................................................24

A.      Defendants' False and Misleading Statements Disseminated to the Public on November 7, 2014 ..............................................................................24

B.      Defendants' False and Misleading Statements Disseminated to the Public on March 2, 2015 ................................................................................27

C.      Defendants' False and Misleading Statements Disseminated to the Public on May 8, 2015 ...................................................................................30

D.      Defendants' False and Misleading Statements Disseminated to the Public on July 14, 2015 .................................................................................33

E.      Defendants' False and Misleading Statements Disseminated to the Public on August 7, 2015 ..............................................................................35

VI.     LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD ..............................................................................38

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................................44

A.      The El Dorado Expansion Project Was by Far the Company's Largest and Most Expensive Construction Project and Accounted for a Large Percentage of the Company's Capital Expenditures .....................................................................45

B.      The Golsens Controlled LSB and Were Substantial Shareholders of the Company ........................................................................................45

C.      The Individual Defendants Claimed to Have Conducted a Thorough Review of All Work Performed and Revaluated All Work Left to Complete on the El Dorado Expansion Project During the Class Period .........................................46

D.      The Full Truth Was Only Revealed After Long-Standing Executives of LSB Were Removed From Their Positions ..................................................................48

VIII.   CLASS ACTION ALLEGATIONS ............................................................................50

IX.   UNDISCLOSED ADVERSE FACTS..........................................................................51

X.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE*
PRESUMPTIONS OF RELIANCE ............................................................................52

XI.   NO SAFE HARBOR...................................................................................................53

XII.   COUNTS……..............................................................................................................54

XIII.   PRAYER FOR RELIEF...............................................................................................58

XIV.   JURY TRIAL DEMANDED ......................................................................................58

Lead Plaintiff Dennis Wilson ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, his counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Defendant LSB Industries, Inc. ("LSB" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) investigative interviews with persons having first-hand knowledge of the Company's operations.

## I.     NATURE OF THE ACTION

1.      This is a securities class action on behalf of a class consisting of all those who purchased LSB securities between November 7, 2014 and November 5, 2015, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This case is quite straightforward: Defendants[1] engaged in securities fraud by misstating the true costs and progress of the Company's largest and most ambitious construction project.

3.      LSB is a manufacturing, marketing, and engineering company whose principal business activities, through its subsidiaries, are the manufacture and sale of a broad range of heating, ventilation, and air conditioning products and the manufacture and sale of chemical products for agriculture, industrial, mining, quarry, and construction uses.

4.      The Company's chemical business primarily sells nitrogen based fertilizers. Producing nitrogen based fertilizers requires the use of ammonia as a feedstock.  According to the Company, purchasing ammonia to use as a feedstock is significantly more expensive than

---

[1] Defendants include LSB, Jack E. Golsen, Barry H. Golsen, Tony M. Shelby, Mark T. Behrman, and Harold L. Rieker Jr.

producing ammonia from natural gas on-site due to high ammonia prices and low natural gas prices.  In fact, the Company's facilities that produce their own ammonia have significantly higher margins than the facilities that are required to purchase ammonia from third parties.

5.      In February 2013, the Company announced that it was planning to construct an ammonia plant at the Company's El Dorado, Arkansas facility at an estimated cost ranging from $250 million to $300 million.  According to the Company, the ammonia plant, if constructed, would produce all of the facility's ammonia feedstock requirements, thereby replacing the ammonia currently being purchased at a cost disadvantage, as compared to ammonia produced from natural gas.

6.      Instead of simply constructing a new plant at the El Dorado facility, LSB purchased an ammonia plant located in Donaldsonville, Louisiana that had been built in 1969 and was shuttered in 2004.[2]  Thereafter, LSB disassembled the plant and relocated its component parts, including the piping and vessels, to its facility in El Dorado.

7.      According to Defendants, as part of the purchase of the long-shuttered plant, the Company acquired the original engineering documentation used to construct the facility in 1969 and then scanned 65 bankers boxes worth of documents into PDFs.  The Company touted that using these PDFs as the "process engineering and mechanical engineering" for the construction of the ammonia plant would lead to a "significant savings in the cost of engineering."[3]  Additionally, the Company touted that it was saving substantial costs by reusing the large bore piping from the Donalsonville facility.

8.      On November 7, 2014, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275-$300 million

---

[2] After the sale and removal of the Donaldsonville ammonia plant, the prior owners of the plant built a completely new ammonia plant in the same facility.

[3] In fact, LSB required that the contractor overseeing the construction of the El Dorado ammonia plant rely exclusively on these 45-plus-year old plans for the process and mechanical engineering of the ammonia plant and utilize the original piping isometric drawings from the construction of the Donaldsonville facility.

and the total planned capital expenditure for the El Dorado expansion project, which also included the construction of a Nitric Acid plant and other infrastructure improvements, was $485-$520 million.  Additionally, the Company represented that the estimated completion date for the ammonia plant was the fourth quarter of 2015 and the estimated start-up date of the plant was the first quarter of 2016.

9.     These statements were false and misleading, however, because Defendants had already been  informed that the construction project was 10%-20% over budget and behind schedule.  Additionally, Defendants estimates simply ignored that the construction of the ammonia plant was an unmitigated disaster from the beginning.  According to confidential witnesses, the plant was disassembled in a manner that made reassembly almost impossible; it was clear that much of the piping and vessels were not reusable, and the Company's use of the Donaldsonville engineering documents was a poor substitute for actually conducting the required degree of engineering necessary to actually construct the plant and properly calculate the true cost of building the ammonia facility.[4]

10.     On July 14, 2015, the Company raised the cost estimate of the expansion project from $495-$520 million to $560-$575 million.   According to the Company, these revised cost estimates were a result of updated estimates from its general contractor.

11.     On this news, shares of LSB declined $1.55 per share, almost 4%, to close on July 15, 2015, at $39.07 per share, on heavy volume.

12.     Less than one month later, on August 7, 2015, the Company further raised the cost estimate for the expansion project to $660-$680 million.  According to the Company's then Chief Executive Officer ("CEO"), these revisions were based on a detailed physical evaluation of the construction project, scrutinizing all work done and reviewing all work left to complete the project.

---

[4] All of these facts were later confirmed by LSB's current Chief Executive Officer.

13.     On this news, shares of LSB declined $12.09 per share, 34.44%, to close at $23.01 per share on August 7, 2015, on unusually heavy volume.

14.     Soon thereafter, the Company's Chief Executive Officer and the management team in charge of overseeing the construction project "resigned" from their positions. According to the newly appoint CEO, the Company's Board of Directors was not comfortable with the amount of detail that went into the Company's August estimate. This resulted in the changes to the senior management and the immediate launch of detailed cost estimate work, which began in September 2015.

15.     On November 6, 2015, the Company finally disclosed that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was now $475-$489 million and the total planned capital expenditure for the El Dorado expansion project was now $831-$855 million, which was at least $170 million more than was represented on August 7, 2015. Additionally, the Company disclosed that the ammonia plant's construction was only 80% complete, the plant would not be completed until 2016, and substantial, additional financing was needed to complete construction.

16.     That same day, the acting Chief Executive Officer confirmed that the Company's prior cost estimates were at all times unrealistic since they were formed without the Company conducting the requisite amount of engineering necessary to confirm their accuracy. As the CEO stated, the Company's prior estimates were "not an engineered estimate ... [and] the detailed engineering work was not there." Additionally, the Company's CEO confirmed that the dismantling and relocation of large bore piping from the Donaldsonville facility had been completed in a manner that was not helpful for reassembly at the El Dorado facility.

17.     On this news, shares of LSB declined $7.04 per share, more than 44%, to close at $9.08 per share on November 6, 2015, on unusually heavy volume.

18.     Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline

in the market value of the Company's stock.  Plaintiff and other Class members have suffered significant losses and damages at the hands of defendants and are entitled to redress.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

22.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

23.    Lead Plaintiff Dennis Wilson, as set forth in the certification he previously filed with the Court and incorporated by reference herein, suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.    Defendant LSB is a Delaware corporation with its principal executive offices located at 16 South Pennsylvania Avenue, Oklahoma City, Oklahoma 73107.  During the Class Period, LSB, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

25.     Defendant Jack E. Golsen ("Jack Golsen") was, at all relevant times, Chairman of the Board of Directors and CEO of LSB from its inception in 1969 until December 31, 2014. Additionally, Defendant Jack Golsen, who founded LSB, served as President of the Company from its inception in 1969 until 2004.  Defendant Jack Golsen became Executive Chairman of the Board on January 1, 2015.

26.     Defendant Barry H. Golsen ("Barry Golsen") was, at all relevant times, the Company's President and Chief Executive Officer from January 2015 until September 2015. Defendant Barry Golsen was President and Chief Operating Officer of LSB from 2004 until December 2014.  Additionally, Defendant Barry Golsen has been Vice-Chairman of the Board of LSB since 1993.

27.     Defendant Tony M. Shelby ("Shelby") was, at all relevant times, Executive Vice President - Finance and Chief Financial Officer ("CFO") of the Company until on or about June 25, 2015.

28.     Defendant Mark T. Behrman ("Behrman") was, at all relevant times, Chief Financial Officer of the Company since on or about June 25, 2015.  Prior to June 25, 2015, Defendant Behrman had served as the Company's Senior Vice President-Corporate Development since March 3, 2014.

29.     Defendant Harold L. Rieker, Jr. ("Rieker") was, at all relevant times, Vice President, Principal Accounting Officer, and Corporate Controller of the Company.

30.     Hereinafter, Defendants Jack Golsen, Barry Golsen, Shelby, Behrman, and Rieker will be collectively referred to as the "Individual Defendants."  Defendant LSB and the Individual Defendants will be collectively referred to as "Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of LSB's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.  STATEMENT OF FACTS

### A.  The Use of Ammonia As a Feedstock to Produce Nitrogen-Based Compounds

31.  Nitrogen is the single most important input a farmer can control to increase crop yields on non-irrigated fields. Therefore, nitrogen fertilizer is one of the key drivers producing high yields in modern agriculture, and its use has grown substantially over the past 40 years. Nitrogen fertilizers are made from ammonia ($NH_3$), which is a compound of nitrogren and hydrogen that  contains one nitrogen atom and three hydrogen atoms.  Due to the widespread use of nitrogen fertilizers in industrial farming, ammonia is one of the most commonly produced industrial chemicals in the United States.

32.  In the environment, ammonia is part of the nitrogen cycle and is produced in soil from bacterial processes. Ammonia is also produced naturally from decomposition of organic matter, including plants, animals, and animal wastes.  Most ammonia, however, is industrially produced through a process known as the Haber-Bosch process, which uses a metal catalyst under high temperatures and pressures to convert atmospheric nitrogen ($N_2$) to ammonia ($NH_3$) through a reaction with hydrogen ($H_2$).  The major source of hydrogen in this process is methane from natural gas. The conversion is conducted with air, which is deoxygenated by the combustion of natural gas.  Essentially, natural gas is used as a feedstock to produce ammonia.

33.     Ammonia or anhydrous ammonia[5] is directly or indirectly the precursor to most industrial nitrogen-containing compounds. Virtually all synthetic nitrogen compounds used are derived from ammonia. These include ammonia nitrate, urea, and nitric acid.

**B.      LSB's Corporate Formation and Structure**

34.     LSB was formed and went public in 1969.  Currently, LSB is a manufacturing, marketing, and engineering company. LSB's principal business activities, through its subsidiaries, are the manufacture and sale of chemical products for agriculture, industrial, mining, quarry, and construction uses and the manufacture and sale of a broad range of heating, ventilation, and air conditioning products used in commercial, institutional and residential buildings.

35.     The Company is divided into three businesses: the Chemical Business, the Climate Control Business, and the Engineered Products Business.  According to the Company, LSB's Engineered Products Business markets a proprietary line of precision metal-working machine tools and industrial performance solutions to customers worldwide.

36.     LSB's Climate Control Business is purportedly a market leader for geothermal and water source heat pumps and hydronic fan coils. The Company also provides geothermal and modular chillers and custom air handlers and executes large-scale geothermal installations. These products are targeted to new commercial, institutional, and residential buildings and the replacement of existing heating and cooling systems.

37.     LSB's Chemical Business produces agrochemical products, such as nitrogen based fertilizers (ammonium nitrate, urea ammonium nitrate, and anhydrous ammonia), industrial acids,[6] such as nitric acid, and mining products,[7] such as industrial grade, solid

---

[5] Anhydrous ammonia means ammonia without water and is the gaseous form of ammonia.

[6] LSB's Industrial Chemical Business primarily produces and markets concentrated nitric acid.

[7] The Company's mining product business manufactures industrial grade, solid ammonium nitrate ("AN"), which is a compound used as an explosive in mining, and AN solutions for the mining, construction, and quarry industries.

ammonium nitrate.  LSB's Agrochemical Business produces nitrogen-based fertilizers, including urea ammonium nitrate ("UAN"), agricultural grade high-density ammonium nitrate ("AN"), and anhydrous ammonia ($NH_3$).

38.     According to the Company, UAN is a high nitrogen content fertilizer used to grow corn, wheat, and other crops with a high nitrogen demand that require longer nitrogen release, such as cotton, small grains, vegetables, and orchards; while AN is a pelletized solid fertilizer used for grains, forage, and many specialty crops, such as citrus and vegetables. Additionally, AN is the primary nitrogen component in nitrogen, phosphorus, and potassium ("NPK") blend fertilizer.  Anhydrous ammonia is a high nitrogen content fertilizer from which all other agricultural nitrogen products are derived. Anhydrous ammonia is primarily used as a fertilizer for wheat and corn production.

### C.     LSB's Chemical Facilities

39.     LSB's Chemical Business operates three multi-plant, multi-product production complexes and a separate dedicated nitric acid production facility.  These facilities include the Company's facilities located in Cherokee, Alabama; Pryor, Oklahoma; Baytown, Texas; and El Dorado, Arkansas.

40.     Cherokee Nitrogen L.L.C. operates a 160-acre multi-product facility on a 1,300-acre site located on the bank of the Tennessee River in Cherokee, Alabama ("Cherokee" or the "Cherokee Facility"). According to the Company, Cherokee produces a wide variety of industrial and agrochemical products, including anhydrous ammonia, nitric acid, ammonium nitrate, urea, and urea ammonium nitrate. Cherokee uses natural gas as its primary feedstock, delivered via pipeline, to produce ammonia, urea, and urea ammonium nitrate ("UAN"), a high nitrogen content fertilizer.  Its products are shipped by truck, rail, pipeline, and barge.

41.     El Dorado Nitrogen, L.P. ("EDN") operates a nitric acid plant located within the Covestro complex in Baytown, Texas ("Baytown" or the "Baytown Facility").  This facility uses anhydrous ammonia feedstock, delivered via pipeline, to produce 65% nitric acid that is used by

the polyurethane, nylon fiber, and plastics industries.  Its product is transported to market via pipeline or truck.

42.     Pryor Chemical Company operates a 47-acre multi-product facility on a 104-acre site in Pryor, Oklahoma ("Pryor" or the "Pryor Facility"). Pryor produces anhydrous ammonia, urea, nitric acid, UAN, and carbon dioxide.  Pryor uses natural gas feedstock, delivered via pipeline, and its products are transported to market via truck or rail.

43.     El Dorado Chemical Company ("EDC") operates a 150-acre multi-product facility located on a 1,400-acre site in El Dorado, Arkansas ("El Dorado" or the "El Dorado Facility"). El Dorado produces a variety of agrochemical and industrial products, including regular nitric acid, concentrated nitric acid, mixed (nitrating) acids, sulfuric acid, and both agricultural and industrial grade ammonium nitrate.  According to the Company, El Dorado uses ammonia as its primary feedstock, delivered by pipeline, and its products are transported to market via truck or rail.

**D.     The Company Announces the Construction of a New Nitric Acid Plant at the El Dorado Facility to Replace a Plant That Had Exploded**

44.     In May 2012, the El Dorado Facility suffered significant damage to its DSN concentrated nitric acid plant and surrounding equipment when a reactor at the plant exploded.

45.     By early 2013, the Company had already repaired the damage to the surrounding plants, and ordered a new 65% nitric acid plant and a separate concentrator to make 98% acid that it was planning on installing at the facility.

46.     According to the Company, as of December 31, 2013, LSB expected that construction of the new nitric acid plant and concentrator would cost between $113 million and $123 and would be completed in 2015.

**E.     The Company Announces That It Will Construct an Ammonia Plant at the El Dorado Facility to Increase Profitability and Margins at the Facility**

47.     While the Cherokee and Pryor Facilities use natural gas as a feedstock to make anhydrous ammonia, the El Dorado and Baytown Facilities use anhydrous ammonia as a

feedstock. According to the Company, purchasing ammonia to use as a feedstock is significantly more expensive than producing ammonia from natural gas on site due to high ammonia prices and low natural gas prices.  In fact, since LSB's Cherokee and Pryor Facilities can produce their own ammonia, these facilities historically have had significantly higher margins than the El Dorado facility.

48.     In February 2013, the Company announced that it was planning to construct an ammonia plant at the El Dorado Facility at an estimated cost ranging from $250 million to $300 million that would require an estimated 24-36 months to complete. According to the Company, the ammonia plant, if constructed, would produce all of this facility's ammonia feedstock requirements, replacing the ammonia currently being purchased at a cost disadvantage, compared to ammonia produced from natural gas.  As the Company explained:

> Our El Dorado Facility produces nitric acids in various concentrations and agricultural and industrial grade AN from purchased ammonia, which is currently at a cost disadvantage compared to products directly produced from natural gas. We believe this cost disadvantage will continue to be significant for the medium and long-term. Therefore we are planning the addition of an anhydrous ammonia production plant at the El Dorado Facility, which if constructed is estimated to cost in the range of $250 million-$300 million and would require an estimated 24-36 months to complete. The final decision to construct the ammonia plant is subject to approval of our Board of Directors, and a number of business considerations including, but not limited to, obtaining the required permits and adequate financing. An independent engineering firm has been engaged to assist in the preliminary engineering and cost evaluation leading to our final decision.

**F.     The Company Issues Senior Secured Notes to Fund the El Dorado Facility Expansion**

49.     On August 7, 2013, LSB sold a $425 million aggregate principal amount of the 7.75% Senior Secured Notes due 2019 (the "Senior Secured Notes") in a private placement. According to the Company, $67.2 million of the proceeds for the sale of notes were used to pay all outstanding borrowings, including the prepayment penalty, under a term loan agreement, and the remaining funds were to be used primarily in connection with the construction of the new ammonia plant and the 65% nitric acid plant and concentrator at the El Dorado Facility.

G. **Instead of Building a New Ammonia Plant at the El Dorado Facility, LSB Purchases a Long-Shuttered Facility in Another State, Disassembles It, Moves It to the El Dorado Facility, and Then Hires Leidos to Attempt to Put It Back Together Using Outdated Schematics and Substantially Worn Piping**

50.     In 1969, a British hydrocarbon contractor named M.W. Kellogg Ltd. built an ammonia production plant in Donaldsonville, Louisiana, which was part of a larger nitrogen facility located on 1,400 acres to be operated by Mississippi Chemical Corp and Triad Chemicals, Inc. as part of a joint-venture.  In the spring of 2003, it was announced that the ammonia plant, which was named "Triad #1," would be shuttered in April 2004 due to decreased profitability and an inability to secure a stable customer base.  After failing to find a buyer for the ammonia plant, it was idled.

51.     In late 2012, CF Industries, the owner of the Donaldsonville facility, announced that it had hired ThyssenKrupp and an engineering and procurement contractor to construct a new $2.1 billion ammonia, urea and UAN plant at the Donaldsonville facility.

52.      In 2013, CF Industries sold Triad #1 to LSB.

53.     Thereafter, LSB entered into an Engineering, Procurement, and Construction Agreement ("EPC") with SAIC Constructors, LLC, which was subsequently renamed Leidos Constructors, LLC (together, "Leidos"), on August 12, 2013 to oversee the construction of the El Dorado ammonia plant.  Therein, LSB disclosed that it had already purchased the Triad #1 ammonia plant, disassembled the plant, and relocated its component parts, including the piping and vessels, to its facility in El Dorado at the time the contract was entered.

54.     When LSB purchased the Triad #1 ammonia plant,[8] it also acquired bankers boxes full of the original engineering documentation used to construct the facility in 1969. According to the EPC, LSB scanned these documents into electronic files (PDFs) and these

_____

[8] The EPC refers to the Triad #1 facility as "Unit No. 531-NH3."

records became part of the permanent record for this process unit.  As the EPC, in relevant part, states:

> Said plant was located in Donaldsonville, LA and will be identified herein as Unit No. 531-NH3 ("531-NH3"). Said plant has been dismantled and shipped by Owner, and will be reassembled at Owner's Site at 4500 N. West Ave, El Dorado, AR by EPC Contractor. 531-NH3 will be reassembled in the same physical arrangement as it was in its original location, unless otherwise specified herein. Process equipment will be set up on the same centerlines and elevations to allow the maximum reuse of piping and interconnections, as inspected by others as set forth herein.

> The original plant, owned by Triad, was designed and constructed in 1969 by M. W. Kellogg (MWK). The Owner purchased 531-NH3 and relocated it to its facility in El Dorado, AR. ***The purchase of the 531-NH3 included the engineering documentation and maintenance records. These documents (65 banker boxes) have been scanned to electronic files (PDF's). These records will become part of the permanent record for this process unit.***

(Emphasis added.)

55.     Under the EPC, LSB required that Leidos rely ***exclusively on these 45-plus-year old plans*** in the construction of the ammonia plant.  In fact, the EPC specifically articulated that Leidos was not responsible for any process engineering in the rebuild of the plant:

> Owner has provided EPC Contractor [Leidos] with historical documentation from the Triad Donaldson plant (MWK Basis)[9]. EPC Contractor has no responsibility for the MWK Basis, and shall rely on such historical documentation and documentation produced by EPC Contractor in the course of the Project, to assist Owner in the development of Owner's Process Safety Management (PSM) files.

> EPC Contractor shall create new engineering documents for foundations, structural steel, electrical and instrumentation and will follow EPC Contractor standard specifications, formats, pipe line numbers and other similar protocols with the incorporation of applicable Owner review comments. ***EPC Contractor shall not be responsible for the 531-NH3 process or process design, and will rely upon and reuse the process engineering and mechanical engineering from the MWK Basis.*** By way of example***, EPC Contractor shall utilize the existing piping isometric drawings from the MWK Basis. These will be published in***

---

[9] "MWK Basis" refers to the historical engineering documentation created at the time of the original construction of the Triad #1 facility.

> *Adobe Acrobat PDF format. The reuse of the existing documents is a significant savings in the cost of engineering. This savings has been taken into account in the proposed engineering budgets.*

(Emphasis added).

56.     Additionally, per the EPC, LSB envisioned that large bore piping from the Triad #1 facility would be reused in recreating the plant at the El Dorado Facility. Under the EPC, LSB would inspect these large pipes to determine if they could be reused:

> Piping of 3" diameter and greater is part of the relocation plan and will be inspected by others within the control of Owner prior to reuse, or replaced by EPC Contractor if it does not pass inspection. Piping that is less than 3" diameter will be purchased new by EPC Contractor.

57.     Under the EPC, Leidos was required to complete the construction of the facility no later than July 31, 2015.

## H.     Defendants Are Informed That Construction on the Ammonia Facility Is Significantly Over Budget

58.     During construction on the El Dorado ammonia plant, LSB was consistently kept apprised of Leidos's progress.  Per the EPC, LSB was required to have a construction manager on-site.  Additionally, per the EPC, Leidos would hold weekly telephonic meetings with LSB, as well as provide detailed monthly reports. As the EPC, in relevant part, states:

> EPC Contractor shall monitor Project progress on a continuous and ongoing basis. EPC Contractor shall conduct weekly telephone meetings with Owner to discuss Project status and any Owner concerns. EPC Contractor will issue monthly progress reports for the duration of the Project which will generally follow the format below:
>
> > Executive Summary
> > Safety Summary
> > Engineering accomplishments, upcoming activities and issues
> > Procurement accomplishments, upcoming activities and issues
> > Construction accomplishments, upcoming activities and issues
> > Graphical EPC Progress Curve(s)
> > EPC Schedule updates
> > Identification of scope changes and change orders
> > Cost report and forecast

59.     During these weekly meetings, certain of the Individual Defendants were informed that the ammonia plant construction project was substantially over budget. Additionally, these same Defendants were kept apprised of the substantial issues facing the project from attempting to reuse the pipes and schematics from Donaldsonville facility.

60.     A Confidential Witness confirms that these weekly meetings, in fact, occurred and that Defendants were aware of issues relating to the ballooning costs of the El Dorado ammonia plant.

> **1.     The Individual Defendants Received Weekly Reports and Participated in Weekly Meetings Regarding the Capital Expenditures for the El Dorado Expansion Project**

61.     Confidential Witness #1 ("CW #1") was employed as a Senior Accountant at LSB from May 2013 to October 2014. During this time, CW #1 reported to Mike Adams, the Corporate Controller of LSB.  In this position, CW #1 was responsible for tracking the Company's capital expenditures, budgets, and funds for all of LSB's capital projects, including those at the El Dorado Facility.  Additionally, part of CW #1's job was to ensure that all of the Company's invoices had been charged to the correct accounts.

62.     According to CW #1, LSB held a weekly management meeting to review capital expenditures at the Company.  CW #1, who attended this meeting each week during CW #1's employment, states the following people regularly attended the meeting either in person or telephonically: Defendant Jack Golsen; Defendant Barry Golsen; Mike Adams; Dallas Robinson, an LSB engineer who was purportedly overseeing the El Dorado expansion project for LSB; Larry Fitzwater, an LSB engineer based in St. Louis who participated in the weekly meetings telephonically; and two representatives of Leidos.  Additionally, Defendant Tony Shelby attended the meeting periodically.

63.     As part of CW #1's position, CW #1 created a weekly report that included all of the expenditures for the Company's capital assets, such as the expenditures for the El Dorado expansion project, the largest of LSB's capital projects among the 60 projects that CW #1

tracked.  This report was emailed to all the members of management attending the weekly meeting, which occurred in the Company's headquarters in Oklahoma City, Oklahoma. Additionally, CW #1 created a summary report that detailed the Company's capital outlays in an Excel spreadsheet.  This summary report was also emailed to the management team listed above.

64.     At the meeting, these individuals reviewed the two reports CW #1 had circulated by email and which were also provided to the management team at the weekly meeting in a hard copy form. These two reports broke down the Company's capital funding, or capital expenditures, by project.  The  reports that were emailed to management also contained a description of how the expenditures on each project compared to their budgets and the percentage of completion of each project to date.   Additionally, these two reports included estimates and figures for both the entire expansion project as well as separate figures for the three components of the El Dorado Facility: the ammonia plant, the nitric acid plant, and the supporting infrastructure that was part of the overall project.[10]

### 2.     Prior to the Class Period, Defendants Are Informed That the El Dorado Expansion Project Is Significantly Over Budget

65.     According to CW #1, the budget for the full expansion at the El Dorado Facility, including the ammonia plant, the nitric plant, and the supporting infrastructure (which is also referred to as outside battery limits work or the OSBL), was approximately $500 million at the time CW #1 was first employed in May 2013.[11]

---

[10] The Company's estimates for the expansion at the El Dorado Facility are described in this same manner in its quarterly presentations.

[11] This figure is confirmed by LSB's presentations to the public prior to and at the start of the Class Period.  For example, the Company's 2013 fiscal year conference call presentation dated February 27, 2014, stated that the planned capital expenditures  for the El Dorado project would be $428-$498 million while the ammonia plant itself would cost $250-$300 million.  Similarly, the Company's 2014 fiscal first quarter conference call presentation, dated May 8, 2014, stated the planned capital expenditures for the El Dorado expansion project as $430-$500 million and the ammonia plant alone at $250-$300 million.

66.     According to CW #1, it became evident from the reports CW #1 created and the weekly meetings that the cost of the El Dorado expansion was steadily increasing and that the project was behind schedule.[12]  In fact, CW #1 stated that in the spring of 2014, Defendants Jack and Barry Golsen began expressing frustration with the progress of project in the weekly meetings and Defendant Shelby expressed his frustrations to CW #1 due to the project being over budget.

67.     CW #1 stated that by mid-2014, it was apparent from the reports and the weekly meetings that the expansion of the El Dorado Facility was over budget by 10-20%.   According to CW #1, by the time of CW #1's departure from the Company in October 2014,  the budget for the expansion project had risen to $575-$585 million.

### I.     Confidential Witnesses Confirm That the Large Bore Pipes Brought from the Donaldsonville Facility Were Dismantled and Relocated in a Not Useful Manner, Many of These Pipes Were Unusable, and Construction Was Hindered by the Attempted Use of Almost 50-Year-Old Engineering Plans

68.     Instead of conducting appropriate engineering to ensure the accuracy of its cost estimates, LSB's cost estimates for the ammonia plant at the El Dorado Facility were admittedly based on the reuse of the large bore pipes from the Triad #1 facility in Donaldsonville, LA and the use of the existing engineering documents from the 1960s.   For example, as discussed in Section IV, G, *supra*, LSB specifically stated that Leidos was not to engage in any process engineering and mechanical engineering and that it was contractually required to rely on the Triad #1 documents since reusing these documents would result in substantial cost-savings that were factored into the proposed engineering budget.

69.     Confidential witnesses that worked on the ammonia plant at the El Dorado Facility confirm that the attempted reassembly of the Triad #1 plant was an unmitigated disaster and that it was clear during the Class Period that the assumptions used by LSB to forecast the

---

[12] CW #1 noted that there were some surprisingly high invoices from Leidos and that these invoices became a big part of the weekly meetings.

cost of the ammonia plant, mainly that the pipes, vessels, and the original engineering documents could be reused, were no longer accurate.

70.     Confidential Witness #2 ("CW #2") was employed by Global Industrial Inc. ("Global") as a Quality Control Inspector at the El Dorado Facility.  CW #2, who reported to Global's Project Manager, Jack Davis, worked on the ammonia plant construction project from January 2015 through May 2015.  CW #2's job responsibilities included the inspection of the welds and pipe thickness of the material from the Triad #1 plant to ensure that the pipes were acceptable for reuse.

71.     Upon arriving at the El Dorado facility, CW #2 saw hundreds, if not thousands, of 50-year-old pipes and vessels laid out at the El Dorado Facility.  The common practice when assembling a facility of this size is to lay out the pipes and vessels in an appropriate grid on the ground so that workers can see how the pieces interact and work on the appropriate pieces in the right order.  Here, however, CW #2 stated that the old pipes and vessels were not laid out in any grid or order.[13]   This is confirmed by Confidential Witness #3 ("CW #3"),[14] who stated that the old pipes and vessels from Triad #1 were simply dumped in piles in a two-acre lot without being organized or labeled in anyway.

72.     Additionally, according to CW #2, putting together the old plant was even more of puzzle because there were no pictures taken of the Triad #1 plant that the workers could use as a guide.  Essentially, the workers had to attempt to reconstruct an ammonia plant from assorted

---

[13] While CW #2 admitted that whoever moved the plant appeared to attempt to create some kind of organizational numbering system for the pipes and vessels, the numbering was destroyed when the pieces were sandblasted for cleaning prior to use.

[14] CW #3 was employed by Global as a Project Coordinator at the El Dorado Facility.  CW #3, who reported to the Global's Project Manager, Jack Davis, worked on the ammonia plant construction project from May 2015 through October 2015.  CW #3's job responsibilities included coordinating the manpower, equipment needs, and work schedule for the expansion project.  According to CW #3, Global had about 100 people working on rebuilding the ammonia plant as part of El Dorado expansion project.

unlabeled pipes and vessels laid out in a field without being able to see how the final project was supposed to look.

73.     According to CW #2, much of the piping brought to the El Dorado Facility was unusable.[15]  Upon inspection much of the piping and vessels clearly had thin, pitted walls.  In fact, since some of the pits in the pipes were a quarter inch deep, the walls were too thin to be safe.  While CW #2 believed that it was a waste of time to attempt to reuse much of the old factory, since Leidos and El Dorado Chemical Co., LSB's subsidiary in charge of the facility, wanted to reuse these pipes and vessels, Global would cut the old pipes and then prepare them to be welded for reassembly, which was a time consuming process.  Each of these pipes would then have to go through an x-ray process and be re-inspected after welding to ensure they could be reused.[16]

74.     According to CW #2, attempting to cut and reassemble the pipes using the old, yellowing blueprints from the plant in Louisiana with faded lines and handwriting made it extremely difficult to put the pieces back together again.[17]  In fact, CW #2 stated that when the crews attempted to put the pieces back together again, they would often not match.  Additionally, CW #2 remembers seeing pressure vessels from the Triad #1 plant being hoisted on cranes, put into place at the El Dorado Facility, and then removed so that the crews could get proper dimensions for further construction.  Likewise, the concrete and steel contractors on site and the pipe/vessel welders, according to CW #3, were unable to coordinate properly due to the use of the old plans, which further slowed down the process.

---

[15] CW #3 estimates that only about 40-50% of the pipes could be reused in the new plant.

[16] CW #2 states that it was common for the pipes and vessels approved for reuse to later be trashed by Leidos's engineers.

[17] CW #3 confirms that there were issues with using the engineering documents from the 1960s. According to CW #3, it was difficult to match up the pipes laid out in the field with those on the blueprints.

75.     According to CW #2, employees from both Leidos and El Dorado Chemical Co. were present at the expansion site at all times and were well aware of the challenges and issues facing the project.[18]   Additionally, CW #3 attended twice weekly organizational meetings with supervisors from Leidos and foremen from El Dorado Chemical Co.  During these meetings, which were held in a conference room on site, CW #3 and other Global staff would discuss the progress in reassembling the plan and where they were in the schedule as compared to the forecast. In these meetings, CW #3 reported the percentage of welds that had been completed to date, which was usually about 40% of the goal for each time period during CW #3's employment, and reiterated to them that they had a mess on their hands and that there was no way they could meet the deadline.

**J.      After the Board of Directors Replaces Defendant Barry Golsen As the CEO, the New Interim CEO Admits That the Company Had Failed to Conduct the Detailed Engineering Needed to Properly Calculate the True Cost of the Project**

76.     On September 3, 2015, the Company announced that, effective immediately, Defendant Barry Golsen would no longer serve as LSB's President and CEO.  The Company announced that his replacement would be Daniel Greenwell,[19] who had only been with the Company as its Lead Independent Director since 2014.

77.     Mr. Greenwell, himself, stated during a November 6, 2015 conference call with analysts and investors, upon his appointment, "[i]n early September 2015, we initiated extensive engineering and cost reviews of the El Dorado construction project and were assisted by outside professional firms."  This review quickly "identified further cost increases to the project in the range of $108 million to $111 million." Furthermore, Mr. Greenwell stated that these revised

---

[18] This is confirmed by CW #1, who stated that issues regarding the use of the pipes from Triad #1 were often discussed in the weekly meeting.   According to CW #1, each week the management team discussed the schedule of the major components of the expansion project, the overall progress of the project, and  the fact that the expansion project was behind schedule.

[19] While Mr. Greenwell was initially appointed to be Interim CEO, he has subsequently been appointed the Company's permanent CEO.

project cost estimates, along with the potential contingency amount, would allow the Company

to complete the project at or below $855 million.  Additionally, Mr. Greenwell explained that the

reason for this disparity in the previously reported estimated costs and the actual costs was that:

> *In order to accelerate the construction of the El Dorado facility, the Company originally decided to bring experienced, large bore pipe, defined as pipe greater than 4 inches in diameter, from the Donaldsonville, Louisiana location to El Dorado. The dismantling and relocation was completed in a manner that was not helpful for reassembly in El Dorado.*
>
> ***
>
> *Further, the Company's approach to the El Dorado expansion was to perform significant engineering work just in advance of construction activities in order to fast track construction efforts. This meant the initial and subsequent cost estimates were not engineered estimates with a high degree of precision. We have painfully learned that fact.*
>
> *In early September 2015, we engaged Hatch Engineering to perform an independent, detailed cost estimate study on the ammonia piping work. Those estimates are reflected in the revised costs we have provided today and are consistent with amounts forecasted by the current piping contractors.*

(Emphasis added.)  Mr. Greenwell further explained that the decision to conduct a new cost

estimate was the result of the Board of Directors becoming uncomfortable with the prior

management of the project:

> What we've done since the two early cost estimates is in late August, mid to late August, we began as a Board to get uncomfortable with where we were on this project and, as I said, we made some management changes and then immediately initiated full detailed cost reviews and cost studies to get our arms around this thing. And we have.
>
> We've changed significant management, we've changed construction responsibility and reporting, we have a clear line of sight to it. We're down there frequently, every week, and we participate in all those management activities for that plant construction commissioning and startup.

78.     During this same conference call, Interim CEO Greenwell confirmed that the

Company's prior cost estimates were unrealistic since they were formed without the Company

conducting the requisite of engineering necessary to confirm their accuracy.  For example, Mr.

Greenwell characterized Defendants failure to create a proper engineered estimate, in response to

an analyst's question regarding how "hundreds of millions of dollars have gotten lost in the estimation," as follows:

> …Let me step back a minute and talk about when we originally put these project cost estimates together, ***that was not an engineered estimate.*** What I mean by that is the engineering work, you have a very, very high level of engineering work. ***The detailed engineering work was not there.***
>
> ***It was not a plus or minus 10% estimate. It was not. I think we probably didn't do as good a job as we should have or could have on that, and the cost should have been probably a plus or minus 50% estimate at that time with the level of engineering work that was done.***
>
> Now, let's take that piece and move to the next piece. ***We decided to bring the large bore piping, we decided to bring the large bore piping up from Donaldsonville. That was dismantled, as I said in my prepared remarks, in a manner that did not allow efficient reinstallation at the new facility.***
>
> So what has occurred is a significant amount of additional labor, materials, scaffolding costs, manpower, candidly, to reassemble that pipe. That's something that we clearly did not anticipate in these cost estimates early on. We anticipated some of it in the August estimate, but the fact of the matter is, it's taken us significantly more time.
>
> I think early on in the project there were a lot of weather delays, we talked about that earlier, and then, clearly, the contractor. ***I mean, just that point on the engineering, of not having an engineered estimate, if you look at the components of our, in our materials, we talked about the ammonia plant***, the nitric acid plant and concentrator, and then what we call the OSBL or outside battery limits work, and you look at that nitric acid plant construction concentrator, that was a fully engineered, detailed project that was built, that was completed and pretty well on budget.
>
> We did have good success with that project that was engineered up front at a detailed level. All that was taken care of and the installation and construction went very well. I think it points to the fact that when you have high-quality engineering, thorough and complete engineering, it sure as heck reduces your construction risk profile, and we've painfully learned that.

(Emphasis added.)

79.     Moreover, during this same conference call with investors and analysts, Mr. Greenwell, in response to questions from analysts, disclosed that when the Company announced its July and August 2015 cost estimate increases, the Company and its Board of Directors were, in fact, aware that the engineering plan was flawed, sufficient engineering had not yet been

performed, and these estimates were inaccurate at the time they were made since the Company had failed to acquire the appropriate level of engineering detail needed:

> [Analyst]: Thanks. Good morning, guys. I guess this is mostly for Dan. I was hoping maybe to go back a little bit more over the timeline as it relates to the cost increases. I guess my question to you, you highlighted some of the challenges in terms of the engineering plan, but that wasn't new, that wasn't something you guys learned about now, that's been the case since this project originally embarked.
>
> I guess maybe I had thought that you guys had already hired Hatch at the time when you put out the Q2 cost increase. I wonder if you can go back through the schedule and help me out on those two topics because, again, I think myself and obviously everyone else is a little surprised by another increase here.
>
> [LSB's Interim CEO Dan Greenwell]: Sure, I mean, we had hired Hatch earlier to -- they were originally hired to help with commissioning activities. Part of their scope was expanded in July to include some other project management activities. But when I came on the first of September, I engaged them specifically to do detailed cost studies and activities surrounding the overall project cost. They did do very detailed cost studies, P&ID looks, all the cost estimates, and then they went through and scrubbed all the other areas of all contractors and timelines, project management, things like that. ***When I came on board we engaged them to do a very detailed piece of work. Prior to that it wasn't that detailed.***
>
> [Analyst]: So then how did the July cost -- I mean, where was the estimating coming for that? Because, again, I have to go back through the exact script, but it was certainly indicated there were a lot of third-party resources that were engaged in order to make that estimation. I guess I'm trying to understand why these consultants are better than those consultants, or -- It's a little bit troubling from the outside.
>
> [LSB's Interim CEO Dan Greenwell]: Keep in mind, I think around the first of July, we had terminated one of the piping contractors that was not performing. The first of July we brought on two new piping contractors, Performance and ParFab. ***At that point in time, the detailed engineering wasn't done and they were making, I would say, their best estimates at that time based on the information they had.*** We had not engaged Hatch to do that detailed cost study.
>
> Those cost estimates at that time based were upon Leidos's information as a general contractor and with the new guys, ParFab and Performance just coming on site, been on-site less than a month, and probably didn't have as detailed information as they could have. ***We subsequently in September launched on that to get very detailed estimates to go down to the individual pipe runs, estimate***

*each individual pipe run. So a much more detailed and thorough cost review was done in very early September.*

[Analyst]: Okay. Maybe we'll take it off-line because I feel like we're missing a step. *I guess the other thing I'll ask, you guys have been on the Board for over a year, was there a recognition of maybe the challenges with the engineering plan? It sounds like in hindsight it was pretty obvious it wasn't going to work, but was that something you guys were aware of earlier? I guess I'm wondering why it was not addressed until more recently.*

[LSB's Interim CEO Dan Greenwell]: *I mean, I think we were aware of it, certainly when we had the initial $50 million cost increase, the Board was aware of it. We were certainly aware of the July increase and the effort that went around that. I think the level of detail that we recognized was not there in the August estimate. The Board is not comfortable with that and, clearly, as a result we made changes to the management, the senior management, and I immediately launched on detailed cost estimate work. That's the sequence of events and that's what occurred.*

(Emphasis added.)

## V.     DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD REGARDING THE ESTIMATED COST AND THE SCHEDULE FOR THE EL DORADO EXPANSION

80.     Throughout the Class Period, Defendants were aware or were reckless in not knowing that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project. In spite of this, Defendants falsely claimed that the Company's estimates regarding both cost and timing were proper at all relevant times.

### A.     Defendants' False and Misleading Statements Disseminated to the Public on November 7, 2014

81.     The Class Period starts on November 7, 2014.  On that date, the Company issued a press release entitled, "LSB Industries, Inc. Reports Results for the 2014 Third Quarter; Provides Chemical Business Product Volume Guidance for 2014 Fourth Quarter."  Therein, Jack Golsen, in relevant part, stated:

> At our El Dorado Facility, we performed certain maintenance on our sulfuric acid plant that was originally scheduled for 2015. ***Our expansion projects underway to install a new ammonia plant, and restore and enhance nitric acid capacity, remain on budget and schedule.*** As we have previously discussed, El Dorado purchases ammonia as its primary feedstock, versus producing its own ammonia using natural gas, as is the case with our Pryor and Cherokee Facilities. This results in a cost disadvantage for El Dorado, a condition that we expect to persist until the ammonia plant is operational in the first quarter of 2016. Once ammonia production is underway, we forecast substantial incremental operating profit from the El Dorado Facility.

(Emphasis added.)

82.     Additionally, on November 7, 2014, the Company published a presentation on its website for investors and analysts entitled, "2014 Third Quarter Results."   Therein, the Company, in relevant part, stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275-$300 million and the total planned capital expenditure for the El Dorado expansion project was $485-$520 million.   Additionally, therein, the Company also stated that the expansion projects were on-time and on-budget, and that the estimated completion date was the fourth quarter of 2015 and the estimated start-up date was the first quarter of 2016.

83.     On November 7, 2014, LSB filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter.   The Company's Form 10-Q was signed by Defendants Shelby and Rieker.   Therein, the Company, in relevant part, reaffirmed the Company's cost estimates announced that day in its presentation.

84.     On November 7, 2014, the Company held a conference call with analysts and investors to discuss its 2014 fiscal third quarter financial results.   Therein, Defendant Shelby, in relevant part, stated:

> With respect to the table reflecting El Dorado expansion projects, the planned spending is presented as a range to provide for variable material costs, unplanned delays in construction, and other contingencies. We've made certain changes to the total planned expenditures since the second quarter. ***As the engineering, design, and bidding process has progressed and project construction proceeds, the estimated range of costs has been narrowed and in certain cases have been revised.*** At this point approximately 76% of our anticipated costs are committed. I would point out that the top of ***the estimated cost has been increased from $500***

> *million to $520 million to reflect the inclusion of the natural gas pipeline to supply the ammonia plant.*

(Emphasis added.)

85.     Additionally, on this same conference call, Defendant Barry Golsen, in relevant part, stated:

> *At this time we expect the El Dorado expansion projects to complete on time and on budget* given the addition of the pipeline costs, which Tony discussed. Although completion of projects of this magnitude are dependent on many suppliers and contractors as well as weather conditions, *we are currently not aware of anything that will prevent on-time completion or cause cost overruns.* Also at this time we have committed costs on approximately 76% of the expansion project's total estimated cost.

> *We expect the acid plant and concentrator to complete and ready for start up in mid-2015, and the ammonia plant construction to be completed by the end of 2015 with ammonia production ramp-up during the first quarter of 2016.* As we have relayed in the past, LSB is making these investments in our chemical facilities to drive growth and value creation and better position LSB to capitalize on favorable market dynamics.

(Emphasis added.)

86.     As the Company later admitted (*see* Section IV, J, *supra*), these statements concerning the estimated costs and schedule for completion for the construction of the El Dorado ammonia plant were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that the cost and completion estimates were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

87.     The materially false and misleading statements alleged in ¶¶81-85 regarding the estimated costs and construction schedule were made with scienter.   Defendants were deliberately reckless as to their falsity because, as explained in Section IV, H, 2, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.

88.     Additionally, these misstatements were made with scienter because:

a.      The El Dorado expansion project accounted for more than 75% of the Company's entire planned capital additional for all of 2015 and was by far the largest undertaking at the Company during the Class Period.  Defendants were aware of the status and developments of the project on which the Company was betting its future; or if the Company's CEOs and CFOs were unaware of these developments, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and the Class;

b.      Besides serving as high-ranking executives of the Company, Defendants Jack and Barry Golsen owned millions of shares of LSB stock and effectively controlled the Company.  It is illogical that high-ranking executives that effectively controlled the Company and owned tens of millions of dollars' worth of stock in LSB would be unaware of the status of the Company's largest and most expensive construction project; and

c.      The true cost of the El Dorado expansion project only came to light upon the removal of long-standing LSB insiders, including Defendant Barry Golsen.  The most cogent inference from this fact is that the Individual Defendants were aware, or were reckless in not knowing, that the Company's cost estimates were more than $100 million dollars off and that sufficient engineering had not yet occurred.

**B.      Defendants' False and Misleading Statements Disseminated to the Public on March 2, 2015**

89.      On March 2, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Results for the 2014 Fourth Quarter; Provides Chemical Business Product Volume Guidance for 2015 First Quarter and Financial Targets for 2017." Therein, Defendant Barry Golsen, in relevant part, stated:

> Furthermore, we expect the cost disadvantage that results from the use of purchased ammonia at El Dorado to be eliminated once the in-process construction of the ammonia plant at the facility – expected to reduce costs,

increase capacity and enhance product balance – is completed. This project, along with the enhancement of the El Dorado's nitric acid capacity, remains on budget and on schedule and we expect significant incremental operating profit beginning in 2016 as a result of these investments.

90.     Additionally, on March 2, 2015, the Company published a presentation on its website for investors and analysts entitled, "2014 Fourth Quarter Results."   Therein, the Company, in relevant part, stated as a 2014 highlight: "Continued progress on the El Dorado expansion projects where we remain on budget and on schedule; approximately 93% of planned scope of work is under contract as 1/31/2015."   Additionally, the Company, in relevant part, therein, stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275-$300 million and the total planned capital expenditure for the El Dorado expansion project was $485-$520 million.

91.     On March 2, 2015, LSB filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year.  The Company's Form 10-K was signed by Defendants Jack Golsen, Barry Golsen, Shelby and Rieker.  Therein, the Company, in relevant part, reaffirmed the Company's cost estimates announced that day in its presentation.  Additionally, therein, the Company, in relevant part, stated that the ammonia plant was expected to be completed in late 2015 and operational in early 2016.

92.     On March 2, 2015, the Company held a conference call with analysts and investors to discuss its 2014 fiscal year financial results.  Therein, Defendant Barry Golsen, in relevant part, stated:

> Page 20 details the status of the El Dorado ammonia plant expansion project. As we have stated in the past, this project will significantly reduce El Dorado's cost of ammonia, as the cost spread between purchased and manufactured ammonia is substantial. It will also produce additional ammonia that will be available for sale or which can be upgraded to other products for sale.
>
> **The engineering effort is now substantially complete, and the project timeline is now driven by executing the construction process.** Pilings and foundations are substantially complete. A large part of the underground piping and structural steel is complete, and a majority of major equipment has been installed.

***

***At this time, we expect the El Dorado expansion projects to be completed on time and on budget.*** Also at this time, we have the costs for approximately 93% of the planned scope of work under contract.

We expect the acid plant and concentrator to be completed, and to begin production in the third quarter of 2015.  And the ammonia plant construction and commissioning to be completed by the end of 2015. With ammonia production start up and ramp up during the first quarter of 2016.

(Emphasis added.)

93.     Additionally, during this same call, Defendant Shelby, in relevant part, stated:

[Analyst]: Regarding your 2015 CapEx range, if all goes to plan of what you'd like to do, what would be the CapEx spend within this band? And what would be the pacing of the CapEx -- the 2015 CapEx within the year? Meaning is it evenly weighted over the four quarters? Is it front-end loaded, backend loaded? Thank you.

[Defendant Shelby]: It's first six months loaded. The majority of it's spent in the first six months of 2015, and to a lesser extent in the third quarter, and then to a lesser extent in the fourth quarter.

[Analyst]: Okay. And do you -- if all goes to plan, would you be at the closer to the $346 million versus $283 million? I'm also trying to understand why the band is still largest given where you are on those two timelines.

[Defendant Shelby]: Well, we've continued to leave that contingency in there. ***Although the ammonia plant is pretty much -- the costs there are pretty much fixed,*** but you still have some contracts that are time and material for the nitric acid and concentrator and you have weather issues. So we're keeping that range there, although, we feel like that we've got adequate contingencies there.

(Emphasis added.)

94.     As the Company later admitted (*see* Section IV, J, *supra*), these statements concerning the estimated costs and schedule for completion for the construction of the El Dorado ammonia plant were materially false or misleading when made or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that the cost and completion estimates were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1

plant, and LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

95.     The materially false and misleading statements alleged in ¶¶89-93 regarding the estimated costs and construction schedule were made with scienter.   Defendants were deliberately reckless as to their falsity because, as explained in Section IV, H, 2, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.   Moreover, as described in Section IV, I, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.

96.     Additionally, these misstatements were made with scienter for the reasons stated in ¶88, *supra*.

### C.     Defendants' False and Misleading Statements Disseminated to the Public on May 8, 2015

97.     On May 8, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Improved Adjusted Operating Results for the 2015 First Quarter; Provides Chemical Business Product Volume Guidance for 2015 Second Quarter."   Therein, Defendant Barry Golsen, in relevant part, stated:

> Partially offsetting these tailwinds was the operating loss at our El Dorado facility resulting from its use of high cost ammonia as its primary feedstock, as compared to the cost effective natural gas used by our Pryor and Cherokee Facilities to make their own ammonia. We expect this cost disadvantage to persist until our **expansion projects at El Dorado, which remain on time and on budget, are completed. Once the ammonia plant is up and running in the first quarter of 2016**, we expect the economics of this facility to greatly improve, resulting in significant incremental operating profit.

(Emphasis added.)

98.     Additionally, on May 8, 2015, the Company published a presentation on its website for investors and analysts entitled, "First Quarter 2015 Update."   Therein, the Company,

in relevant part, stated that the El Dorado expansion projects were on budget and on schedule. Additionally, the Company, in relevant part, therein, stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $285-$300 million and the total planned capital expenditure for the El Dorado expansion project was $495-$520 million.

99.     On May 8, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter.  The Company's Form 10-Q was signed by Defendants Shelby and Rieker, and reaffirmed the Company's cost estimates announced that day in its presentation.  Additionally, therein, the Company, in relevant part, stated that the ammonia plant was expected to be completed in late 2015 and operational in early 2016.

100.     On May 8, 2015, the Company held a conference call with analysts and investors to discuss its 2015 fiscal first quarter financial results.  Therein, Defendant Barry Golsen, in relevant part, stated:

> Page 13, details the status of the El Dorado ammonia plant expansion project, which will provide ammonia for on-site upgraded products at a significant cost savings and have the capacity to produce additional ammonia for sale.
>
> The engineering effort is now approximately 97% complete and the project timeline is now driven by executing the construction process…
>
> ***
>
> At this time, we expect the El Dorado expansion projects to be completed on-time and on-budget. We expect the acid plant and concentrator to be complete by mid-year and to begin production in the third quarter of 2015 and the ammonia plant construction and commissioning to be completed by the end of 2015, with ammonia production start-up and ramp-up during the first quarter of 2016.

101.     Additionally, during this same call, Defendant Shelby, in relevant part, stated:

> Moving to page 11 for a summary of capital expenditures. As shown here the planned capital expenditures for the remainder of 2015 will be between $227 million and $276 million including between a $162 million and $187 million for the El Dorado expansion projects. Also included in the total are upgrades to our plants to maintain compliance with environmental regulations and guidelines and other renewals and improvement projects. As a reminder, we expect the spending

to be funded by cash investments, internally generated cash flow and the third-party financings. ***As noted on the lower right hand corner of this page, the total estimated cost of the El Dorado expansion project is expected to be $495 million to $520 million, reflecting our continued status of on-time and on-budget.*** That concludes an overview of the current results of operations, liquidity and capital resources and financial conditions…

(Emphasis added.)

102.     As the Company later admitted (*see* Section IV, J, *supra*), these statements concerning the estimated costs and schedule for completion for the construction of the El Dorado ammonia plant were materially false or misleading when made or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that the cost and completion estimates were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

103.     The materially false and misleading statements alleged in ¶¶97-101 regarding the estimated costs and construction schedule were made with scienter.   Defendants were deliberately reckless as to their falsity because, as explained in Section IV, H, 2, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.   Moreover, as described in Section IV, I, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.

104.     Additionally, these misstatements were made with scienter for the reasons stated in ¶88, *supra*.

**D.      Defendants' False and Misleading Statements Disseminated to the Public on July 14, 2015**

105.     On July 14, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Updates Status of El Dorado Facility Expansion."  Therein, the Company, in relevant part, stated:

> LSB Industries, Inc. (NYSE:LXU) ("LSB" or "the Company"), a producer of chemical products for the agricultural, mining and industrial markets and a leading manufacturer of commercial and residential climate control products, today provided an update on the status of the expansion project at its El Dorado, Arkansas facility ("EDC expansion"). The new nitric acid plant and concentrator are on schedule to be completed and operational by the end of the third quarter of 2015. *The 375,000 ton per year ammonia plant remains on schedule to be completed and operational in the first quarter of 2016. The Company's current cost estimate for the EDC expansion is now in the range of $560 million to $575 million, up from the previous estimate of $495 million to $520 million. Based on management's current project cost estimates and forecast for operating cash flow, at this time LSB does not expect to require additional financing to complete the EDC expansion other than the previously announced financings related to the installation of the cogeneration facility and the ammonia storage tank.*
>
> *The Company recently updated its cost estimate to complete the EDC expansion using refined estimates for specific quantities of construction materials and labor-hours based upon information provided by its engineering, procurement and construction contractor.* Contributing to the increased cost estimate to complete the EDC expansion were productivity and quality issues with a subcontractor responsible for the installation of piping in the ammonia plant.
>
> *"We are pleased to report that the timeline for completion of our El Dorado facility expansion remains intact*, although we are disappointed that the total cost of the project is expected to exceed our initial cost estimates," stated Barry Golsen, LSB's President and Chief Executive Officer. "The safety, product quality, and operational reliability of the El Dorado facility are our primary areas of focus as we move forward toward the completion of the project. Even with the anticipated higher costs, we believe that the project economics remain compelling, with the new capacity expected to yield approximately $90 million of annual incremental EBITDA operating at full capacity."

(Emphasis added.)

106.     As the Company later admitted (*see* Section IV, J, *supra*), these statements concerning the estimated costs and schedule for completion for the construction of the El Dorado

ammonia plant were materially false or misleading when made or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that the cost and completion estimates were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

107.    The materially false and misleading statements alleged in ¶105 regarding the estimated costs and construction schedule were made with scienter.   Defendants were deliberately reckless as to their falsity because, as explained in Section IV, H, 2, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.   Moreover, as described in Section IV, I, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.

108.    Additionally, these misstatements were made with scienter for the reasons stated in ¶88, *supra*, and because:

a.    If the Defendants had conducted the substantial review of the cost estimates and the status of the construction that they claimed to have performed, Defendants would have discovered (if they had not already known) that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

**E.**    **Defendants' False and Misleading Statements Disseminated to the Public on August 7, 2015**

109.    On August 7, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Operating Results for the 2015 Second Quarter; Updates Status of El Dorado Facility Expansion; Provides Chemical Business Product Volume Guidance for 2015 Third Quarter." Therein, the Company, in relevant part, stated:

**El Dorado Facility Expansion Update**

***During the first part of August 2015, the engineering, procurement and construction contractor and other consultants we have retained in connection with the El Dorado Expansion projects advised us they are now estimating that the total cost to complete the El Dorado Expansion projects will exceed what we previously projected, due, in part, to work performed by a previous subcontractor. We have now been advised that the total cost to complete the El Dorado Expansion projects is estimated to be in the range of $660 million to $680 million ($437 million spent as of June 30, 2015 and $223 million to $243 million to be spent in the balance of 2015 with the possibility that a portion of these capital additions could occur during the first quarter of 2016).***

***It is expected that the new ammonia plant will be mechanically complete by the end of 2015 and should begin production early in the second quarter 2016.*** As it relates to the new nitric acid plant and concentrator, the concentrator went into production in June 2015 and the nitric acid plant is expected to be mechanically complete in September 2015, with production beginning mid-fourth quarter 2015.

We expect to be able to fund the cash needs for our operations and our capital expenditures, including the El Dorado Expansion projects and our other planned discretionary capital projects, from cash on hand, internally generated cash flow, working capital, borrowings under our working capital revolver, and other financings. We are currently negotiating with third party lenders for the financing for certain discrete pieces of equipment in connection with the El Dorado Expansion projects. Additionally, the Indenture governing our Senior Secured Notes allows us to incur an additional $50 million in debt. We are also in discussions with other financing providers to provide additional capital, as needed, for the completion of the El Dorado Expansion projects. If for some reason we are unable to complete these financings or there is a shortfall in our internally generated cash flow, either of which would negatively affect our ability to fund all of the discretionary capital projects we had planned to complete or initiate during the balance of 2015 and 2016, we would be required to reduce, delay the start of, or terminate at least some of these capital projects.

(Emphasis added.).

110.    Additionally, on August 7, 2015, the Company published a presentation on its website for investors and analysts entitled, "Second Quarter 2015 Update."   Therein, the Company, in relevant part, stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $405-$420 million and the total planned capital expenditure for the El Dorado expansion project was now $660-$680 million, which was at least $160 million more than was represented in the presentation for the previous quarter.

111.    On August 7, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal second quarter.   The Company's Form 10-Q was signed by Defendants Behrman and Rieker, and reaffirmed the Company's cost estimates announced that day in its presentation.   Additionally, therein, the Company, in relevant part, stated that ammonia plant is expected to be operational early in the second quarter of 2016.

112.    On August 7, 2015, the Company held a conference call with analysts and investors to discuss its 2015 fiscal second quarter financial results.   Therein, Defendant Barry Golsen, in relevant part, stated:

> There is a separate situation relating to El Dorado that is important for me to discuss with you. Three weeks ago, we announced to you that we expected the overall expansion project costs to increase to as much as $575 million, and we believed we could still maintain our original targeted startup schedule during the first quarter of 2016 for the ammonia plant. That report was based on representations made to us by our EPC contractor at that time during project review meetings which addressed the remaining scope of work, the time to complete the project, and the associated costs.
>
> One action that was an outgrowth of those meetings was a decision by our EPC contractor to replace an underperforming mechanical and piping subcontractor with a different subcontractor already on the job working on a different section of the plant who had an excellent record of quality and performance. As a result of the detailed physical evaluation over the past three weeks of the work previously done by the dismissed subcontractor and other work remaining to be done, we have now determined that it is likely that there will be a push out into the second quarter of 2016 for startup of the ammonia plant, and *we believe that the total investment to complete the expansion projects will increase to a range of $660 million to $680 million. To develop those cost estimates, we have scrutinized all work done by the dismissed subcontractor and have reevaluated all work left to*

*complete that part of the project together with the replacement subcontractor and our commissioning subcontractor.*

In addition, a team consisting of LSB senior corporate chemical engineering managers, all project managers for various parts of the expansion project, and El Dorado site management had extensive assessment meetings with each major subcontractor along with our EPC contractor and commissioning contractor. *We reviewed the scope of all work remaining to be done on all parts and all systems of the project and associated cost estimates and timelines. After this detailed review, we believe that the revised cost and time of completion are accurate.* A breakdown of the total cost increase by category is approximately as follows: 75% is related to piping, mechanical, and scaffolding; 8% electrical; 7% insulation; and 10% various other items.

In addition to the staff already assigned to work on this project, we have also retained an owner's representative firm to add additional oversight and control to projects schedule adherence and costs. The El Dorado expansion projects have been designed and we believe will be built to meet the highest standards of engineering and structural integrity with the goal of maximizing operational reliability, product quality, and safety.

While we are not pleased to have increased the cost estimate for the EDC expansion from what we previously announced a few weeks ago, we felt it was prudent to announce what we knew at the time. And since then, we've worked to refine that estimate further, unfortunately to the upside.

(Emphasis added.)

113.    As the Company later admitted (*see* Section IV, J, *supra*), these statements concerning the estimated costs and schedule for completion for the construction of the El Dorado ammonia plant were materially false or misleading when made or omitted to state material facts necessary to make the statements not misleading because the Company failed to disclose that the cost and completion estimates were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

114.    The materially false and misleading statements alleged in ¶¶109-12 regarding the estimated costs and construction schedule were made with scienter.   Defendants were deliberately reckless as to their falsity because, as explained in Section IV, H, 2, *supra*, the

Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Section IV, I, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.

115.    Additionally, these misstatements were made with scienter for the reasons stated in ¶¶88, 108, *supra.*

## VI.    LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

116.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

117.    During the Class Period, as a result of the open, well-developed, and efficient market for LSB's stock, the prices of LSB's stock fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of LSB's stock.

118.    Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in LSB's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

119.    The truth regarding LSB's financial condition and/or the true status and costs of the El Dorado Facility expansion was partially revealed, and/or the concealed risks materialized, on or about: July 14, 2015, August 7, 2015, and November 6, 2015. As a direct result of these partial disclosures, the price of LSB's stock declined precipitously on heavy trading volume.

120.    On July 14, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Updates Status of El Dorado Facility Expansion."  Therein, the Company, in relevant part, stated:

> The 375,000 ton per year ammonia plant remains on schedule to be completed and operational in the first quarter of 2016. The Company's current cost estimate for the EDC expansion is now in the range of $560 million to $575 million, up from the previous estimate of $495 million to $520 million.
>
> ***
>
> "We are pleased to report that the timeline for completion of our El Dorado facility expansion remains intact, although we are disappointed that the total cost of the project is expected to exceed our initial cost estimates," stated Barry Golsen, LSB's President and Chief Executive Officer. "The safety, product quality, and operational reliability of the El Dorado facility are our primary areas of focus as we move forward toward the completion of the project. Even with the anticipated higher costs, we believe that the project economics remain compelling, with the new capacity expected to yield approximately $90 million of annual incremental EBITDA operating at full capacity."

121.    On this news, shares of LSB declined $1.55 per share, almost 4%, to close on July 15, 2015, at $39.07 per share, on heavy volume.

122.    On August 7, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Operating Results for the 2015 Second Quarter; Updates Status of El Dorado Facility Expansion; Provides Chemical Business Product Volume Guidance for 2015 Third Quarter."  Therein, the Company, in relevant part, stated:

**El Dorado Facility Expansion Update**

***During the first part of August 2015, the engineering, procurement and construction contractor and other consultants we have retained in connection with the El Dorado Expansion projects advised us they are now estimating that the total cost to complete the El Dorado Expansion projects will exceed what we previously projected, due, in part, to work performed by a previous subcontractor. We have now been advised that the total cost to complete the El Dorado Expansion projects is estimated to be in the range of $660 million to $680 million ($437 million spent as of June 30, 2015 and $223 million to $243 million to be spent in the balance of 2015 with the possibility that a portion of these capital additions could occur during the first quarter of 2016).***

It is expected that the new ammonia plant will be mechanically complete by the end of 2015 and should begin production early in the second quarter 2016. As it relates to the new nitric acid plant and concentrator, the concentrator went into production in June 2015 and the nitric acid plant is expected to be mechanically complete in September 2015, with production beginning mid-fourth quarter 2015.

We expect to be able to fund the cash needs for our operations and our capital expenditures, including the El Dorado Expansion projects and our other planned discretionary capital projects, from cash on hand, internally generated cash flow, working capital, borrowings under our working capital revolver, and other financings. We are currently negotiating with third party lenders for the financing for certain discrete pieces of equipment in connection with the El Dorado Expansion projects. Additionally, the Indenture governing our Senior Secured Notes allows us to incur an additional $50 million in debt. We are also in discussions with other financing providers to provide additional capital, as needed, for the completion of the El Dorado Expansion projects. If for some reason we are unable to complete these financings or there is a shortfall in our internally generated cash flow, either of which would negatively affect our ability to fund all of the discretionary capital projects we had planned to complete or initiate during the balance of 2015 and 2016, we would be required to reduce, delay the start of, or terminate at least some of these capital projects.

(Emphasis added.).

123.    On this news, shares of LSB declined $12.09 per share, 34.44%, to close at $23.01 per share on August 7, 2015, on unusually heavy volume.

124.    On November 6, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Operating Results for the 2015 Third Quarter; Revises Cost Estimate for El Dorado Facility Expansion to $831 Million to $855 Million; $564 Million Invested as of September 30, 2015; Announces Strategic Investment of $260 Million to Complete El Dorado Expansion; El Dorado Ammonia Plant Remains on Track to be in Production Early in Second Quarter of 2016; Provides Chemical Business Product Volume Guidance for 2015 Fourth Quarter." Therein, the Company, in relevant part, stated:

"Our ongoing engineering and construction review and analysis of our El Dorado Facility Expansion recently determined that the expected cost to complete the project is higher than we previously estimated when we reported second quarter 2015 results in August," stated Daniel Greenwell, LSB's Interim CEO. "The primary reason for the further cost escalation relates to mechanical and piping labor cost increases versus earlier estimates. Despite the increased cost estimate to

complete our expansion project, the new nitric acid plant should be in production next week, and the ammonia plant remains on track to be in production early in the second quarter of 2016, which we expect to dramatically increase the profitability of the facility. Additionally, we are pleased to report that we have signed a three-year offtake agreement with Koch Fertilizer for all of the excess ammonia the new El Dorado ammonia plant is expected to produce, above that consumed by that plant for upgrade into other products. We've worked hard to secure the financing that should allow us to complete the project with little impact to our timeline, and expect that even with the increased costs, the new ammonia and nitric acid facilities will provide a solid return and significant incremental cash flow."

***

Mr. Greenwell concluded, "During the third quarter, I assumed the role of LSB's Interim CEO while fellow Board member, Richard Sanders, was appointed Interim Executive Vice President of Chemical Manufacturing. I believe LSB is in the midst of an important and pivotal transition period, during which we are diligently positioning the Company for significantly enhanced long-term growth. Working with the existing leadership team, both Richard and I are committed to advancing the strategic growth initiatives that the Company has had underway, while instilling a performance oriented, accountable culture throughout the organization, and pursuing the previously disclosed strategic alternatives for both of our businesses. ***During the third quarter, our primary focus was to accurately revise the capital expenditure projections for the El Dorado project, increase the reliability and production consistency of our facilities, and secure the financing necessary to complete our El Dorado Expansion.*** We believe these three objectives have been met. Over the longer-term, our goal is to deliver significantly improved value to our shareholders, while providing excellent service to our customers, and a safe, motivating environment for our employees

***

Financial Position and Capital Additions

As of September 30, 2015, total cash and investments were $39.0 million, including short-term investments.

Total long-term debt was $496.4 million at September 30, 2015 compared to $457.3 million at December 31, 2014 and the borrowings on our $100 million Working Capital Revolver Loan were $13.3 million (borrowing availability, which is tied in to eligible accounts receivable and inventories, was $57.6 million at September 30, 2015). Interest expense, net of capitalized interest, for the third quarter of 2015 was $0.9 million compared to $5.1 million for the same period in 2014.

Capital additions were $139.7 million in the third quarter of 2015, including $128.6 million relating to the expansion projects at the El Dorado Facility. Planned capital additions, in the aggregate, are estimated to range from $280 million to $310 million, including $267 million to $291 million remaining for the El Dorado Expansion projects. An estimated $70 million to $75 million of the capital additions needed to complete the El Dorado Expansion projects will occur in 2016.

***

**El Dorado Facility Expansion Update**

*Over the course of September and October, management in conjunction with the owner's representative, the engineering, procurement and construction contractor and other consultants determined that the total cost to complete the El Dorado Expansion projects will exceed what we previously projected, due, in part, to mechanical and piping labor cost increases compared to earlier estimates. We have now determined that the total cost to complete the El Dorado Expansion projects is estimated to be in the range of $831 million to $855 million ($564 million spent as of September 30, 2015 and $197 million to $216 million to be spent in the fourth quarter of 2015 and between $70 million to $75 million to be spent in 2016).*

*It is expected that the new ammonia plant will be mechanically complete by early February 2016 and should begin production early in the second quarter of 2016.* As it relates to the new nitric acid plant and concentrator, the concentrator went into production in June 2015 and the nitric acid plant is expected to be in production beginning the week of November 9th.

**New Financing to Complete El Dorado Project**

On November 6, 2015, the Company executed a commitment for financing for the purpose of completing its El Dorado Expansion project. The commitment is from Security Benefit Corporation and one or more of its affiliates ("Investor") and provides for $260 million of capital in the form of debt and equity. The details are as follows:

- $50 million in Senior Secured Notes issued at par with a 12% annual interest rate, subject to certain adjustments, maturity of August 2019, callable by the Company beginning August 2016 at 106%, August 2017 at 103% after August 2018 at par.

- $210 million in cumulative redeemable nonconvertible perpetual non-voting preferred stock ("Preferred Stock") with a 14% annual dividend rate and an economic participation right equal to 2% of the outstanding common stock before the transaction; Company will be entitled to redeem the Preferred Stock at any time without premium or penalty at the liquidation preference plus accrued and unpaid dividends plus the value of

the participating right. The Investor will have the option to redeem the Preferred Stock beginning one day after the maturity date of the Company's existing Senior Secured Notes.

- Warrants to purchase 17.99% of the Company with an exercise price of $0.01 per warrant and a ten year term.

- Voting rights equal to 19.99% of the outstanding common stock before the transaction.

- The right to appoint three nominees to the Company's Board as replacements for three existing independent directors effective at the closing of the Preferred Stock.

- The Company will pay a commitment fee of 2% on the full amount of the committed financing and a funding fee of 2% upon issuance of each of the Senior Secured Notes and the Preferred Stock.

- The Company will pay a fee of 3% of the Preferred Stock commitment in the event that the Preferred Stock and Warrants are not issued as a result of the Company obtaining financing from a different entity or if the Preferred Stock and Warrants are not issued as a result of the Company's failure to satisfy conditions precedent that are solely within its control.

*Timing and Conditions of Financing*

- We expect to close the Senior Secured Notes over the next few days. We expect to close the rest of the financing prior to December 31st, subject to definitive agreements and Hart-Scott-Rodino Act approval, if required.

(Emphasis added.)

125.    Additionally, on November 6, 2015, the Company published a presentation on its website for investors and analysts entitled, "Third Quarter 2015 Update."   Therein, the Company, in relevant part, stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $475-$489 million[20] and the total planned capital expenditure for the El Dorado expansion project was now $831-$855 million, which was at least $170 million more than was represented in the presentation for the previous quarter. Additionally, the Company disclosed that the ammonia plant's construction was only 80% complete and that additional financing was needed to complete construction.   Moreover, the

---

[20] This was an increase of more than $90 million from the previous quarter.

Company disclosed that the above-ground piping installation and the installation of certain vessel were still not completed.

126.    On this news, shares of LSB declined $7.04 per share, more than 44%, to close at $9.08 per share on November 6, 2015, on unusually heavy volume.

127.    During the Class Period, Plaintiff and the Class purchased LSB securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

128.    The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting that construction of the Company's El Dorado ammonia plant was over budget and behind schedule; (b) their receipt of information reflecting that the Company's estimates were not engineered with a high degree of precision since they were premised on the assumption that the engineering plans from Triad #1 would be sufficient to rebuild the facility and that the Triad #1 pipes and vessels had been dismantled and relocated in a manner that would enable them to be reused at the El Dorado Facility; (c) their intentional issuance of materially false or misleading statements regarding the status and costs of the El Dorado ammonia plant expansion project; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

129.    The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause

the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

## A. The El Dorado Expansion Project Was by Far the Company's Largest and Most Expensive Construction Project and Accounted for a Large Percentage of the Company's Capital Expenditures

130.    The El Dorado expansion project was by far the largest undertaking at the Company during the Class Period.  For example, according to the Company's 2014 Annual Report, the Company's planned capital additions for all of 2015 were $283-$346 million, while the El Dorado Facility expansion project accounted for $225-$260 million of this figure. Essentially, the El Dorado expansion accounted for more than 75% of all funds that LSB was planning to spend for the year.[21]

131.    The Individual Defendants were aware of the details of the expansion project, particularly that the construction was facing a myriad of problems from attempting to disassemble a factory in another state, move it, and then reassemble it again, as it involved more than three quarters of LSB capital expenditures; or if the Company's CEOs and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members. However, the most reasonable inference from this fact is that the Individual Defendants were aware that the project was over budget and behind schedule as the Company later admitted.

## B. The Golsens Controlled LSB and Were Substantial Shareholders of the Company

132.    According to the Company, as of February 13, 2015, Defendant Jack Golsen, and members of his immediate family, including Defendant Barry Golsen, and entities owned by them and trusts for which they possess voting or dispositive power as trustee, owned an

---

[21] The size and importance to the Company of the expansion is similarly demonstrated by a comparison with the Company's market capitalization at the start of the Class Period.  On November 7, 2014, the Company's market capitalization was $726 million while the high-end estimate for the cost of the El Dorado expansion project was $520 million.  Therefore, the cost of the expansion project was equal to 71.6% of the value of the Company at that time.

aggregate of 2,815,064 shares of LSB's common stock and 1,020,000 shares of voting preferred stock (1,000,000 of which shares have .875 votes per share, or 875,000 votes). Their shares, together, represent approximately 16% of the voting power (prior to conversion of the shares of voting preferred) of the Company's issued and outstanding voting securities as of February 13, 2015. Therefore, as the Company admits, the Golsens effectively control the company, and as a result, the ability of other stockholders to influence LSB's management and policies could be limited.

133.    It is simply illogical that Defendants Jack and Barry Golsen, who cumulatively have a financial interest in almost 4 million shares of LSB stock and control the Company through their stock ownership and their positions as CEO and Chairman of the LSB, were not aware of the status of the Company's largest and most expensive construction project, including the difficulties in using the piping and vessels from the Triad #1 facility and issues resulting from the Company's reliance on almost 50-year-old engineering documents.

   **C.    The Individual Defendants Claimed to Have Conducted a Thorough Review of All Work Performed and Revaluated All Work Left to Complete on the El Dorado Expansion Project During the Class Period**

134.    According to the Individual Defendants, during the Company's 2015 fiscal second quarter, the Company twice reviewed its cost estimates and determined that the expansion project would first cost $560-$575 million, and then, after conducting an even more thorough review, $660-$680 million. For example, on July 14, 2015, when the Company first raised the cost estimate of the expansion project from $495-$520 million to $560-$575 million, the Company, in relevant part, stated:

> *The Company recently updated its cost estimate to complete the EDC expansion using refined estimates for specific quantities of construction materials and labor-hours based upon information provided by its engineering, procurement and construction contractor.* Contributing to the increased cost estimate to complete the EDC expansion were productivity and quality issues with a subcontractor responsible for the installation of piping in the ammonia plant.

(Emphasis added.)

135.    Similarly, on August 7, 2015, which is the date the Company further raised the cost estimate for the expansion project to $660-$680 million, Defendant Barry Golsen stated on a conference call with analysts and investors that:

> One action that was an outgrowth of those meetings was a decision by our EPC contractor to replace an underperforming mechanical and piping subcontractor with a different subcontractor already on the job working on a different section of the plant who had an excellent record of quality and performance. *As a result of the detailed physical evaluation over the past three weeks of the work previously done by the dismissed subcontractor and other work remaining to be done,* we have now determined that it is likely that there will be a push out into the second quarter of 2016 for startup of the ammonia plant, and we believe that the total investment to complete the expansion projects will increase to a range of $660 million to $680 million. *To develop those cost estimates, we have scrutinized all work done by the dismissed subcontractor and have reevaluated all work left to complete that part of the project together with the replacement subcontractor and our commissioning subcontractor.*
>
> *In addition, a team consisting of LSB senior corporate chemical engineering managers, all project managers for various parts of the expansion project, and El Dorado site management had extensive assessment meetings with each major subcontractor along with our EPC contractor and commissioning contractor. We reviewed the scope of all work remaining to be done on all parts and all systems of the project and associated cost estimates and timelines. After this detailed review, we believe that the revised cost and time of completion are accurate.* A breakdown of the total cost increase by category is approximately as follows: 75% is related to piping, mechanical, and scaffolding; 8% electrical; 7% insulation; and 10% various other items.
>
> In addition to the staff already assigned to work on this project, we have also retained an owner's representative firm to add additional oversight and control to projects schedule adherence and costs. The El Dorado expansion projects have been designed and we believe will be built to meet the highest standards of engineering and structural integrity with the goal of maximizing operational reliability, product quality, and safety.
>
> While we are not pleased to have increased the cost estimate for the EDC expansion from what we previously announced a few weeks ago, we felt it was prudent to announce what we knew at the time. *And since then, we've worked to refine that estimate further, unfortunately to the upside.*

(Emphasis added.)

136.     If in fact the Defendants had conducted the substantial review of the cost estimates and the status of the construction that they claimed to have performed, they should have uncovered that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project. Moreover, it is implausible that a substantive review of the El Dorado expansion project by LSB would not have uncovered the disastrous situation described by the Confidential Witnesses or that the ammonia plant estimate was ***more than $100 million dollars off*** due to additional construction costs, as the new management disclosed three months later.

137.     The only reasonable inference that can be made from the fact that these "reviews" failed to uncover the true status of the expansion project is the Individual Defendants had knowledge of, or were reckless in not knowing, that the cost estimates were more than $100 million dollars off and that sufficient engineering had not occurred.

### D.     The Full Truth Was Only Revealed After Long-Standing Executives of LSB Were Removed From Their Positions

138.     On September 3, 2015, LSB announced that, effective immediately, Defendant Barry Golsen had stepped down as both President and Chief Executive Officer of LSB. According to the Company, the Board of Directors had appointed Daniel Greenwell, the Board's Lead Independent Director, to serve as Interim Chief Executive Officer. Thereafter, on September 29, 2015, LSB announced that the Company had appointed Richard Sanders as Interim Executive Vice President, Chemical Manufacturing and that, effective immediately, Mr. Sanders would oversee all plant operations. In the same press release, the Company announced the "resignations" of David Goss, Executive Vice President of Operations, and Michael Tepper, Senior Vice President of LSB International Operations. Both Defendant Barry Golsen and David

Goss had been affiliated with LSB for more than 35 years.[22]

139.    In fact, LSB's new Interim CEO Greenwell explained that one of the reasons for the restructuring of the management team was to "driv[e] accountabilty" and develop "a strong sense of urgency."   As Interim CEO Greenwell explained, the Company had poor corporate governance practices that should have been fixed earlier and which hindered getting a complete understanding of the situation:

> What we've done since the two early cost estimates is in late August, mid to late August, we began as a Board to get uncomfortable with where we were on this project and, as I said, we made some management changes and then immediately initiated full detailed cost reviews and cost studies to get our arms around this thing. And we have.
>
> We've changed significant management, we've changed construction responsibility and reporting, we have a clear line of sight to it. We're down there frequently, every week, and we participate in all those management activities for that plant construction commissioning and startup.[23]

140.    The most logical inference from this mass departure of long-serving LSB management just prior to the end of the Class Period is that LSB's management, including the Individual Defendants, had knowledge of, or were reckless in not knowing, that the cost estimates were more than $100 million dollars off and that sufficient engineering had not occurred, and the Board of Directors wanted to bring in new management to ensure that such a debacle could not occur again.[24]

---

[22] Additionally, Defendant Shelby, who also left the Company during the Class Period, had been a part of the Company's management team since its inception in 1969.

[23] The clear implication from this statement is that the prior management, specifically Defendant Barry, were not as active and involved as they needed to be in the construction process and/or in their cost reviews.   This conduct is certainly reckless as it involved the Company's largest project and hundreds of millions of dollars.

[24] Moreover, on March 16, 2015, the Company announced that it was establishing a new position of President of its Chemical Business, which would oversee the El Dorado expansion project, and had hired an executive search firm to carry out the search.

## VIII.   CLASS ACTION ALLEGATIONS

141.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the securities of LSB during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

142.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LSB securities were actively traded on the New York Stock Exchange (the "NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of LSB shares were traded publicly during the Class Period on the NYSE. As of October 30, 2015, the Company had 22,811,262 shares of stock outstanding, excluding 4,320,462 shares held as treasury stock.  Record owners and other members of the Class may be identified from records maintained by LSB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143.     Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein. Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

144.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' conduct alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of LSB; and

c.      to what extent Class members have sustained damages and the proper measure of damages.

145.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    UNDISCLOSED ADVERSE FACTS

146.    The market for LSB's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, LSB's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired LSB's securities relying upon the integrity of the market price of the Company's securities and market information relating to LSB, and have been damaged thereby.

147.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LSB's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about LSB's business, operations, and prospects as alleged herein.

148.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff  and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LSB's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## X.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

149.    The market for LSB securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period. On April 28, 2015, the Company's stock closed at a Class Period high of $45.26 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to LSB; Plaintiff and Class members have been damaged thereby.

150.    During the Class Period, the artificial inflation of the value of LSB securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

151.    At all relevant times, the market for LSB securities was efficient for the following reasons, among others:

a.    LSB's stock met the requirements for listing, and it was listed and actively traded on the NYSE, a highly efficient and automated market.

b.    As a regulated issuer, LSB filed periodic public reports with the SEC and/or the NYSE.

c.    LSB regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

d.    LSB was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

152.    Based on the foregoing, during the Class Period, the market for LSB securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of LSB stock. Under these circumstances, the market for LSB securities was efficient during the Class Period and, therefore, investors' purchases LSB securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

153.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XI.    NO SAFE HARBOR

154.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions

alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XII.   COUNTS

### FIRST COUNT
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

155.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

156.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase LSB securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

157.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LSB securities in violation of Section 10(b) of the Exchange Act and Rule 10b 5.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

158.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about LSB's business, operations, management, and prospects, as specified herein.

159.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LSB's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LSB and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

160.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

161.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LSB business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's operations and cost estimates throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

162.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of LSB securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired LSB securities during the Class Period at artificially high prices and were damaged thereby.

163.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that LSB was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LSB securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

164.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder.

165.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND COUNT**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

166.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

167.    The Individual Defendants acted as controlling persons of LSB within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

168.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

169.    As set forth above, LSB and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 16, 2016

Respectfully submitted,

GLANCY PRONGAY & MURRAY LLP


By:  *s/ Casey E. Sadler*
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

-and-

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (BM-9954)
Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com


*Lead Counsel for Lead Plaintiff Dennis Wilson*

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO SOUTHERN DISTRICT OF NEW YORK ECF AND LOCAL RULES AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 16, 2016, I served true and correct copies of **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 16, 2016, at Los Angeles California.

*s/ Casey E. Sadler*
Casey E. Sadler

# Mailing Information for a Case 1:15-cv-07614-RA

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joni S. Jacobsen**
  joni.jacobsen@dechert.com,angela.liu@dechert.com,nicole.ladue@dechert.com,nycmanagingclerks@dechert.co

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com

- **Rebecca Kahan Waldman**
  rebecca.waldman@dechert.com,nycmanagingclerks@dechert.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)