**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENNIS WILSON, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:15-cv-07614-RA |
| Plaintiff, | ECF Case |
| v. | |
| LSB INDUSTRIES, INC., JACK E. GOLSEN, BARRY H. GOLSEN, MARK T. BEHRMAN, TONY M. SHELBY, and HAROLD L. RIEKER, JR. | |
| Defendants. | |

**CORRECTED[1] SECOND AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

[1] Corrected only to revise Paragraph 30 and to include an updated certification of Lead Plaintiff's trades, pursuant to Court's Order dated April 3, 2017.  Dkt. No. 68.

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ..................................................................................... 5

II.  JURISDICTION AND VENUE ...............................................................................12

III.  PARTIES .................................................................................................................12

IV.  STATEMENT OF FACTS.......................................................................................14

    A.  Background ...................................................................................................14

        1.  The Use Of Ammonia As A Feedstock To Produce Nitrogen-Based Compounds ............................................................... 14

        2.  LSB's Corporate Formation And Structure ............................................. 15

        3.  LSB's Chemical Facilities ...................................................................... 16

        4.  The Company Announces The Construction Of A New Nitric Acid Plant At The El Dorado Facility To Replace A Plant That Had Exploded........ 17

    B.  The El Dorado Expansion Project ................................................................17

        1.  The Company Announces That It Would Construct An Ammonia Plant At The El Dorado Facility To Increase Profitability And Margins At The Facility .................................................................................................. 17

        2.  The Company Issues Senior Secured Notes To Fund The El Dorado Facility Expansion ................................................................................... 18

        3.  Instead Of Building A New Ammonia Plant At The El Dorado Facility, LSB Purchases A Long-Shuttered Facility In Another State, Disassembles It, Moves It To The El Dorado Facility, And Then Hires Leidos To Attempt To Put It Back Together Using Outdated Schematics And Substantially Worn Piping ....................................................................... 19

        4.  Defendants Are Informed That Construction On The Ammonia Facility Is Significantly Over Budget ...................................................................... 23

            a)  The Individual Defendants Received Weekly Reports And Participated In Weekly Meetings Regarding The Capital Expenditures For The El Dorado Expansion Project .................... 23

b) Prior To The Class Period, Defendants Are Informed That The El Dorado Expansion Project Is Significantly Over Budget ............ 25

c) Another Former Employee Of The Company Confirms That During The Class Period LSB Had Weekly Meetings Regarding The Project ................................................................................. 25

5. Prior To The Class Period, The Contractor In Charge Of Building The Ammonia Plant Informs LSB And Leidos That It Was Unwilling To Make A Fixed, Lump Sum Bid On The Project Due To The Flawed Disassembly Of The Triad #1 Facility And The Poor Condition And Quality Of The Pipes From That Facility ......................................................... 26

6. Construction Costs And Progress Was Hindered By The Large Bore Pipes Brought From The Donaldsonville Facility Being Dismantled And Relocated In A Not Useful Manner, Many Of These Pipes Being Unusable, And The Attempted Use Of Almost 50-Year-Old Engineering Plans ........................................................................................... 30

7. The Costly And Intentional Installation Of Unusable Pipes And Vessels For The Purpose Of Raising Necessary Financing ................................... 34

a) Global Is Instructed To Use Unusable And Not Approved Piping And Vessels To Make The Ammonia Plant Appear Further Along ................................................................................................ 34

b) Defendants' Public Disclosures Regarding The Acquisition Of Additional Financing Track Defendants' Scheme ....................... 35

8. After The Board Of Directors Replaces Defendant Barry Golsen As The CEO, The New Interim CEO Admits That The Company Had Failed To Conduct The Detailed Engineering Needed To Properly Calculate The True Cost Of The Project ....................................................................... 40

V. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD REGARDING THE ESTIMATED COST, SCHEDULE AND PROGRESS FOR THE EL DORADO EXPANSION ...................................................................... 44

A. Defendants' False And Misleading Statements To The Public On November 7, 2014 ............................................................................... 47

B. Defendants' False And Misleading Statements To The Public On March 2, 2015 ......................................................................................... 53

C.      Defendants' False And Misleading Statements To The Public On Or About April 17, 2015 ....................................................................58

D.      Defendants' False And Misleading Statements To The Public On May 8, 2015 ..........................................................................61

E.      Defendants' False And Misleading Statements To The Public On Or About June 2, 2015 ........................................................................67

F.      Defendants' False And Misleading Statements To The Public On July 14, 2015 .......................................................................71

G.      Defendants' False And Misleading Statements To The Public On August 7, 2015 .......................................................................74

VI.     LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD ..............................................................83

VII.    ADDITIONAL SCIENTER ALLEGATIONS ..............................................92

A.      The El Dorado Expansion Project Was By Far The Company's Largest And Most Important Construction Project And Accounted For A Large Percentage Of The Company's Capital Expenditures ...........................................93

B.      LSB Had A Small Corporate Staff ....................................................94

C.      The Individual Defendants Were Purportedly Monitoring The Expansion Project And Represented That They Had Conducted A Thorough Review Of All Work Performed And Revaluated All Work Left To Complete On The El Dorado Expansion Project During The Class Period ........................................95

D.      The Need For Financing To Complete The El Dorado Expansion Provided A Motive For Defendants To Misrepresent The Status Of The El Dorado Expansion Project As On Schedule And On Budget........................................98

E.      The Golsens Controlled LSB And Were Substantial Shareholders Of The Company .............................................................................101

F.      Activist Shareholders Had Fought The Golsen Family's Entrenchment At LSB And Forced Changes To The Composition Of LSB's Board Of Directors, And The Individual Defendants Were Motivated To Maintain The Impression That The El Dorado Expansion Project Was Proceeding Smoothly In Order To Maintain Their Positions ................................................................102

G.      The Full Truth Was Only Revealed After Long-Standing Executives Of LSB Were Removed From Their Positions.............................................115

VIII.   CLASS ACTION ALLEGATIONS ............................................................................116

IX.   UNDISCLOSED ADVERSE FACTS........................................................................118

X.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ............................................................................119

XI.   NO SAFE HARBOR................................................................................................120

XII.   COUNTS ................................................................................................................121

XIII.   PRAYER FOR RELIEF............................................................................................125

XIV.   JURY TRIAL DEMANDED ....................................................................................125

Lead Plaintiff Dennis Wilson ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, his counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Defendant LSB Industries, Inc. ("LSB" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company; (d) interviews with persons having first-hand knowledge of the Company's operations, including former employees of LSB and its subsidiaries; and (e) information and legal filings relating to the Company's activities at issue.

## I.     NATURE OF THE ACTION

1.     This is a securities class action on behalf of a class consisting of all those who purchased LSB securities between November 7, 2014 and November 5, 2015, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     This case is straightforward: Defendants[2] engaged in securities fraud by repeatedly telling investors throughout the Class Period that the Company's largest and most ambitious construction project—the construction of an ammonia plant and related facilities in El Dorado, Arkansas—was "on time" and "on budget," when Defendants knew that the project was, in fact, materially behind schedule and drastically over budget. During the first seven months of the Class Period, between November 2014 and June 2015, Defendants consistently maintained that the project was expected to cost no more than $520 million and that the ammonia plant would be operational by the first quarter of 2016. In statement after statement, Defendants

---

[2] Defendants include LSB, Jack E. Golsen, Barry H. Golsen, Tony M. Shelby, Mark T. Behrman, and Harold L. Rieker Jr.

continually reassured investors that the project was "on time" (or "on schedule") and "on budget," as reflected in the following table:[3]

| DATE | SOURCE | STATEMENT |
|---|---|---|
| 11/7/14 | PR | • "[projects] remain **on budget and schedule**" |
| | IP | • "[e]xpansion projects **on-time and on-budget**" |
| | CF | • "[we are] not aware of anything that will prevent **on-time completion or cause cost overruns** [of El Dorado Expansion]" |
| | CF | • "El Dorado expansion projects to be completed **on time and on budget**" |
| 3/2/15 | PR | • "[El Dorado project] remains **on budget and on schedule**" |
| | IP | • "Expansion projects **on budget and on schedule**" |
| | CF | • "[the project] remains **on budget and on schedule**" |
| 4/17/15 | AR | • "El Dorado expansion project . . . is **on budget and on schedule**" |
| 5/8/15 | PR | • "[expansion projects] remain **on time and on budget**" |
| | IP | • "Expansion projects **on budget and on schedule**" |
| | CF | • "El Dorado expansion projects to be completed **on time and on budget**" |
| 6/2/15 | IP | • "Completion of El Dorado projects . . . . **on budget and on schedule**" |

PR = Press release,   IP = Investor Presentation,   CF = Conference call,   AR = Annual Report

3.      Then, between July 2015 and November 2015, Defendants shocked the market by revising their cost and completion estimates for the El Dorado expansion project *three* separate times in a span of less than four months, expanding the total planned capital expenditures by more than $335 million, an increase of 64% to 71% above the original stated range of estimated costs.  As the market learned the true costs of the project, the Company's stock price plummeted, declining almost 78% between July 14, 2015 and November 6, 2015.

4.      Following the end of the Class Period, one of the subcontractors that worked on the construction of the El Dorado ammonia plant revealed in a recently filed complaint that in the spring of 2015 it was directed by LSB and its general contractor to install defective piping and vessels in order to make the project appear substantially closer to completion than it actually was.  The purpose of this ruse was to fool private lenders into extending additional financing to

---

[3] The examples in this table are merely illustrative.  A more complete listing of Defendants' "on time" and "on budget" statements is provided at ¶131.

LSB to finish the project. While attempting to mislead those lenders about the status of the project, Defendants simultaneously misled the public with their repeated misrepresentations that the project was "on time" and "on budget." The facts revealed in the subcontractor's complaint confirm that the Defendants' continued reassurances to the market that the project was "on time" and "on budget" were knowingly, or severely recklessly, false and misleading.

5. LSB is a manufacturing, marketing, and engineering company whose principal business activities, through its subsidiaries, are the manufacture and sale of chemical products for agriculture, industrial, mining, quarry, and construction uses.

6. The Company's chemical business primarily sells nitrogen based fertilizers. Producing nitrogen based fertilizers requires the use of ammonia as a feedstock. According to the Company, purchasing ammonia to use as a feedstock is significantly more expensive than producing ammonia from natural gas on-site due to high ammonia prices and low natural gas prices. The Company's facilities that produce their own ammonia, therefore, have significantly higher margins than the facilities that are required to purchase ammonia from third parties.

7. In February 2013, the Company announced that it was planning to construct an ammonia plant at the Company's El Dorado, Arkansas facility at an estimated cost ranging from $250 million to $300 million. According to the Company, the ammonia plant, if constructed, would produce all of the facility's ammonia feedstock requirements, thereby replacing the ammonia currently being purchased at a cost disadvantage, as compared to ammonia produced from natural gas.

8. Instead of simply constructing a new plant at the El Dorado facility, in August 2013, LSB purchased an ammonia plant located in Donaldsonville, Louisiana that had been built in 1969 and was shuttered in 2004.[4] Even though the plant had been idle for almost a decade and exposed to the elements, LSB hired contractors to disassemble the plant and relocate its component parts, including the piping and vessels, to its facility in El Dorado, Arkansas.

---

[4] After the sale and removal of the Donaldsonville ammonia plant, the prior owners of the plant built a completely new ammonia plant in the same facility.

9.      According to Defendants, as part of the purchase of the long-shuttered plant, the Company acquired the original engineering documentation used to construct the facility in 1969 and then scanned 65 bankers boxes worth of documents into PDFs.  The Company touted that using these PDFs as the "process engineering and mechanical engineering" for the construction of the ammonia plant would lead to a "significant savings in the cost of engineering."[5] Additionally, the Company touted that it was saving substantial costs by reusing the large bore piping from the Donaldsonville facility.

10.      By the beginning of the Class Period, construction was well underway.   On November 7, 2014, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275–$300 million and the total planned capital expenditure for the El Dorado expansion project, which also included the construction of a Nitric Acid plant and other infrastructure improvements, was $485–$520 million.   Additionally, the Company represented that the scheduled completion date for the ammonia plant was the fourth quarter of 2015 and the scheduled start-up date of the plant was the first quarter of 2016.

11.      These statements were false and misleading, however, because the project was neither on time nor on budget.   In fact, Defendants had already been informed that the construction project was 10%–20% over budget and behind schedule.  Additionally, Defendants' estimates simply ignored that the construction of the ammonia plant was an unmitigated disaster from the beginning.

12.      According to confidential witnesses, the plant was disassembled in a manner that made reassembly almost impossible; it was clear that much of the piping and vessels were not reusable; and the Company's use of the Donaldsonville engineering documents was a poor

---

[5] In fact, LSB required that the contractor overseeing the construction of the El Dorado ammonia plant rely exclusively on these 45-plus-year old plans for the process and mechanical engineering of the ammonia plant and utilize the original piping isometric drawings from the construction of the Donaldsonville facility.

substitute for actually conducting the required degree of engineering necessary to construct the plant and properly calculate the cost of building the ammonia facility.[6]

13.     By the spring of 2015, the costs of the El Dorado expansion project had spiraled further out of control.  During that time period, LSB was in the process of attempting to secure additional third-party financing to pay for three separate pieces of equipment necessary to complete the El Dorado expansion project (a natural gas pipeline, a cogeneration facility, and an ammonia storage tank), which, at the time, LSB represented would require approximately $50 million in additional financing.  In order to persuade lenders to provide this financing on commercially reasonable terms, LSB needed to convince those lenders that the construction of the ammonia plant was near completion and proceeding on schedule and on budget.  In reality, however, the project was nowhere near completion and was well behind schedule and over budget due to problems related to reusing pipes and vessels from the Donaldsonville plant.

14.     In order to mislead its prospective lenders, whose representatives visited the El Dorado facility in order to physically inspect and assess the progress of the expansion project, LSB, in concert with the general contractor, orchestrated and engaged in a fraudulent scheme to make it appear that the construction of the El Dorado ammonia plant was significantly more advanced than in fact it actually was (*i.e.*, to hide that the project was neither on time nor on budget).  As detailed in a recently-filed complaint by a subcontractor hired to construct the El Dorado ammonia plant, LSB and its general contractor directed the subcontractor to install pipes and vessels from the Donaldsonville plant that LSB and the general contractor knew had not been cleared for installation by engineers and inspectors.[7]  According to the subcontractor, the sole purpose of installing the uncleared pipes and vessels was to make the project appear to be more advanced and nearer completion than it actually was in order to facilitate LSB's efforts to

---

[6] All of these facts were later admitted by LSB's current Chief Executive Officer.

[7] That complaint is the First Amended Complaint in the action styled *Global Industrial, Inc. d/b/a Global Turnaround v. Leidos Constructors, LLC, et al.*, Case No. 70-CV-2016 (Circuit Court, Union County, Arkansas filed July 19, 2016) (the "Global Complaint"), which is attached hereto as Exhibit ("Ex.") 1.

obtain the financing necessary to complete the project.  Later, those uncleared pipes and vessels had to be removed, repaired or replaced, and reinstalled, which caused the costs of completing the project (which was already extremely over budget) to balloon even further.

15.    In April of 2015, LSB was able to convince one of the private lenders with whom it was negotiating to provide $16 million for one of the three pieces of equipment it had said it needed financing for, the natural gas pipeline.  However, notwithstanding LSB's representations in March and May of 2015 that it was in "final discussions" for the financing of the cogeneration facility and ammonia storage tank, LSB did not in fact raise the capital for those pieces of equipment until November 2015, when LSB issued new debt and a dilutive equity issuance on terms that were devastating to existing shareholders.

16.    Consistent with its misrepresentations to prospective lenders in the spring of 2015, LSB made similar misrepresentations to the investing public in April, May and June of 2015, continuing to assure the market that the El Dorado expansion project was "on time" and "on budget," even while LSB knew that the subcontractor constructing the ammonia plant had installed pipes and vessels that had not been cleared by engineers and inspectors.

17.    On July 14, 2015, LSB raised the cost estimate of the expansion project from $495–$520 million to $560–$575 million.  According to LSB, these revised cost estimates were a result of updated estimates from its general contractor.  LSB stated that while it was disappointed that the total costs of the project would exceed its initial cost estimates, the timeline for completion of the project remained intact, the Company did not expect to require additional financing beyond the previously announced financings, and, notwithstanding the adjustment in costs, the project's economics remained compelling.

18.    On this news, shares of LSB declined $1.55 per share, almost 4%, to close on July 15, 2015, at $39.07 per share, on heavy volume.

19.    Less than one month later, on August 7, 2015, the Company shocked the market by further raising the cost estimate for the expansion project to $660–$680 million.  According to the Company's then Chief Executive Officer ("CEO"), these revisions were based on a detailed

physical evaluation of the construction project, scrutinizing all work done and reviewing all work left to complete the project.   The Company also announced that production at the ammonia plant would be pushed back a quarter, to start in the second quarter of 2016.

20.     On this news, shares of LSB declined $12.09 per share, 34.44%, to close at $23.01 per share on August 7,  2015, on unusually heavy volume.

21.     Soon thereafter, the Company's CEO and the management team in charge of overseeing the construction project "resigned" from their positions.   According to the newly appointed CEO, the Company's Board of Directors was not comfortable with the amount of detail that went into the Company's August estimate.   This resulted in the changes to the senior management and the immediate launch of detailed cost estimate work, which he said began in September 2015.

22.     On November 6, 2015, the Company finally disclosed that the planned capital expenditure for the ammonia plant component (of the El Dorado expansion project) was now $475–$489 million and the total planned capital expenditure for the entire El Dorado expansion project was now $831–$855 million, which was at least $170 million more than was represented on August 7, 2015.   Additionally, the Company disclosed that the ammonia plant's construction was only 80% complete, the plant would not be completed until 2016, and substantial, additional financing was needed to complete construction. In particular, LSB announced that it had agreed to issue $50 million in new debt in the form of senior secured notes with a 12% annual interest rate and $210 million in preferred stock with a 14% annual dividend rate.

23.     That same day, the acting CEO confirmed that the Company's prior cost estimates were at all times unrealistic since they were formed without the Company conducting the requisite amount of engineering necessary to confirm their accuracy.   As the CEO stated, the Company's prior estimates were "not an engineered estimate . . . [and] the detailed engineering work was not there."   Additionally, the Company's CEO confirmed that the dismantling and relocation of large bore piping from the Donaldsonville facility had been completed in a manner that was not helpful for reassembly at the El Dorado facility.

24.     On this news, shares of LSB declined $7.04 per share, more than 44%, to close at $9.08 per share on November 6,  2015, on unusually heavy volume.

25.     Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's stock.  Plaintiff and other Class members have suffered significant losses and damages at the hands of defendants and are entitled to redress.

## II.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

28.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

29.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

30.     Lead Plaintiff Dennis Wilson, as set forth in the certification attached hereto as Ex. 8 and incorporated by reference herein, suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

31.     Defendant LSB is a Delaware corporation with its principal executive offices located at 16 South Pennsylvania Avenue, Oklahoma City, Oklahoma 73107.  During the Class

Period, LSB, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

32.     Defendant Jack E. Golsen ("Jack Golsen") was, at all relevant times, Chairman of the Board of Directors and CEO of LSB from its inception until December 31, 2014. Additionally, Defendant Jack Golsen, who founded LSB, served as President of the Company from its inception until 2004.  Defendant Jack Golsen became Executive Chairman of the Board on January 1, 2015.

33.     Defendant Barry H. Golsen ("Barry Golsen") was, at all relevant times, the Company's President and Chief Executive Officer from January 1, 2015 until September 1, 2015.  Defendant Barry Golsen was also President and Chief Operating Officer of LSB from 2004 until January 1, 2015.  Additionally, Defendant Barry Golsen has been Vice-Chairman of the Board of LSB since 1993.

34.     Defendant Tony M. Shelby ("Shelby") was, at all relevant times, Executive Vice President - Finance and Chief Financial Officer ("CFO") of the Company until on or about June 25, 2015.

35.     Defendant Mark T. Behrman ("Behrman") was, at all relevant times, Chief Financial Officer of the Company since on or about June 25, 2015.  Prior to June 25, 2015, Defendant Behrman had served as the Company's Senior Vice President-Corporate Development since March 3, 2014.

36.     Defendant Harold L. Rieker, Jr. ("Rieker") was, at all relevant times, Vice President, Principal Accounting Officer, and Corporate Controller of the Company.

37.     Hereinafter, Defendants Jack Golsen, Barry Golsen, Shelby, Behrman, and Rieker will be collectively referred to as the "Individual Defendants."  Defendant LSB and the Individual Defendants will be collectively referred to as "Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of LSB's reports to the SEC, press releases, and presentations to securities

analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   Each

defendant was provided with copies of the Company's reports and press releases alleged herein

to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.   Because of their positions and access to

material non-public information available to them, each of these defendants knew that the

adverse facts specified herein had not been disclosed to, and were being concealed from, the

public and that the positive representations which were being made were then materially false

and/or misleading.   The Individual Defendants are liable for the false statements, pleaded herein,

as those statements were each "group-published" information, the result of the collective actions

of the Individual Defendants.

## IV.    STATEMENT OF FACTS

### A.    Background

#### 1.    The Use Of Ammonia As A Feedstock To Produce Nitrogen-Based Compounds

38.    Nitrogen is the single most important input a farmer can control to increase crop

yields on non-irrigated fields. Therefore, nitrogen fertilizer is one of the key drivers producing

high yields in modern agriculture, and its use has grown substantially over the past 40 years.

Nitrogen fertilizers are made from ammonia ($NH_3$), which is a compound of nitrogen and

hydrogen that  contains one nitrogen atom and three hydrogen atoms.  Due to the widespread use

of nitrogen fertilizers in industrial farming, ammonia is one of the most commonly produced

industrial chemicals in the United States.

39.    In the environment, ammonia is part of the nitrogen cycle and is produced in soil

from bacterial processes. Ammonia is also produced naturally from decomposition of organic

matter, including plants, animals, and animal wastes.  Most ammonia, however, is industrially

produced through a process known as the Haber-Bosch process, which uses a metal catalyst

under high temperatures and pressures to convert atmospheric nitrogen ($N_2$) to ammonia ($NH_3$)

through a reaction with hydrogen ($H_2$).  The major source of hydrogen in this process is methane

from natural gas. The conversion is conducted with air, which is deoxygenated by the combustion of natural gas. Essentially, natural gas is used as a feedstock to produce ammonia.

40.     Ammonia or anhydrous ammonia[8] is directly or indirectly the precursor to most industrial nitrogen-containing compounds. Virtually all synthetic nitrogen compounds used are derived from ammonia. These include ammonia nitrate, urea, and nitric acid.

### 2.     LSB's Corporate Formation And Structure

41.     LSB was formed in 1968 and went public in 1969.  Currently, LSB is a manufacturing, marketing, and engineering company. LSB's principal business activities, through its subsidiaries, are the manufacture and sale of chemical products for agriculture, industrial, mining, quarry, and construction uses.

42.     LSB's primary business operations are centered in its Chemical Business unit.[9] LSB's Chemical Business produces agrochemical products, such as nitrogen based fertilizers (ammonium nitrate, urea ammonium nitrate, and anhydrous ammonia), industrial acids,[10] such as nitric acid, and mining products,[11] such as industrial grade, solid ammonium nitrate.  LSB's Agrochemical Business produces nitrogen-based fertilizers, including urea ammonium nitrate ("UAN"), agricultural grade high-density ammonium nitrate ("AN"), and anhydrous ammonia ($NH_3$).

---

[8] Anhydrous ammonia means ammonia without water and is the gaseous form of ammonia.

[9] Historically, LSB's other reportable business segment has been its Climate Control Business. LSB completed the sale of its Climate Control Group to a third party on July 1, 2016 for $364 million.  LSB also has an Engineered Products Business, which markets a proprietary line of precision metal-working machine tools and industrial performance solutions to customers worldwide, but that business unit is not reported as a separately reportable segment in LSB's financial statements.  Following the sale of its Climate Control Group, LSB now operates in only one reportable segment, its Chemical Business.

[10] LSB's Industrial Chemical Business primarily produces and markets concentrated nitric acid.

[11] The Company's mining product business manufactures industrial grade, solid ammonium nitrate ("AN"), which is a compound used as an explosive in mining, and AN solutions for the mining, construction, and quarry industries.

43.     According to the Company, UAN is a high nitrogen content fertilizer used to grow corn, wheat, and other crops with a high nitrogen demand that require longer nitrogen release, such as cotton, small grains, vegetables, and orchards; while AN is a pelletized solid fertilizer used for grains, forage, and many specialty crops, such as citrus and vegetables. Additionally, AN is the primary nitrogen component in nitrogen, phosphorus, and potassium ("NPK") blend fertilizer.  Anhydrous ammonia is a high nitrogen content fertilizer from which all other agricultural nitrogen products are derived. Anhydrous ammonia is primarily used as a fertilizer for wheat and corn production.

### 3.     LSB's Chemical Facilities

44.     LSB's Chemical Business operates three multi-plant, multi-product production complexes and a separate dedicated nitric acid production facility.  These facilities include the Company's facilities located in Cherokee, Alabama; Pryor, Oklahoma; Baytown, Texas; and El Dorado, Arkansas.

45.     Cherokee Nitrogen L.L.C. operates a 160-acre multi-product facility on a 1,300-acre site located on the bank of the Tennessee River in Cherokee, Alabama ("Cherokee" or the "Cherokee Facility").   According to the Company, Cherokee produces a wide variety of industrial and agrochemical products, including anhydrous ammonia, nitric acid, ammonium nitrate, urea, and urea ammonium nitrate.  Cherokee uses natural gas as its primary feedstock, delivered via pipeline, to produce ammonia, urea, and urea ammonium nitrate ("UAN"), a high nitrogen content fertilizer.  Its products are shipped by truck, rail, pipeline, and barge.

46.     El Dorado Nitrogen, L.P. ("EDN") operates a nitric acid plant located within the Covestro complex in Baytown, Texas ("Baytown" or the "Baytown Facility").  This facility uses anhydrous ammonia feedstock, delivered via pipeline, to produce 65% nitric acid that is used by the polyurethane, nylon fiber, and plastics industries.  Its product is transported to market via pipeline or truck.

47.     Pryor Chemical Company operates a 47-acre multi-product facility on a 104-acre site in Pryor, Oklahoma ("Pryor" or the "Pryor Facility"). Pryor produces anhydrous ammonia,

urea, nitric acid, UAN, and carbon dioxide.  Pryor uses natural gas feedstock, delivered via pipeline, and its products are transported to market via truck or rail.

48.     El Dorado Chemical Company ("EDC") operates a 150-acre multi-product facility located on a 1,400-acre site in El Dorado, Arkansas ("El Dorado" or the "El Dorado Facility"). El Dorado produces a variety of agrochemical and industrial products, including regular nitric acid, concentrated nitric acid, mixed (nitrating) acids, sulfuric acid, and both agricultural and industrial grade ammonium nitrate.  According to the Company, El Dorado used ammonia as its primary feedstock, delivered by pipeline, and its products are transported to market via truck or rail.

### 4.     The Company Announces The Construction Of A New Nitric Acid Plant At The El Dorado Facility To Replace A Plant That Had Exploded

49.     In May 2012, the El Dorado Facility suffered significant damage to its DSN concentrated nitric acid plant and surrounding equipment when a reactor at the plant exploded.

50.     By early 2013, the Company had already repaired the damage to the surrounding plants, and ordered a new 65% nitric acid plant and a separate concentrator to make 98% acid that it was planning on installing at the facility.

51.     According to the Company, as of December 31, 2013, LSB expected that construction of the new nitric acid plant and concentrator would cost between $113 million and $123 and would be completed in 2015.

### B.     The El Dorado Expansion Project

### 1.     The Company Announces That It Would Construct An Ammonia Plant At The El Dorado Facility To Increase Profitability And Margins At The Facility

52.     While the Cherokee and Pryor Facilities use natural gas as a feedstock to make anhydrous ammonia, the Baytown Facility uses and, until recently, the El Dorado Facility used anhydrous ammonia as a feedstock.  According to the Company, purchasing ammonia to use as a feedstock is significantly more expensive than producing ammonia from natural gas on site due

to high ammonia prices and low natural gas prices.  In fact, since LSB's Cherokee and Pryor Facilities produce their own ammonia, these facilities historically have had significantly higher margins than the El Dorado Facility.

53.    In February 2013, the Company announced that it was planning to construct an ammonia plant at the El Dorado Facility at an estimated cost ranging from $250 million to $300 million that would require an estimated 24–36 months to complete.  According to the Company, the ammonia plant, when constructed, would produce all of this facility's ammonia feedstock requirements, replacing the ammonia being purchased at a cost disadvantage, compared to ammonia produced from natural gas.  As the Company explained:

> Our El Dorado Facility produces nitric acids in various concentrations and agricultural and industrial grade AN from purchased ammonia, which is currently at a cost disadvantage compared to products directly produced from natural gas. We believe this cost disadvantage will continue to be significant for the medium and long-term. Therefore we are planning the addition of an anhydrous ammonia production plant at the El Dorado Facility, which if constructed is estimated to cost in the range of $250 million-$300 million and would require an estimated 24-36 months to complete. The final decision to construct the ammonia plant is subject to approval of our Board of Directors, and a number of business considerations including, but not limited to, obtaining the required permits and adequate financing. An independent engineering firm has been engaged to assist in the preliminary engineering and cost evaluation leading to our final decision.

### 2.    The Company Issues Senior Secured Notes To Fund The El Dorado Facility Expansion

54.    On August 7, 2013, LSB sold a $425 million aggregate principal amount of the 7.75% Senior Secured Notes due 2019 (the "Senior Secured Notes") in a private placement. According to the Company, $67.2 million of the proceeds for the sale of notes were used to pay all outstanding borrowings, including the prepayment penalty, under a term loan agreement, and the remaining funds were to be used primarily in connection with the construction of the new ammonia plant and the 65% nitric acid plant and concentrator at the El Dorado Facility.

55.    On August 9, 2013, Defendant Jack Golsen further explained that:

> Two days ago on Wednesday, August 7, we completed a $425 million bond issue and received the funds. Now with this money, we are in the progress of

engineering an anhydrous ammonia plant that will allow us to almost double our total ammonia production capacity. We are well on our way to constructing this plant with the engineering and the purchase of some of the major long-term lead items required for the plant.

> **3.** **Instead Of Building A New Ammonia Plant At The El Dorado Facility, LSB Purchases A Long-Shuttered Facility In Another State, Disassembles It, Moves It To The El Dorado Facility, And Then Hires Leidos To Attempt To Put It Back Together Using Outdated Schematics And Substantially Worn Piping**

56.     In 1969, a British hydrocarbon contractor named M.W. Kellogg Ltd. built an ammonia production plant in Donaldsonville, Louisiana, which was part of a larger nitrogen facility located on 1,400 acres to be operated by Mississippi Chemical Corp and Triad Chemicals, Inc. as part of a joint-venture.  In the spring of 2003, it was announced that the ammonia plant, which was named "Triad #1," would be shuttered in April 2004 due to decreased profitability and an inability to secure a stable customer base.  After failing to find a buyer for the ammonia plant, it was left idle.

57.     In late 2012, CF Industries, the owner of the Donaldsonville facility, announced that it had hired ThyssenKrupp and an engineering and procurement contractor to construct a new $2.1 billion ammonia, urea and UAN plant at the Donaldsonville facility.

58.     In 2013, CF Industries sold Triad #1 to LSB.

59.     Thereafter, on August 12, 2013, LSB entered into an Engineering, Procurement, and Construction Agreement ("EPC") with SAIC Constructors, LLC, which was subsequently renamed Leidos Constructors, LLC (together, "Leidos")  to oversee the construction of the El Dorado ammonia plant.  In the EPC, LSB stated that it had already purchased the Triad #1 ammonia plant, disassembled the plant, and relocated its component parts, including the piping and vessels, to its facility in El Dorado at the time the contract was entered.

60.     When LSB purchased the Triad #1 ammonia plant,[12] it also acquired bankers boxes full of the original engineering documentation used to construct the facility in 1969. According to the EPC, LSB scanned these documents into electronic files (PDFs) and these records became part of the permanent record for this process unit.  As the EPC, in relevant part, states:

> Said plant was located in Donaldsonville, LA and will be identified herein as Unit No. 531-NH3 ("531-NH3"). Said plant has been dismantled and shipped by Owner, and will be reassembled at Owner's Site at 4500 N. West Ave, El Dorado, AR by EPC Contractor. 531-NH3 will be reassembled in the same physical arrangement as it was in its original location, unless otherwise specified herein. Process equipment will be set up on the same centerlines and elevations to allow the maximum reuse of piping and interconnections, as inspected by others as set forth herein.

> The original plant, owned by Triad, was designed and constructed in 1969 by M. W. Kellogg (MWK). The Owner purchased 531-NH3 and relocated it to its facility in El Dorado, AR. ***The purchase of the 531-NH3 included the engineering documentation and maintenance records. These documents (65 banker boxes) have been scanned to electronic files (PDF's). These records will become part of the permanent record for this process unit.***

(Emphasis added.)

61.     The EPC provided that Leidos would be paid a fixed fee for two specific components of the services it would provide, and the rest of the work would be performed on an "pass-through basis" that would allow Leidos to charge for its actual costs plus a mark-up of 4.5%.  In particular, the EPC provided that Leidos would be paid a fixed lump sum amount of $16,649,631, which consisted of an Engineering fee of $10,255,869 and a General Conditions cost of $6,393,762.[13]

---

[12] The EPC refers to the Triad #1 facility as "Unit No. 531-NH3."

[13] According to the EPC, "General Conditions" was a "category of costs often referred to as indirect costs that include budgets for various costs required to support project execution."  In particular, "General Conditions" included items such as "staffing cost, both field and home office staff, such as field supervision, inspection, management, safety, home office support, procurement and project controls" and "living and travel expenses for field staff and Project-

62.     The EPC defined "Engineering" to include "all design work, vendor interface and field support required to execute the Project, excluding design work on Owner-Furnished Equipment."   In turn, "Owner-Furnished Equipment" was defined to include "major items of equipment moved from Donalsonville, LA" by LSB.   Accordingly, the Engineering fee only compensated Leidos for engineering work for items such as foundations, facilities and infrastructure other than the ammonia plant, and other collateral items.

63.     With respect to the construction of the ammonia plant itself, the EPC required Leidos to rely exclusively on the 45-plus-year old plans for Triad #1.   In fact, the EPC specifically articulated that Leidos was not responsible for any process engineering in the rebuild of the plant:

> Owner has provided EPC Contractor [Leidos] with historical documentation from the Triad Donaldson plant (MWK Basis).[14] EPC Contractor has no responsibility for the MWK Basis, and shall rely on such historical documentation and documentation produced by EPC Contractor in the course of the Project, to assist Owner in the development of Owner's Process Safety Management (PSM) files.
>
> EPC Contractor shall create new engineering documents for foundations, structural steel, electrical and instrumentation and will follow EPC Contractor standard specifications, formats, pipe line numbers and other similar protocols with the incorporation of applicable Owner review comments. ***EPC Contractor shall not be responsible for the 531-NH3 process or process design, and will rely upon and reuse the process engineering and mechanical engineering from the MWK Basis.*** By way of example, ***EPC Contractor shall utilize the existing piping isometric drawings from the MWK Basis. These will be published in Adobe Acrobat PDF format. The reuse of the existing documents is a significant savings in the cost of engineering. This savings has been taken into account in the proposed engineering budgets.***

(Emphasis added.)

64.     Additionally, per the EPC, LSB envisioned that large bore piping from the Triad

---

related travel, temporary facilities such as trailers, portable toilets, communications, printing, mailing and distribution, safety equipment and supplies, protective equipment, etc."   In other words, the "General Conditions" costs compensated Leidos for the overall costs of managing the project, rather than the costs of actual construction of the ammonia plant and other facilities.

[14] "MWK Basis" refers to the historical engineering documentation created at the time of the original construction of the Triad #1 facility.

#1 facility would be reused in recreating the plant at the El Dorado Facility.  Under the EPC, LSB would inspect these large pipes to determine if they could be reused:

> Piping of 3" diameter and greater is part of the relocation plan and will be inspected by others within the control of Owner prior to reuse, or replaced by EPC Contractor if it does not pass inspection. Piping that is less than 3" diameter will be purchased new by EPC Contractor.

65.     Under the EPC, Leidos was required to complete the construction of the facility no later than July 31, 2015.

66.      Because the fixed fee component of Leidos's compensation was approximately $17 million and the overall initial budget for the expansion project was approximately $430–$500 million, with the ammonia plant component alone expected to cost $250–$300 million, it was clearly contemplated that the vast majority of the costs associated with the project were not fixed.   Accordingly, the EPC contained a number of provisions to ensure that LSB was continuously apprised of the ongoing costs and status of the project.

67.     First, the EPC provided that all pass-through work be performed "on an open-book basis that allows Owner or its agent to examine actual costs and expenses of EPC Contractor in connection with the Project."   Per the EPC, LSB was required to have a construction manager on-site.  Additionally, per the EPC, Leidos would hold weekly telephonic meetings with LSB, as well as provide detailed monthly reports.[15]   As the EPC, in relevant part, states:

> EPC Contractor shall monitor Project progress on a continuous and ongoing basis. EPC Contractor shall conduct weekly telephone meetings with Owner to discuss Project status and any Owner concerns. EPC Contractor will issue monthly progress reports for the duration of the Project which will generally follow the

---

[15] In addition, the EPC requires Leidos, upon a request from LSB or on its own request for extra work or any changes in the work, to furnish to LSB a written statement within five days "setting forth in detail the proposal of EPC Contractor for performing the extra work or changes . . . and the effect of the extra work or changes . . . if any, on the contract price and Completion Date." The EPC also requires Leidos to incorporate the obligations of the EPC into its subcontracts and that change orders by subcontractors be submitted in sufficient time to allow Leidos to timely provide that information to LSB in accordance with the EPC.

format below:

> Executive Summary
> Safety Summary
> Engineering accomplishments, upcoming activities and issues
> Procurement accomplishments, upcoming activities and issues
> Construction accomplishments, upcoming activities and issues
> Graphical EPC Progress Curve(s)
> EPC Schedule updates
> Identification of scope changes and change orders
> Cost report and forecast

68.     As a result of these weekly meetings, certain of the Individual Defendants were informed that the ammonia plant construction project was substantially over budget. Additionally, these same Defendants were kept apprised of the substantial issues facing the project caused by the attempted reuse of the pipes and schematics from Donaldsonville facility.

69.     As discussed below, former LSB employees and former employees of a subcontractor working on the ammonia plant confirm that these weekly meetings did, in fact, take place and that Defendants were aware of issues relating to the ballooning costs of the El Dorado ammonia plant.

### 4.     Defendants Are Informed That Construction On The Ammonia Facility Is Significantly Over Budget

#### a)     The Individual Defendants Received Weekly Reports And Participated In Weekly Meetings Regarding The Capital Expenditures For The El Dorado Expansion Project

70.     Confidential Witness #1 ("CW #1") was employed as a Senior Accountant at LSB from May 2013 to October 2014.  During this time, CW #1 reported to Mike Adams, the Corporate Controller of LSB.  In this position, CW #1 was responsible for tracking the Company's capital expenditures, budgets, and funds for all of LSB's capital projects, including those at the El Dorado Facility.  Additionally, part of CW #1's job was to ensure that all of the Company's invoices had been charged to the correct accounts.

71.     According to CW #1, LSB held a weekly management meeting to review capital expenditures at the Company.  CW #1, who attended this meeting each week during CW #1's

employment, states the following people regularly attended the meeting either in person or telephonically: Defendant Jack Golsen; Defendant Barry Golsen; Mike Adams; Dallas Robinson, an LSB engineer who was purportedly overseeing the El Dorado expansion project for LSB; Larry Fitzwater, an LSB engineer based in St. Louis who participated in the weekly meetings telephonically; and two representatives of Leidos.  Additionally, Defendant Tony Shelby attended the meeting periodically.

72.    As part of CW #1's position, CW #1 created a weekly report that included all of the expenditures for the Company's capital assets, including the expenditures for the El Dorado expansion project, the largest of LSB's capital projects among the 60 projects that CW #1 tracked.  This report was emailed to all the members of management attending the weekly meeting, which occurred in the Company's headquarters in Oklahoma City, Oklahoma. Additionally, CW #1 created a summary report that detailed the Company's capital outlays in an Excel spreadsheet.  This summary report was also emailed to the management team listed above.

73.    At the meeting, these individuals reviewed the two reports CW #1 had circulated by email, which were also provided to the management team at the weekly meeting in a hard copy form. These two reports broke down the Company's capital funding, or capital expenditures, by project.  The reports that were emailed to management also contained a description of how the expenditures on each project compared to their budgets and the percentage of completion of each project to date.  Additionally, these two reports included estimates and figures for both the entire expansion project as well as separate figures for the three components of the El Dorado Facility: the ammonia plant, the nitric acid plant, and the supporting infrastructure that was part of the overall project.[16]

---

[16] The Company's estimates for the expansion at the El Dorado Facility are described in this same manner in its quarterly presentations.

        **b)**      **Prior To The Class Period, Defendants Are Informed That The El Dorado Expansion Project Is Significantly Over Budget**

74.     According to CW #1, the budget for the full expansion at the El Dorado Facility, including the ammonia plant, the nitric plant, and the supporting infrastructure (which is also referred to as outside battery limits work or the "OSBL"), was approximately $500 million at the time CW #1 was first employed in May 2013.[17]

75.     According to CW #1, it became evident from the reports CW #1 created and the weekly meetings that the cost of the El Dorado expansion was steadily increasing and that the project was behind schedule.[18]  In fact, CW #1 stated that in the spring of 2014, Defendants Jack and Barry Golsen began expressing frustration with the progress of the project in the weekly meetings and Defendant Shelby expressed his frustrations to CW #1 due to the project being over budget.

76.     CW #1 stated that by mid-2014, it was apparent from the reports and the weekly meetings that the expansion of the El Dorado Facility was over budget by 10–20%.  According to CW #1, by the time of CW #1's departure from the Company in October 2014, the budget for the expansion project had risen to $575–$585 million.

        **c)**      **Another Former Employee Of The Company Confirms That During The Class Period LSB Had Weekly Meetings Regarding The Project**

77.     Andy Fuller was a Corporate Project Manager for LSB at its corporate office in Oklahoma City, Oklahoma from April 2015 through May 2016.  Prior to Mr. Fuller's appointment to this position, he served as an ERP Project Team Member for LSB from June

---

[17] This figure is confirmed by LSB's presentations to the public prior to and at the start of the Class Period.  For example, the Company's 2013 fiscal year conference call presentation dated February 27, 2014, stated that the planned capital expenditures for the El Dorado project would be $428–$498 million while the ammonia plant itself would cost $250–$300 million.  Similarly, the Company's 2014 fiscal first quarter conference call presentation, dated May 8, 2014, stated the planned capital expenditures for the El Dorado expansion project as $430–$500 million and the ammonia plant alone at $250-$300 million.

[18] CW #1 noted that there were some surprisingly high invoices from Leidos and that these invoices became a big part of the weekly meetings.

2012 to April 2015, and as a Controller at LSB's Baytown Facility from November 2001 until June 2012.

78.    According to Mr. Fuller,[19] during his employment as a Corporate Project Manager, LSB held weekly progress meetings concerning the El Dorado expansion project that included LSB's upper management, Leidos and major subcontractors working on the project.

> **5.    Prior To The Class Period, The Contractor In Charge Of Building The Ammonia Plant Informs LSB And Leidos That It Was Unwilling To Make A Fixed, Lump Sum Bid On The Project Due To The Flawed Disassembly Of The Triad #1 Facility And The Poor Condition And Quality Of The Pipes From That Facility**

79.    In the summer of 2014, Leidos requested that contractors, including Global Industrial Inc. ("Global"), submit bids on a "lump sum" basis for the construction of the ammonia plant.

80.    Under a lump sum contract, a single "lump sum" price for all of the work is agreed to before the construction begins.   While lump sum contracts are common for construction projects, they require contractors to be able to accurately price the project at the time of bidding.

81.    In order for Global to create a bid for the ammonia plant, Leidos provided Global with certain engineered drawings including those created when the Triad #1 plant was originally constructed in 1969.   Additionally, Global sent a crew to the El Dorado site in an attempt to make a reasonable estimate of the work and materials needed to complete the ammonia plant.

82.    Upon arrival on the El Dorado site, Global's crew found that the pipes and vessels that had been brought from Donaldsonville had not placed on site in an orderly manner.   In fact, most of the pieces did not have markings that indicated how the pieces should be reassembled. Of the pieces that did have markings, Leidos (among others) was actually removing these marks by sandblasting the pieces for future painting.

83.    After spending approximately two weeks at the El Dorado site inspecting the

---

[19] All statements attributed to Mr. Fuller are derived from his résumé.

pieces of the Triad #1 plant that had been transported to the facility, Global determined and informed Leidos that it would not submit a lump sum bid to build the ammonia plant. According to Global, this decision was based on the facts that (1) transported pieces from Donaldsonville were not placed at the El Dorado facility in an organized manner and lacked organizational markings for reassembly, (2) the engineering documents from 1969 would be of little use in the construction of the plant, and (3) many of the pipes and vessels from the Triad #1 plant were unusable due to their poor quality and condition. Since many of the transported materials were no longer usable, the corresponding engineering documents were also of limited use because the use of new materials necessitated the creation of new engineered drawings.

84.   Global informed Leidos that it would not submit a lump sum bid. Instead, Global offered to reconstruct the ammonia plant on a time and material basis only. Under this type of arrangement, Global would be paid for the hours and expenses actually expended in the construction of the plant.

85.    According to Global, LSB was pressuring Leidos to begin construction on the ammonia plant so that the plant would be finished by the time that Defendants had represented to the public. While still negotiating the terms of the agreement between Global and Leidos, Leidos directed Global through the issuance of a "Notice to Proceed" to immediately begin construction on the project on September 16, 2014, even though there was no written agreement in place between the parties.

86.   Based on the fact that Leidos instructed Global to proceed without a written agreement for a lump sum price, Plaintiff is informed and believes that Global was unable to obtain a lump sum bid from any subcontractor or that any lump sum bid it received so far exceeded the planned budget that Leidos was forced to request Global to begin work on a time and materials basis.

87.   While negotiating the contract for the construction of the ammonia plant, Leidos requested that Global sign Leidos' standard subcontract, which contained a lump sum price of $22.545 million for the construction of the plant. However, Global was unwilling to agree to this

amount since it was clear that it would cost significantly more.

88.     While Leidos required all subcontractors to sign its standard subcontract (which in this instance maintained a lump sum price of $22.545 million), as a compromise, Global agreed to sign the subcontract with Leidos (the "Subcontract") and simultaneously enter a side agreement, called the "Change Order," that clarified that the $22.545 million figure was not Global's estimate, that the cost of construction would exceed this figure and that Global was only willing to work on the ammonia plant on a time and materials basis.[20]   As the Change Order stated:

> Subcontractor [Global] will perform the Work on a time and materials basis. Subcontractor shall not perform this work for a lump sum amount, and the Subcontract Price of $22,545,504 was an estimated cost for the Work as initially bid (the "Budgeted Amount").   However, the scope of the Work has changed since Subcontractor's initial bid, and the parties have agreed that Subcontractor shall be paid on a pure time and materials basis…. When Subcontractor has billed Contractor $15,781,852.70 (i.e., 70% of $22,545,504), Subcontractor and Contractor shall meet and agree on any adjustments to the Budgeted Amount.

89.     Defendants were either aware of the terms of the Ammonia Plant Subcontract and the Change Order or were severely reckless in not learning of those facts, because, as discussed in ¶67, the EPC required Leidos to promptly share any subcontractor change orders with LSB.

90.     In addition, the Ammonia Plant Subcontract contained express terms to ensure that Global promptly reported all costs and provided regular progress updates to Leidos so that Leidos, in turn, could promptly report such information to LSB.   In particular, Schedule C of the Ammonia Plant Subcontract provided the following Invoice Requirements:

> ***Subcontractor shall ensure that a draft invoice has been reviewed and accepted by Contractor on or before the 16th of each month.   The draft invoice shall represent mutually agreed projected progress through the end of said month. The final agreed invoice original documents shall be furnished to Contractor's home office accounting no later than the 23rd of said month, for inclusion with Contractors monthly billing to Owner***.   Should Subcontractor final invoice be

---

[20]  According to the Global Complaint, both the Ammonia Plant Subcontract and the Change Order were executed on or about December 18, 2014, but "[n]otwithstanding the actual date of execution," the Subcontract showed a "subcontract date" of October 17, 2014.

received after the 23rd of the month, then said invoice shall be included in the next monthly billing to Owner, and that progress payment shall be made the following month.   The cost of money or other related expenses incurred by Subcontractor due to Subcontractor delayed billing shall be borne by the Subcontractor.

(Emphasis added.)

91.     In addition, Schedule E of the Ammonia Plant Subcontract provided the following Reporting Requirements:

The Subcontractor shall promptly submit the reports and schedules as listed below:

-Daily Report for each day worked by 10 AM the following day,

-Quality Control Reports in accordance with the Quality Control Plan

-*Schedule (update monthly with invoice submitted)*

-Daily and Monthly Safety reports

-Three week look ahead report submitted weekly

-*Progress Matrix (submitted weekly)*

-Obtain a Safe Work/Hot Work/Excavation Permit before starting each work day or shift

-Any Subcontractor commercial operating permits as applicable

-Other reports as reasonably requested by Contractor

(Emphasis added.)

92.     These Invoice Requirements and Reporting Requirements ensured that Leidos and LSB were constantly apprised of the progress, status and costs of the construction of the ammonia plant.

93.     During Global's work on the ammonia plant, Leidos assigned it many additional tasks, such as refacing piping and vessel flanges and painting, that were not contemplated under the initial agreement.   Additionally, during construction, Leidos repeatedly issued engineering drawings that were either incomplete or revised after Global had already installed piping and vessels, requiring Global to perform work again that had already been completed.

94.     On approximately May 28, 2015, Global informed Leidos that it had billed $15.781 million on the project.   After Leidos requested a revised budget from Global, Global

provided a revised budget of $39,980,361.08 for the completion of the ammonia plant. In response to this budget, Leidos represented that it would increase the budget gradually in parts and agreed to a second change order that was the first part of the increase in budget, which increased the budget by $6 million from $22.545 million to $28.545 million. This second change order acknowledged that "at the time of bid there were 170 isometric (detailed) drawings to now near 1,000 detailed drawings available. Additionally [sic] increases are associated with working with experienced pipe and replacement items."

> **6.      Construction Costs And Progress Was Hindered By The Large Bore Pipes Brought From The Donaldsonville Facility Being Dismantled And Relocated In A Not Useful Manner, Many Of These Pipes Being Unusable, And The Attempted Use Of Almost 50-Year-Old Engineering Plans**

95.     Instead of conducting appropriate engineering to ensure the accuracy of its cost estimates, LSB's cost estimates for the ammonia plant at the El Dorado Facility were admittedly based on the reuse of the large bore pipes from the Triad #1 facility in Donaldsonville, Louisiana and the use of the existing engineering documents from the 1960s. For example, as discussed in Section IV.B.3, *supra*, LSB specifically stated that Leidos was not to engage in any process engineering and mechanical engineering and that it was contractually required to rely on the Triad #1 documents since reusing these documents would result in substantial cost-savings that were factored into the proposed engineering budget.

96.     As Global began working on the ammonia plant, its employees found thousands of pieces scattered throughout the facility without any real organization. In fact, it appeared that the transported pieces had simply been dumped into random piles.

97.      The common practice when plants are taken apart for reassembly in a different location is that each pipe is carefully marked during disassembly. For example, when a pipe is cut, each end is marked with a line, spool and cut/match number. The line number shows where in the plant the pipe was originally located, while the spool number designates how many separate pieces the pipe was cut into and the cut/match number shows how the pieces of cut pipe

fit back together.

98.    LSB and its contractors ignored this custom in dissembling the Triad #1 facility and the pipes that had been relocated to the El Dorado Facility lacked spool and match numbers. Instead, the pipes only had line numbers.  However, these line numbers did not correspond to any engineering drawings.  The lack of proper marks and failure to have the marks inputted into plant drawings added considerable time and expense to the project.

99.    Additionally, the pipes from Triad #1 plant were improperly cut during disassembly.  Large bore pipes should be cut along the welds to prevent the need for replacing old, potentially unsatisfactory welds.  The pipes from Triad #1 were not cut along the welds. Therefore, large sections of pipes contained old aging welds.  Global was often directed to cut out and replace old welds even though the pipe had yet been approved for installation.  It was not uncommon for the pipes with replaced welds to later be scrapped as unusable.

100.    Additionally, during construction, Leidos repeatedly issued engineering drawings that were either incomplete or revised after Global had already installed piping and vessels, requiring Global to perform work again that had already been completed.

101.    Confidential witnesses that worked on the ammonia plant at the El Dorado Facility confirm that the attempted reassembly of the Triad #1 plant was an unmitigated disaster and that it was clear during the Class Period that the assumptions used by LSB to forecast the cost of the ammonia plant—mainly, that the pipes, vessels, and the original engineering documents could be reused—were no longer accurate.

102.    Confidential Witness #2 ("CW #2") was employed by Global as a Quality Control Inspector at the El Dorado Facility.  CW #2, who reported to Global's Project Manager, Jack Davis, worked on the ammonia plant construction project from January 2015 through May 2015. CW #2's job responsibilities included the inspection of the welds and pipe thickness of the material from the Triad #1 plant to ensure that the pipes were acceptable for reuse.

103.    Upon arriving at the El Dorado facility, CW #2 saw hundreds, if not thousands, of 50-year-old pipes and vessels laid out at the El Dorado Facility.  As discussed above, the

common practice when assembling a facility of this size is to lay out the pipes and vessels in an appropriate grid on the ground so that workers can see how the pieces interact and work on the appropriate pieces in the right order.  Here, however, CW #2 stated that the old pipes and vessels were not laid out in any grid or order.[21]  This is confirmed by Confidential Witness #3 ("CW #3"),[22] who stated that the old pipes and vessels from Triad #1 were simply dumped in piles in a two-acre lot without being organized or labeled in anyway.

104.    Additionally, according to CW #2, putting together the old plant was even more of a puzzle because there were no pictures taken of the Triad #1 plant that the workers could use as a guide.  Essentially, the workers had to attempt to reconstruct an ammonia plant from assorted unlabeled pipes and vessels laid out in a field without being able to see how the final project was supposed to look.

105.    According to CW #2, much of the piping brought to the El Dorado Facility was unusable.[23]  Upon inspection much of the piping and vessels clearly had thin, pitted walls.  In fact, since some of the pits in the pipes were a quarter inch deep, the walls were too thin to be safe.  While CW #2 believed that it was a waste of time to attempt to reuse much of the old factory, since Leidos and El Dorado Chemical Co., LSB's subsidiary in charge of the facility, wanted to reuse these pipes and vessels, Global would cut the old pipes and then prepare them to be welded for reassembly, which was a time consuming process.  Each of these pipes would then have to go through an x-ray process and be re-inspected after welding to ensure they could be

---

[21] While CW #2 stated that whoever moved the plant appeared to attempt to create some kind of organizational numbering system for the pipes and vessels, the numbering was destroyed when the pieces were sandblasted for cleaning prior to use.

[22] CW #3 was employed by Global as a Project Coordinator at the El Dorado Facility.  CW #3, who reported to the Global's Project Manager, Jack Davis, worked on the ammonia plant construction project from May 2015 through October 2015.  CW #3's job responsibilities included coordinating the manpower, equipment needs, and work schedule for the expansion project.  According to CW #3, Global had about 100 people working on rebuilding the ammonia plant as part of El Dorado expansion project.

[23] CW #3 estimates that only about 40-50% of the pipes could be reused in the new plant.

reused.[24]

106.     According to CW #2, attempting to cut and reassemble the pipes using the old, yellowing blueprints from the plant in Louisiana with faded lines and handwriting made it extremely difficult to put the pieces back together again.[25]  In fact, CW #2 stated that when the crews attempted to put the pieces back together, they would often not match.  Additionally, CW #2 remembers seeing pressure vessels from the Triad #1 plant being hoisted on cranes, put into place at the El Dorado Facility, and then removed so that the crews could get proper dimensions for further construction.  Likewise, the concrete and steel contractors on site and the pipe/vessel welders, according to CW #3, were unable to coordinate properly due to the use of the old plans, which further slowed down the process.

107.     According to CW #2, employees from both Leidos and El Dorado Chemical Co. were present at the expansion site at all times and were well aware of the challenges and issues facing the project.[26]  Additionally, CW #3 attended twice weekly organizational meetings with supervisors from Leidos and foremen from El Dorado Chemical Co.  During these meetings, which were held in a conference room on site, CW #3 and other Global staff would discuss the progress in reassembling the plant and where they were in the schedule as compared to the forecast.  In these meetings, CW #3 reported the percentage of welds that had been completed to date, which was usually about 40% of the goal for each time period during CW #3's employment, and reiterated to them that they had a mess on their hands and that there was no way they could meet the deadline.

---

[24] CW #2 states that it was common for the pipes and vessels approved for reuse to later be trashed by Leidos's engineers.

[25] CW #3 confirms that there were issues with using the engineering documents from the 1960s. According to CW #3, it was difficult to match up the pipes laid out in the field with those on the blueprints.

[26] This is confirmed by CW #1, who stated that issues regarding the use of the pipes from Triad #1 were often discussed in the weekly meeting.  According to CW #1, each week the management team discussed the schedule of the major components of the expansion project, the overall progress of the project, and the fact that the expansion project was behind schedule.

**7.     The Costly And Intentional Installation Of Unusable Pipes And Vessels For The Purpose Of Raising Necessary Financing**

108.     The Global Complaint outlines Defendants' scheme to make the construction of the ammonia plant appear further along that it actually was so that LSB could acquire necessary funding for the continuation of the project.  The existence of this scheme is corroborated by not just the Global Complaint but by statements from LSB's former employee Mr. Fuller, as well as Defendants' own public statements issued during the Class Period.

**a)     Global Is Instructed To Use Unusable And Not Approved Piping And Vessels To Make The Ammonia Plant Appear Further Along**

109.     According to the Global Complaint, during the construction of the ammonia plant, Leidos would provide Global with line lists (diagrams) that had notations regarding whether certain pipes and vessels were ready to be installed or not: "green shading=good to install" whereas "peach shading-line list info is complete but there may be possible mark ups on the existing iso's [isometric drawings], meaning rework."

110.     Up until early 2015, Global only installed lines of existing pipe from the Triad #1 facility that had been cleared by Leidos and been marked green on the line lists.

111.     According to Global, however, in the spring of 2015, LSB directed Leidos to make it appear to potential investors and/or bankers, from whom LSB was attempting to acquire financing, that the ammonia plant was close to completion.  In order to make the ammonia plant appear more complete to the untrained eye than it actually was, LSB and Leidos directed Global to install pipe and vessels from the Triad #1 facility that had yet been cleared for installation by the appropriate inspectors and engineers.

112.     At first, Global refused to install pipes and vessels that had yet to be cleared for construction.  As the Global Complaint explains, Global was concerned that installing such non-approved pipes and vessels could lead to safety issues, as well as non-payment for its work in the

installation of questionable pipes and vessels and further non-payment for the time and expense that would be incurred later in removing bad pipes and vessels.

113.    After Jack Davis, Global's project superintendent informed Leidos's Senior Project Manager, Pat Noonan, of Global's concerns, Mr. Noonan screamed at Mr. Davis: "I don't care if we need to pull bad piping out of this project in 2 foot pieces – start hanging pipe. You'll be paid for this work."   In addition, just days later, Mr. Noonan emailed Mr. Davis, stating, in relevant part:

> Jack,
>
> Immediately start installing the existing piping.
>
> There should never been a holdup in waiting for a line to 'turn green.'
>
> You have been instructed multiple times to install the existing pipe.
>
> ***
>
> There is no punishment for rework or "work in the rack." …
>
> Schedule is of the essence. …
>
> New 4000 series has been "turned green" to coincide with the issuing of the isometric.

114.    According to Global, the sole purpose for the installation of the uncleared pipes and vessels was to make the project appear further along than it actually was to help ensure that LSB's financing efforts were successful.  In fact, after the ammonia plant was shown to various groups of investors and/or bankers during April and May 2015, Global was instructed to remove the condemned vessels and related piping.  The removed, condemned vessels were then sent off-site for repair.

### b)      Defendants' Public Disclosures Regarding The Acquisition Of Additional Financing Track Defendants' Scheme

115.    Global's accusations regarding LSB's scheme, which were made under oath in a verified complaint, are further supported by the Company's own disclosures regarding the timing

of and need for financing (particularly that it was seeking financing for a natural gas pipeline, cogeneration facility, and ammonia storage tank during this time period) and by the fact that LSB's own former employee confirms that by April 2015 the project was experiencing rapid cost escalations. In fact, the Company claimed that it was in "final discussions" for financing of the cogeneration facility and ammonia storage tank during this exact period.

116.   As discussed above, the Company raised $425 million through the sale of the Senior Secured Notes in 2013. Defendants represented that much of these funds would be used for the engineering and construction of the ammonia plant.

117.   On November 7, 2014, the Company announced that it was seeking approximately $50 million in additional financing for construction of the ammonia plant and related facilities and infrastructure:

> For the remainder of 2014 and 2015, we have extensive planned capital expenditures. Our primary cash needs for this period of time will be to fund these capital expenditures, as well as, our operations, our general obligations, and our interest payment requirements. We expect to fund these cash needs from the noncurrent restricted cash and investments (provided from the proceeds from the Senior Secured Notes), working capital, internally generated cash flows, and third-party financing. ***We are currently in discussion with certain lenders to finance three separately identifiable pieces of equipment that are included in the planned expansion project. Subject to the terms of our existing loan agreements, including the Senior Secured Notes, the total secured borrowings being considered and under discussion is approximately $50 million.***

(Emphasis added.)

118.   Then, on March 2, 2015, the Company further disclosed in its Annual Report that LSB was in discussion with lenders regarding the financing of the three distinct pieces of equipment at the El Dorado Facility. The Company reported that (i) it had already received a $16 million conditional commitment for financing on the natural gas pipeline, (ii) it was in "final discussions" regarding $21 million in financing related to the construction of a cogeneration

facility at the El Dorado Facility, (iii) that it was considering borrowing on a third piece of equipment (later identified as an ammonia storage tank), and (iv) that the total secured borrowings being considered and under discussion were approximately $50 million:

> For 2015, we have extensive planned capital expenditures. Our primary cash needs for this period of time will be to fund our planned capital spending program, as well as, our operations, our general obligations, and our interest payment requirements. Based upon our projections for 2015, we expect to fund these cash needs from the noncurrent restricted cash and investments (provided from the proceeds from the Senior Secured Notes), working capital, internally generated cash flows, and third-party financing. ***We are currently in discussion with certain lenders to finance three separately identifiable pieces of equipment that are included in the planned expansion project. We have received a conditional commitment for $16 million to finance a natural gas pipeline being constructed at our El Dorado Facility. Additionally, we are in final discussions regarding financing $21 million related to the construction of a cogeneration facility at our El Dorado Facility. We continue to consider additional borrowing for a third piece of equipment. Subject to the terms of our existing loan agreements, including the Senior Secured Notes, these total secured borrowings being considered and under discussion is approximately $50 million.*** We believe that neither the Senior Secured Notes nor the Amended Working Capital Revolver Loan will preclude us from entering into the additional borrowings.

(Emphasis added.)

119.   On March 2, 2015, during a conference call with analysts and investors, Defendant Shelby confirmed that the Company's "planned capital spending is being funded by our cash investments, as shown on the year-end balance sheet; internally generated cash flow and ***certain third-party financing for approximately $50 million***" (emphasis added).

120.   As explained by Mr. Fuller, in April 2015, LSB's El Dorado expansion project was experiencing rapid cost escalations.  In particular, Mr. Fuller stated that he was "[h]ired on in April 2015 by General Manager and CEO at the time when $500M capital expansion project was experiencing ***rapid cost escalations***" (emphasis added).[27]

---

[27] At this time, the El Dorado expansion project was the only project that LSB was involved in of such size.

121.    As explained in Section IV.B.7(a),  LSB compelled Global in April and May 2015 to install unapproved vessels and pipes in order to make the ammonia plant look to the untrained eye that it was further along than it actually was so that bankers and/or investors would presumably provide additional financing to LSB for the project on commercially reasonable terms.

122.    On May 8, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter.  The Company's Form 10-Q was signed by Defendants Shelby and Rieker, and reaffirmed the Company's cost estimates announced that day in its presentation.   In particular, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $285–$300 million and the total planned capital expenditure for the El Dorado expansion project was $495–$520 million.  In addition, the Company stated that the ammonia plant was "expected to be complete in late 2015 and operational in early 2016."

123.    In the same Form 10-Q, the Company also stated that it had completed the $16 million financing for the natural gas pipeline and was in "final discussions" with certain lenders for a $21 million financing for the cogeneration facility and a $20 million financing for the ammonia storage tank:

> For the remainder of 2015, we have extensive planned capital expenditures. Our primary cash needs for this period of time will be to fund our planned capital spending program, as well as our operations, our general obligations, and our interest payment requirements. Based upon our projections for 2015, we expect to fund these cash needs from working capital, the noncurrent restricted investments (provided from the proceeds from the Senior Secured Notes), internally generated cash flows, and third-party financing. ***In April 2015, we received approximately $16 million to finance a natural gas pipeline being constructed at our El Dorado Facility. We are currently in discussion with certain lenders to finance two other separately identifiable pieces of equipment that are included in the planned expansion project. We are in final discussions regarding financing $21 million related to the construction of a cogeneration facility and $20 million***

> *related to the construction of an ammonia storage tank at our El Dorado*
> *Facility*,…

(Emphasis added.)

124.    Additionally, on that same day, Defendant Shelby, on a conference call with investors and analysts, confirmed that "before the end of 2015, *we expect to finance certain discrete pieces of equipment including the El Dorado expansion project and including the natural gas pipeline, the co-gen facility and the ammonia storage tank for a combined total of approximately $55 million*. We received financing on the natural gas pipeline in April of approximately $16 million."  (Emphasis added.)

125.    Thereafter, as discussed herein, on July 14, 2015, the Company disclosed that its estimate for El Dorado project had increased to between $560 million and $575 million, up from the previous estimate of between $495 million and $520 million.  At that time, the Company stated: "[A]t this time LSB does not expect to require additional financing to complete the EDC expansion other than the previously announced financings related to the installation of the cogeneration facility and the ammonia storage tank."

126.    After disclosing that the project's estimate had increased, however, the Company was unable to close the additional financings for the cogeneration facility and ammonia storage tank.  Indeed, even though LSB was supposedly in "final discussions" for these financings in May 2015 (and supposedly was in "final discussions" with respect to the financing for the cogeneration facility in March 2015), on August 7, 2015, the Company again announced that it was "currently negotiating with third party lenders for the financing for certain discrete pieces of equipment in connection with the El Dorado Expansion projects."  As discussed below in Section VI, it was not until November 2015 that the Company was able to secure financing to

complete the El Dorado expansion project, and that financing was on terms that were shocking to the market and extremely painful for LSB's existing shareholders.

> ### 8. After The Board Of Directors Replaces Defendant Barry Golsen As The CEO, The New Interim CEO Admits That The Company Had Failed To Conduct The Detailed Engineering Needed To Properly Calculate The True Cost Of The Project

127.   On September 3, 2015, the Company announced that, effective immediately, Defendant Barry Golsen would no longer serve as LSB's President and CEO.  The Company announced that his replacement would be Daniel Greenwell,[28] who had only been with the Company as its Lead Independent Director since 2014.

128.   Mr. Greenwell, himself, stated during a November 6, 2015 conference call with analysts and investors, upon his appointment, that "[i]n early September 2015, we initiated extensive engineering and cost reviews of the El Dorado construction project and were assisted by outside professional firms."  This review quickly "identified further cost increases to the project in the range of $108 million to $111 million."  Furthermore, Mr. Greenwell stated that these revised project cost estimates, along with the potential contingency amount, would allow the Company to complete the project at or below $855 million.  Additionally, Mr. Greenwell explained that the reason for this disparity in the previously reported estimated costs and the actual costs was that:

> *In order to accelerate the construction of the El Dorado facility, the Company originally decided to bring experienced, large bore pipe, defined as pipe greater than 4 inches in diameter, from the Donaldsonville, Louisiana location to El Dorado. The dismantling and relocation was completed in a manner that was not helpful for reassembly in El Dorado.*
>
> \*\*\*
>
> *Further, the Company's approach to the El Dorado expansion was to perform significant engineering work just in advance of construction activities in order to fast track construction efforts. This meant the initial and subsequent cost*

---

[28] While Mr. Greenwell was initially appointed to be Interim CEO, he has subsequently been appointed the Company's permanent CEO.

> *estimates were not engineered estimates with a high degree of precision. We have painfully learned that fact.*
>
> *In early September 2015, we engaged Hatch Engineering to perform an independent, detailed cost estimate study on the ammonia piping work. Those estimates are reflected in the revised costs we have provided today and are consistent with amounts forecasted by the current piping contractors.*

(Emphasis added.)  Mr. Greenwell further explained that the decision to conduct a new cost estimate was the result of the Board of Directors becoming uncomfortable with the prior management of the project:

> What we've done since the two early cost estimates is in late August, mid to late August, we began as a Board to get uncomfortable with where we were on this project and, as I said, we made some management changes and then immediately initiated full detailed cost reviews and cost studies to get our arms around this thing. And we have.
>
> We've changed significant management, we've changed construction responsibility and reporting, we have a clear line of sight to it. We're down there frequently, every week, and we participate in all those management activities for that plant construction commissioning and startup.

129.    During this same conference call, Interim CEO Greenwell confirmed that the Company's prior cost estimates were unrealistic since they were formed without the Company conducting the requisite engineering necessary to confirm their accuracy.  For example, Mr. Greenwell characterized Defendants' failure to create a proper engineered estimate, in response to an analyst's question regarding how "hundreds of millions of dollars have gotten lost in the estimation," as follows:

> . . . Let me step back a minute and talk about when we originally put these project cost estimates together, *that was not an engineered estimate.* What I mean by that is the engineering work, you have a very, very high level of engineering work. *The detailed engineering work was not there.*
>
> *It was not a plus or minus 10% estimate. It was not. I think we probably didn't do as good a job as we should have or could have on that, and the cost should have been probably a plus or minus 50% estimate at that time with the level of engineering work that was done.*
>
> Now, let's take that piece and move to the next piece. *We decided to bring the large bore piping, we decided to bring the large bore piping up from*

*Donaldsonville. That was dismantled, as I said in my prepared remarks, in a manner that did not allow efficient reinstallation at the new facility.*

So what has occurred is a significant amount of additional labor, materials, scaffolding costs, manpower, candidly, to reassemble that pipe. That's something that we clearly did not anticipate in these cost estimates *early on*. We anticipated some of it in the August estimate, but the fact of the matter is, it's taken us significantly more time.

I think early on in the project there were a lot of weather delays, we talked about that earlier, and then, clearly, the contractor. *I mean, just that point on the engineering, of not having an engineered estimate, if you look at the components of our, in our materials, we talked about the ammonia plant*, the nitric acid plant and concentrator, and then what we call the OSBL or outside battery limits work, and you look at that nitric acid plant construction concentrator, that was a fully engineered, detailed project that was built, that was completed and pretty well on budget.

We did have good success with that project that was engineered up front at a detailed level. All that was taken care of and the installation and construction went very well. I think it points to the fact that when you have high-quality engineering, thorough and complete engineering, it sure as heck reduces your construction risk profile, and we've painfully learned that.

(Emphasis added.)

130.   Moreover, during this same conference call with investors and analysts, Mr. Greenwell, in response to questions from analysts, disclosed that when the Company announced its July and August 2015 cost estimate increases, the Company and its Board of Directors were, in fact, aware that (i) the engineering plan was flawed, (ii) sufficient engineering had not yet been performed, and (iii) these estimates were inaccurate at the time they were made since the Company had failed to acquire the appropriate level of engineering detail needed:

[Analyst]: Thanks. Good morning, guys. I guess this is mostly for Dan. I was hoping maybe to go back a little bit more over the timeline as it relates to the cost increases. I guess my question to you, you highlighted some of the challenges in terms of the engineering plan, but that wasn't new, that wasn't something you guys learned about now, that's been the case since this project originally embarked.

I guess maybe I had thought that you guys had already hired Hatch at the time when you put out the Q2 cost increase. I wonder if you can go back through the

schedule and help me out on those two topics because, again, I think myself and obviously everyone else is a little surprised by another increase here.

[LSB's Interim CEO Dan Greenwell]: Sure, I mean, we had hired Hatch earlier to -- they were originally hired to help with commissioning activities. Part of their scope was expanded in July to include some other project management activities. But when I came on the first of September, I engaged them specifically to do detailed cost studies and activities surrounding the overall project cost. They did do very detailed cost studies, P&ID looks, all the cost estimates, and then they went through and scrubbed all the other areas of all contractors and timelines, project management, things like that. ***When I came on board we engaged them to do a very detailed piece of work. Prior to that it wasn't that detailed.***

[Analyst]: So then how did the July cost -- I mean, where was the estimating coming for that? Because, again, I have to go back through the exact script, but it was certainly indicated there were a lot of third-party resources that were engaged in order to make that estimation. I guess I'm trying to understand why these consultants are better than those consultants, or -- It's a little bit troubling from the outside.

[LSB's Interim CEO Dan Greenwell]: Keep in mind, I think around the first of July, we had terminated one of the piping contractors that was not performing. The first of July we brought on two new piping contractors, Performance and ParFab. ***At that point in time, the detailed engineering wasn't done and they were making, I would say, their best estimates at that time based on the information they had.*** We had not engaged Hatch to do that detailed cost study.

Those cost estimates at that time based were upon Leidos's information as a general contractor and with the new guys, ParFab and Performance just coming on site, been on-site less than a month, and probably didn't have as detailed information as they could have. ***We subsequently in September launched on that to get very detailed estimates to go down to the individual pipe runs, estimate each individual pipe run. So a much more detailed and thorough cost review was done in very early September.***

[Analyst]: Okay. Maybe we'll take it off-line because I feel like we're missing a step. ***I guess the other thing I'll ask, you guys have been on the Board for over a year, was there a recognition of maybe the challenges with the engineering plan? It sounds like in hindsight it was pretty obvious it wasn't going to work, but was that something you guys were aware of earlier? I guess I'm wondering why it was not addressed until more recently.***

[LSB's Interim CEO Dan Greenwell]: ***I mean, I think we were aware of it, certainly when we had the initial $50 million cost increase, the Board was aware of it. We were certainly aware of the July increase and the effort that went around that. I think the level of detail that we recognized was not there in***

*the August estimate. The Board is not comfortable with that and, clearly, as a result we made changes to the management, the senior management, and I immediately launched on detailed cost estimate work. That's the sequence of events and that's what occurred.*

(Emphasis added.)[29]

## V.   DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY MADE FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD REGARDING THE ESTIMATED COST, SCHEDULE AND PROGRESS FOR THE EL DORADO EXPANSION

131.    Throughout the Class Period, Defendants were aware, or were severely reckless in not knowing, that the El Dorado expansion project was not on time and not on budget.  In spite of this, Defendants repeatedly made the false claim that the project was "on time" and "on budget," as summarized in the table below:

| DATE | SOURCE | STATEMENT |
|---|---|---|
| 11/7/2014 | PR | •"[projects] remain on **budget** and **schedule**" |
| | IP | •"**on-time** and **on-budget**" |
| | IP | • "[e]xpansion projects **on-time** and **on-budget**" |
| | IP | • "[o]n [s]chedule" |
| | CF | • "El Dorado expansion projects to complete **on time** and **on budget**" |
| | CF | • "[we are] not aware of anything that will prevent **on-time completion** or **cause cost overruns** [of El Dorado Expansion]" |
| | CF | • "we are **on time** and **on budget** with these projects" |
| | CF | • "El Dorado is pretty much **on time**" |
| | CF | • "construction project is from a progression standpoint is **on time**" |
| | CF | • "[El Dorado expansion project] is **on target** and spending is as we have shown it there" |
| 3/2/2015 | PR | • "[El Dorado facility] remains **on budget and on schedule**" |
| | IP | • "[El Dorado expansion projects] remain **on budget** and **on schedule**" |
| | IP | • "[El Dorado] expansion projects **on budget** and **on schedule**" |
| | CF | • "[the project] remains **on budget** and **on schedule**" |
| | CF | • "[W]e expect the El Dorado expansion projects to be completed **on time** and **on budget**." |
| 4/17/2015 | AR | • "El Dorado expansion project … is **on budget** and **on schedule**" |

---

[29] According to Mr. Fuller, it was not until this "executive transfer process" that "[t]he project costs were brought under control."

| 5/8/2015 | PR | • "[expansion projects] remain **on time** and **on budget**" |
| | IP | • "Expansion projects **on budget** and **on schedule**" |
| | IP | • Slide title: "El Dorado Ammonia Plant Project **on Time** and **on Budget**" |
| | IP | • "El Dorado Ammonia Plant Project … **On Budget: Yes**" |
| | CF | • "El Dorado expansion projects to be completed **on-time** and **on-budget**" |
| | CF | • [projects maintain] continued status of **on-time** and **on-budget**" |
| 6/2/2015 | IP | • Slide title: "El Dorado Ammonia Plant Project **on Time** and **on Budget**" |
| | IP | • "Completion of El Dorado projects … **on budget** and **on schedule** with contemplated plan" |
| PR = Press release,   IP = Investor Presentation,   CF = Conference call,   AR = Annual Report | | |

132.   As explained below, these statements were false and misleading because at all times during the Class Period, the project was neither on time nor on budget, and at each successive date, the project was further behind schedule and further above budget.  In fact, even before the Class Period began, the Defendants were already aware that (i) the Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan, (ii) many of the pipes and vessels from Triad #1 were unusable, (iii) the 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility, and (iv) as a result of these factors, no subcontractor would provide a lump sum bid for the construction of the ammonia plant for an amount that would have allowed the project to be completed on budget.  Indeed, after the Class Period, Defendants admitted that their cost estimates were "not an engineered estimate . . . [and] the detailed engineering work was not there."  Notwithstanding these facts and in spite of Global's unwillingness to agree to a lump sum contract for the construction of the ammonia plant, Defendants were so desperate for work to begin on the ammonia plant that Leidos, at Defendants' direction, instructed Global to begin work on the ammonia plant without a written agreement in September 2014.  By October 2014, one month before the Class Period began, Defendants were already informed that the project was 10%–20% over budget and behind schedule.

133.    Once the Class Period began, the El Dorado expansion project became even further over budget and behind schedule.  In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant, not on a lump sum basis.  In April 2015, LSB hired Andy Fuller as a new Corporate Project Manager to assist with managing the El Dorado expansion project because the project was "experiencing rapid cost escalations."  And in the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors.  Defendants knew that these pipes would have to be removed, repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project, which was already drastically over budget and behind schedule.

134.    In addition, in May through August 2015, Defendants made a number of false and misleading statements concerning the status of financing for the El Dorado expansion project.  In those statements, Defendants stated that LSB was in "final discussions" with certain lenders concerning the financing of discrete pieces of equipment, and/or Defendants suggested that LSB would not need significant new financing in order to complete the project.  Those statements were false and misleading because they failed to disclose, among other things, that (i) in the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors, (ii) that these pipes would have to be removed, repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project, which was already drastically over budget and behind schedule, and (iii) if the true status of the El Dorado expansion project were revealed to LSB's prospective lenders, LSB would not be able to obtain financing to complete the El Dorado expansion project, except on terms that would be very onerous to LSB and dramatically more expensive than the terms LSB had agreed to for prior financings of the El Dorado expansion project.

135.     Finally, throughout the Class Period, Defendants were aware, or were severely reckless in not knowing, that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.   In spite of this, Defendants falsely claimed that the Company's estimates regarding both cost and timing were proper at all relevant times.

### A.     Defendants' False And Misleading Statements To The Public On November 7, 2014

136.     The Class Period starts on November 7, 2014.  On that date, the Company issued a press release entitled, "LSB Industries, Inc. Reports Results for the 2014 Third Quarter; Provides Chemical Business Product Volume Guidance for 2014 Fourth Quarter."  Therein, Jack Golsen, in relevant part, stated:

> ***Our expansion projects underway to install a new ammonia plant, and restore and enhance nitric acid capacity, remain on budget and schedule.*** As we have previously discussed, El Dorado purchases ammonia as its primary feedstock, versus producing its own ammonia using natural gas, as is the case with our Pryor and Cherokee Facilities. This results in a cost disadvantage for El Dorado, a condition that we expect to persist ***until the ammonia plant is operational in the first quarter of 2016***. Once ammonia production is underway, we forecast substantial incremental operating profit from the El Dorado Facility.

(Emphasis added.)

137.     Additionally, on November 7, 2014, the Company published a presentation on its website for investors and analysts entitled, "2014 Third Quarter Results," excerpts of which are attached hereto as Ex. 2.  Therein, the Company, in relevant part, stated:

a.     As a 3Q 2014 highlight: "Continued progress on the El Dorado expansion projects where we remain ***on-time and on-budget***.  Approximately 76% of the total expansion project costs are committed."  Ex. 2 at 3 (emphasis added).

b.      That the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275–$300 million and the total planned capital expenditure for the El Dorado expansion project was $485–$520 million.  Ex. 2 at 7.

c.      With respect to the status of El Dorado facilities as a whole, "[e]xpansion projects *on-time and on-budget*."  Ex. 2 at 20 (emphasis added).

d.      That each of the project elements at the ammonia plant and nitric acid plant and concentrator were either "[c]omplete" or "[o]n [s]chedule."  Ex. 2 at 21, 23.

e.      That the project elements relating to underground piping and aboveground piping at the ammonia plant were "[o]n [s]chedule."  Ex. 2 at 21.

f.      That the estimated completion date for the ammonia plant was the fourth quarter of 2015.  Ex. 2 at 21.

g.      That the estimated start-up date for the ammonia plant was the first quarter of 2016.  Ex. 2 at 21.

138.    On November 7, 2014, LSB filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter.  The Company's Form 10-Q was signed by Defendants Shelby and Rieker.  Therein, the Company, in relevant part, reaffirmed the Company's cost estimates and completion schedule announced that day in its presentation.  In particular, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275–$300 million and the total planned capital expenditure for the El Dorado expansion project was $485–$520 million.  In addition, the Company stated in the Form 10-Q that the construction of the ammonia plant was "expected to be complete by late 2015."

139.    On November 7, 2014, the Company held a conference call with analysts and investors to discuss its 2014 fiscal third quarter financial results.  Therein, Defendant Shelby, in relevant part, stated:

> With respect to the table reflecting El Dorado expansion projects, the planned spending is presented as a range to provide for variable material costs, unplanned

delays in construction, and other contingencies. We've made certain changes to the total planned expenditures since the second quarter. ***As the engineering, design, and bidding process has progressed and project construction proceeds, the estimated range of costs has been narrowed and in certain cases have been revised.*** At this point approximately 76% of our anticipated costs are committed. I would point out that the top of ***the estimated cost has been increased from $500 million to $520 million to reflect the inclusion of the natural gas pipeline to supply the ammonia plant.***

(Emphasis added.)

140.   Additionally, on this same conference call, Defendant Barry Golsen, in relevant

part, stated:

> ***At this time we expect the El Dorado expansion projects to complete on time and on budget*** given the addition of the pipeline costs, which Tony discussed. Although completion of projects of this magnitude are dependent on many suppliers and contractors as well as weather conditions, ***we are currently not aware of anything that will prevent on-time completion or cause cost overruns.*** Also at this time we have committed costs on approximately 76% of the expansion project's total estimated cost.
>
> ***We expect the acid plant and concentrator to complete and ready for start up in mid-2015, and the ammonia plant construction to be completed by the end of 2015 with ammonia production ramp-up during the first quarter of 2016.*** As we have relayed in the past, LSB is making these investments in our chemical facilities to drive growth and value creation and better position LSB to capitalize on favorable market dynamics.
>
> ***
>
> ***We have major capital projects underway at El Dorado that will improve its profitability substantially. At this time -- at this point we are on time and on budget with these projects.***

(Emphasis added.)

141.   Additionally, on this same conference call, Defendant Shelby responded to a

series of questions from an analyst concerning the timing of capital expenditures in relation to

the construction schedule and further reaffirmed that the El Dorado project was proceeding on

schedule and on budget:

> [Analyst]: Okay. And then looking at your capital expenditure chart from last quarter to this quarter it looks like spending at El Dorado was $430 million to

$500 million on the project for total and now it's $485 million to $520 million, yet total capital spending on the piece above that went from -- went to $388 million to $458 million from $392 million to $515 million. I guess I'm trying to reconcile how the El Dorado project went up but total capital spending went down?

[Defendant Shelby]: A lot of it is just timing, David. ***We have -- we have narrowed the ranges. The progress of the construction project in El Dorado is pretty much on time,*** but the spending is lagging a bit. But the timing of the spending and the completion of project is somewhat separated right now, ***so the construction project is from a progression standpoint*** [sic] ***on time.*** The spending on the other projects will fluctuate from time to time as we move things in and out, but ***on the El Dorado expansion project everything is on target and spending is as we have shown it there.***

[Analyst]: I guess, would you expect any of that to roll over into 2016 potentially since the ramp up of spending is a little longer than expected?

[Defendant Shelby]: No, ***we still expect completion of construction in 2015 and the commissioning of the plant in 2016***. So spending will be complete by 2015.

(Emphasis added.)

142.    The statements in ¶¶136-141 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.    Many of the pipes and vessels from Triad #1 were unusable;

c.    The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.    As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.      Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.      Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

h.      As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

143.    The materially false and misleading statements alleged in ¶¶136-141 were made with scienter.  Defendants were deliberately reckless as to the falsity of these statements because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Sections IV.B.5–B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.

144.    Additionally, these misstatements were made with scienter because:

a.      The El Dorado expansion project accounted for more than 75% of the Company's entire planned capital additions for all of 2015 and was by far the largest undertaking at the Company during the Class Period.  Defendants were aware of the status and developments of the project on which the Company was betting its future; or if

the Company's CEOs and CFOs were unaware of these developments, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and the Class;

b.      The true cost of the El Dorado expansion project only came to light upon the removal of long-standing LSB insiders, including Defendant Barry Golsen.  The most cogent inference from this fact is that the Individual Defendants were aware, or were deliberately reckless in not knowing, that the Company's cost estimates were more than $100 million dollars off and that sufficient engineering had not yet occurred.  This is particularly true in light of the rapidity with which new management was able to determine the actual costs of the project once Defendant Barry Golsen was removed;

c.      As LSB had only approximately 30 corporate staff, LSB's executives would be aware of the particulars of its largest and most important construction project, particularly as this project constituted such a large amount of its capital expenditures;

d.      According to the Individual Defendants, they were actively monitoring the status of the construction project at issue and had intimate knowledge of the project's construction costs and progress.  If the Individual Defendants had been monitoring the progress and costs of the project, they would have uncovered that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project;

e.      Besides serving as high-ranking executives of the Company, Defendants Jack and Barry Golsen owned millions of shares of LSB stock and effectively controlled the Company.  It is illogical that high-ranking executives that effectively controlled the Company and owned tens of millions of dollars' worth of stock in LSB would be unaware of the status of the Company's largest and most expensive construction project;

f.      Since both before and during the Class Period, activist shareholders sought to wrest control of the Company from the Golsens, the Individual Defendants were motivated to conceal the escalating costs and construction issues at the El Dorado Facility, that the project was both over budget and behind schedule, and that the project required substantial, additional financing so they could retain control of the Company;

g.      Since LSB required additional financing to complete the El Dorado expansion project, Defendants were motivated to misrepresent the status of the project to both lenders and the general public in order to be able to obtain that financing on commercially reasonable terms; and

h.      The facts alleged in ¶¶142 were readily available to Defendants, and in light of those facts, Defendants' statements that they were "currently not aware of anything that will prevent on-time completion or cause cost overruns" and other statements concerning the costs and status of the project were, at a minimum, severely reckless.

**B.      Defendants' False And Misleading Statements To The Public On March 2, 2015**

145.    On March 2, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Results for the 2014 Fourth Quarter; Provides Chemical Business Product Volume Guidance for 2015 First Quarter and Financial Targets for 2017." Therein, Defendant Barry Golsen, in relevant part, stated:

> Furthermore, we expect the cost disadvantage that results from the use of purchased ammonia at El Dorado to be eliminated once the in-process construction of the ammonia plant at the facility – expected to reduce costs, increase capacity and enhance product balance – is completed. ***This project, along with the enhancement of the El Dorado's nitric acid capacity, remains on budget and on schedule and we expect significant incremental operating profit beginning in 2016 as a result of these investments***.

(Emphasis added.)

146.     Additionally, on March 2, 2015, the Company published a presentation on its website for investors and analysts entitled, "2014 Fourth Quarter Results," excerpts of which are attached hereto as Ex. 3.  Therein, the Company, in relevant part, stated:

a.       As a 2014 highlight: "Continued progress on the El Dorado expansion projects where we remain ***on budget and on schedule***; Approximately 93% of planned scope of work is under contract as 1/31/2015."  Ex. 3 at 3 (emphasis added).

b.       That the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275–$300 million and the total planned capital expenditure for the El Dorado expansion project was $485–$520 million.  Ex. 3 at 7.

c.       With respect to the status of El Dorado facilities as a whole, "Expansion projects ***on budget and on schedule***."  Ex. 3 at 19 (emphasis added).

d.       With respect to the ammonia plant, that (i) the installation of the underground piping was 90%+ complete, (ii) the installation of the aboveground piping was "[i]n process/[o]n schedule," and (iii) the anticipated start-up date of the plant was the first quarter of 2016, as reflected in the following chart:



Ex. 3 at 20.

147.    On March 2, 2015, LSB filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year.  The Company's Form 10-K was signed by Defendants Jack Golsen, Barry Golsen, Shelby and Rieker.  Therein, the Company, in relevant part, reaffirmed the Company's cost estimates announced that day in its presentation.  In particular, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $275–$300 million and the total planned capital expenditure for the El Dorado expansion project was $485–$520 million.  In addition, the Company stated in the Form 10-K that the ammonia plant was "expected to be complete in late 2015 and operational in early 2016."

148.    On March 2, 2015, the Company held a conference call with analysts and investors to discuss its 2014 fiscal year financial results.  Therein, Defendant Barry Golsen, in relevant part, stated:

> *The El Dorado ammonia plant expansion project is expected to substantially enhance the plant's profitability, reduce costs, increase capacity, and improve product balance. Importantly, this project along with the enhancement of the facilities nitric acid capacity, remains on budget and on schedule and we expect significant incremental operating profit beginning in 2016 as a result of these investments*.

***

> Page 20 details the status of the El Dorado ammonia plant expansion project. As we have stated in the past, this project will significantly reduce El Dorado's cost of ammonia, as the cost spread between purchased and manufactured ammonia is substantial. It will also produce additional ammonia that will be available for sale or which can be upgraded to other products for sale.

> *The engineering effort is now substantially complete, and the project timeline is now driven by executing the construction process.* Pilings and foundations are substantially complete. A large part of the underground piping and structural steel is complete, and a majority of major equipment has been installed.

***

***At this time, we expect the El Dorado expansion projects to be completed on time and on budget.*** Also at this time, we have the costs for approximately 93% of the planned scope of work under contract.

We expect the acid plant and concentrator to be completed, and to begin production in the third quarter of 2015. ***And the ammonia plant construction and commissioning to be completed by the end of 2015. With ammonia production start up and ramp up during the first quarter of 2016***.

(Emphasis added.)

149.    Additionally, during this same call, Defendant Shelby, in relevant part, stated:

[Analyst]: Regarding your 2015 CapEx range, if all goes to plan of what you'd like to do, what would be the CapEx spend within this band? And what would be the pacing of the CapEx -- the 2015 CapEx within the year? Meaning is it evenly weighted over the four quarters? Is it front-end loaded, backend loaded? Thank you.

[Defendant Shelby]: It's first six months loaded. The majority of it's spent in the first six months of 2015, and to a lesser extent in the third quarter, and then to a lesser extent in the fourth quarter.

[Analyst]: Okay. And do you -- if all goes to plan, would you be at the closer to the $346 million versus $283 million? I'm also trying to understand why the band is still largest given where you are on those two timelines.

[Defendant Shelby]: Well, we've continued to leave that contingency in there. ***Although the ammonia plant is pretty much -- the costs there are pretty much fixed,*** but you still have some contracts that are time and material for the nitric acid and concentrator and you have weather issues. So we're keeping that range there, although, we feel like that we've got adequate contingencies there.

(Emphasis added.)

150.    The statements in ¶¶145-149 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.    Many of the pipes and vessels from Triad #1 were unusable;

c.      The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.      As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.      Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.      Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant;

h.      As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

i.      As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

151.    The materially false and misleading statements alleged in ¶¶145-149 were made with scienter.  Defendants were deliberately reckless as to the falsity of these statements because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Section

IV.B.5-B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.

152.    Additionally, these misstatements were made with scienter for the reasons stated in ¶144, *supra*.

### C.    Defendants' False And Misleading Statements To The Public On Or About April 17, 2015

153.    On or about April 17, 2015, the Company issued a letter to shareholders, dated April 17, 2015, which was published on the Company's website as a cover letter to the Company's 2014 Annual Report.  The letter was signed by Defendants Jack Golsen and Barry Golsen.  Therein, those Defendants, in relevant part, stated:

> The El Dorado expansion project, expected to reduce costs, increase capacity and enhance product balance capabilities, ***is on budget and on schedule***. The significant cost disadvantage that results from the use of purchased ammonia at El Dorado (impacting 2014 and 2015 results) will be alleviated when we complete construction of the new ammonia plant in 2016.

(Emphasis added.)

154.    The statements in ¶153 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.    Many of the pipes and vessels from Triad #1 were unusable;

c.    The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.    As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was

willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.      Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.      Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant;

h.      The expansion project was experiencing rapid cost escalations.  For example, in April 2015, LSB hired Andy Fuller as a new Corporate Project Manager to assist with managing the El Dorado expansion project because the project was "experiencing rapid cost escalations."

i.      In the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors, and these pipes would have to be removed, repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project;

j.      If the true status of the El Dorado expansion project were revealed to LSB's prospective lenders, LSB would not be able to obtain financing to complete the El Dorado expansion project, except on terms that would be very onerous to LSB and dramatically more expensive than the terms LSB had agreed to for prior financings of the El Dorado expansion project;

k.      As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

l.      As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

155.    The materially false and misleading statements alleged in ¶153 were made with scienter.  Defendants were deliberately reckless as to the falsity of these statements because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Section IV.B.5-B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.  In addition, as described in Section IV.B.7(b), *supra*, these statements were made with scienter because LSB management hired Mr. Fuller to assist in managing rapid cost escalations in the El Dorado expansion project, and therefore Defendants must have known about those rapid cost escalations.  Moreover, as described in Section IV.B.7(a), *supra*, these statements were made with scienter because LSB directed Global to install pipes and vessels that were not cleared for installation by engineers and inspectors, and this direction, by its very nature, reflects knowledge that the project was not on time or on budget.

156.    Additionally, these misstatements were made with scienter for the reasons stated in ¶144, *supra*.

**D.      Defendants' False And Misleading Statements To The Public On May 8, 2015**

157.    On May 8, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Improved Adjusted Operating Results for the 2015 First Quarter; Provides Chemical Business Product Volume Guidance for 2015 Second Quarter."  Therein, Defendant Barry Golsen, in relevant part, stated:

> Partially offsetting these tailwinds was the operating loss at our El Dorado facility resulting from its use of high cost ammonia as its primary feedstock, as compared to the cost effective natural gas used by our Pryor and Cherokee Facilities to make their own ammonia. We expect this cost disadvantage to persist until our ***expansion projects at El Dorado, which remain on time and on budget, are completed. Once the ammonia plant is up and running in the first quarter of 2016***, we expect the economics of this facility to greatly improve, resulting in significant incremental operating profit.
>
> ***
>
> ***We remain confident in our prospects for continued performance improvement for the balance of 2015 and a material expansion of profitability beginning in 2016, when our new capacity at El Dorado is up and running***.

(Emphasis added.)

158.    Additionally, on May 8, 2015, the Company published a presentation on its website for investors and analysts entitled, "First Quarter 2015 Update," excerpts of which are attached hereto as Ex. 4.  Therein, the Company, in relevant part, stated:

a.      That the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $285–$300 million and the total planned capital expenditure for the El Dorado expansion project was $495–$520 million.  Ex. 4 at 11.

b.      With respect to the El Dorado facilities as a whole, "Expansion projects ***on budget and on schedule***."  Ex. 4 at 12 (emphasis added).

c.      In a slide entitled "El Dorado Ammonia Plant Project on Time and on Budget," that (i) the installation of the underground piping was 90%+ complete, (ii) the installation of the aboveground piping was 70%+ complete and scheduled to be fully complete by the

end of Q3 15, and (iii) the anticipated start-up date of the plant was the first quarter of 2016, as reflected in the following chart:



Ex. 4 at 13.

159.    On May 8, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter.  The Company's Form 10-Q was signed by Defendants Shelby and Rieker, and reaffirmed the Company's cost estimates announced that day in its presentation.  In particular, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $285–$300 million and the total planned capital expenditure for the El Dorado expansion project was $495–$520 million.  In

addition, the Company stated that the ammonia plant was "expected to be complete in late 2015 and operational in early 2016."

160.     Additionally, in the same Form 10-Q, the Company stated:

For the remainder of 2015, we have extensive planned capital expenditures. Our primary cash needs for this period of time will be to fund our planned capital spending program, as well as our operations, our general obligations, and our interest payment requirements. Based upon our projections for 2015, we expect to fund these cash needs from working capital, the noncurrent restricted investments (provided from the proceeds from the Senior Secured Notes), internally generated cash flows, and third-party financing. ***In April 2015, we received approximately $16 million to finance a natural gas pipeline being constructed at our El Dorado Facility. We are currently in discussion with certain lenders to finance two other separately identifiable pieces of equipment that are included in the planned expansion project. We are in final discussions regarding financing $21 million related to the construction of a cogeneration facility and $20 million related to the construction of an ammonia storage tank at our El Dorado Facility***, subject to the terms of our existing loan agreements, including the Senior Secured Notes. We believe that neither the Senior Secured Notes nor the Amended Working Capital Revolver Loan will preclude us from entering into the additional borrowings.

(Emphasis added.)

161.     On May 8, 2015, the Company held a conference call with analysts and investors to discuss its 2015 fiscal first quarter financial results.  Therein, Defendant Barry Golsen, in relevant part, stated:

Page 13, details the status of the El Dorado ammonia plant expansion project, which will provide ammonia for on-site upgraded products at a significant cost savings and have the capacity to produce additional ammonia for sale.

The engineering effort is now approximately 97% complete and the project timeline is now driven by executing the construction process. ***Piping installation is now underway and it is our main focus before installing controls and electrical equipment***.

***

At this time, we expect the El Dorado expansion projects to be completed ***on-time and on-budget***. We expect the acid plant and concentrator to be complete by mid-year and to begin production in the third quarter of 2015 and ***the ammonia plant***

*construction and commissioning to be completed by the end of 2015, with ammonia production start-up and ramp-up during the first quarter of 2016.*

(Emphasis added.)

162.   Additionally, during this same call, Defendant Shelby, in relevant part, stated:

As previously mentioned, before the end of 2015, *we expect to finance certain discrete pieces of equipment including the El Dorado expansion project and including the natural gas pipeline, the co-gen facility and the ammonia storage tank for a combined total of approximately $55 million*. We received financing on the natural gas pipeline in April of approximately $16 million.

\*\*\*

Moving to page 11 for a summary of capital expenditures. As shown here the planned capital expenditures for the remainder of 2015 will be between $227 million and $276 million including between a $162 million and $187 million for the El Dorado expansion projects. Also included in the total are upgrades to our plants to maintain compliance with environmental regulations and guidelines and other renewals and improvement projects.

As a reminder, *we expect the spending to be funded by cash investments, internally generated cash flow and the third-party financings. As noted on the lower right hand corner of this page, the total estimated cost of the El Dorado expansion project is expected to be $495 million to $520 million, reflecting our continued status of on-time and on-budget.* That concludes an overview of the current results of operations, liquidity and capital resources and financial conditions…

(Emphasis added.)

163.   The statements in ¶¶157-162 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.     The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.     Many of the pipes and vessels from Triad #1 were unusable;

c.     The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.      As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.      Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.      Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant;

h.      The expansion project was experiencing rapid cost escalations.  For example, in April 2015, LSB hired Andy Fuller as a new Corporate Project Manager to assist with managing the El Dorado expansion project because the project was "experiencing rapid cost escalations."

i.      In the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors, and these pipes would have to be removed, repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project;

j.      If the true status of the El Dorado expansion project were revealed to LSB's prospective lenders, LSB would not be able to obtain financing to complete the El Dorado expansion project, except on terms that would be very onerous to LSB and

dramatically more expensive than the terms LSB had agreed to for prior financings of the El Dorado expansion project;

k.       As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

l.       As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

164.    The materially false and misleading statements alleged in ¶¶157-162 were made with scienter.  Defendants were deliberately reckless as to their falsity because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Section IV.B.5-B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.  In addition, as described in Section IV.B.7(b), *supra*, these statements were made with scienter because LSB management hired Mr. Fuller to assist in managing rapid cost escalations in the El Dorado expansion project, and therefore Defendants must have known about those rapid cost escalations.  Moreover, as described in Section IV.B.7(a), *supra*, these statements were made with scienter because LSB directed Global to install pipes and vessels that were not cleared for installation by engineers and inspectors, and this direction, by its very nature, reflects knowledge that the project was not on time or on budget.

165.    Additionally, these misstatements were made with scienter for the reasons stated in ¶144, *supra*.

**E.     Defendants' False And Misleading Statements To The Public On Or About June 2, 2015**

166.    On or about June 2, 2015, the Company published a presentation for investors entitled, "Investor Presentation," excerpts of which are attached hereto as Ex. 5.   Therein, the Company, in relevant part, stated:

a.     In a slide entitled, "El Dorado expansion expected to significantly improve margins beginning in 2016," that (i) "The spread between purchased and produced ammonia at El Dorado has averaged over $300 for the past three years," and (ii) "Completion of ammonia plant allows El Dorado to capitalize on spread difference." Ex. 5 at 16.

b.     In a slide entitled, "El Dorado Expansion Expected to Improve Operations/reliability and Capacity," that (i) "Foundations and plant infrastructure [are] well in place," (ii) LSB expected "[c]omplete commissioning [of the El Dorado ammonia plant] in Q4 2015 and start-up beginning in Q1 2016," and (iii) "Completion of El Dorado projects expected by Q1 2016, ***on budget and on schedule*** with contemplated plan." Ex. 5 at 17 (emphasis added).

c.     In a slide entitled "El Dorado Ammonia Plant Project on Time and on Budget," that (i) the installation of the underground piping was 90%+ complete, (ii) the installation of the aboveground piping was 70%+ complete and scheduled to be fully complete by the end of Q3 15, and (iii) the anticipated start-up date of the plant was the first quarter of 2016, as reflected in the following chart:

[Chart on next page]



Ex. 5 at 18.

d.      That the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $285–$300 million and the total planned capital expenditure for the El Dorado expansion project was $495–$520 million.  Ex. 5 at 25.

167.    The statements in ¶166 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.      The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.      Many of the pipes and vessels from Triad #1 were unusable;

c.      The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.      As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.      Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.      Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant;

h.      The expansion project was experiencing rapid cost escalations.  For example, in April 2015, LSB hired Andy Fuller as a new Corporate Project Manager to assist with managing the El Dorado expansion project because the project was "experiencing rapid cost escalations."

i.      In the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors, and these pipes would have to be removed, repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project;

j.      If the true status of the El Dorado expansion project were revealed to LSB's prospective lenders, LSB would not be able to obtain financing to complete the El Dorado expansion project, except on terms that would be very onerous to LSB and

dramatically more expensive than the terms LSB had agreed to for prior financings of the El Dorado expansion project;

k.      As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

l.      As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

168.    The materially false and misleading statements alleged in ¶166 were made with scienter.  Defendants were deliberately reckless as to their falsity because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Section IV.B.5-B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.  In addition, as described in Section IV.B.7(b), *supra*, these statements were made with scienter because LSB management hired Mr. Fuller to assist in managing rapid cost escalations in the El Dorado expansion project, and therefore Defendants must have known about those rapid cost escalations.  Moreover, as described in Section IV.B.7(a), *supra*, these statements were made with scienter because LSB directed Global to install pipes and vessels that were not cleared for installation by engineers and inspectors, and this direction, by its very nature, reflects knowledge that the project was not on time or on budget.

169.    Additionally, these misstatements were made with scienter for the reasons stated in ¶144, *supra*.

**F.      Defendants' False And Misleading Statements To The Public On July 14, 2015**

170.     On July 14, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Updates Status of El Dorado Facility Expansion."  Therein, the Company, in relevant part, stated:

> LSB Industries, Inc. (NYSE:LXU) ("LSB" or "the Company"), a producer of chemical products for the agricultural, mining and industrial markets and a leading manufacturer of commercial and residential climate control products, today provided an update on the status of the expansion project at its El Dorado, Arkansas facility ("EDC expansion"). The new nitric acid plant and concentrator are on schedule to be completed and operational by the end of the third quarter of 2015. ***The 375,000 ton per year ammonia plant remains on schedule to be completed and operational in the first quarter of 2016. The Company's current cost estimate for the EDC expansion is now in the range of $560 million to $575 million, up from the previous estimate of $495 million to $520 million. Based on management's current project cost estimates and forecast for operating cash flow, at this time LSB does not expect to require additional financing to complete the EDC expansion other than the previously announced financings related to the installation of the cogeneration facility and the ammonia storage tank.***
>
> ***The Company recently updated its cost estimate to complete the EDC expansion using refined estimates for specific quantities of construction materials and labor-hours based upon information provided by its engineering, procurement and construction contractor.*** Contributing to the increased cost estimate to complete the EDC expansion were productivity and quality issues with a subcontractor responsible for the installation of piping in the ammonia plant.
>
> ***"We are pleased to report that the timeline for completion of our El Dorado facility expansion remains intact***, although we are disappointed that the total cost of the project is expected to exceed our initial cost estimates," stated Barry Golsen, LSB's President and Chief Executive Officer. "The safety, product quality, and operational reliability of the El Dorado facility are our primary areas of focus as we move forward toward the completion of the project. Even with the anticipated higher costs, we believe that the project economics remain compelling, with the new capacity expected to yield approximately $90 million of annual incremental EBITDA operating at full capacity."

(Emphasis added.)

171.     The statements in ¶170 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because

they failed to disclose the following adverse facts:

a.      The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.      Many of the pipes and vessels from Triad #1 were unusable;

c.      The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.      As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.      Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.      Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant;

h.      The expansion project was experiencing rapid cost escalations.  For example, in April 2015, LSB hired Andy Fuller as a new Corporate Project Manager to assist with managing the El Dorado expansion project because the project was "experiencing rapid cost escalations."

i.      In the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors, and these pipes would have to be removed,

repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project;

j.      If the true status of the El Dorado expansion project were revealed to LSB's prospective lenders, LSB would not be able to obtain financing to complete the El Dorado expansion project, except on terms that would be very onerous to LSB and dramatically more expensive than the terms LSB had agreed to for prior financings of the El Dorado expansion project;

k.      As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

l.      As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

172.    The materially false and misleading statements alleged in ¶170 were made with scienter.  Defendants were deliberately reckless as to their falsity because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado expansion was over budget and behind schedule.  Moreover, as described in Section IV.B.5-B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans.  In addition, as described in Section IV.B.7(b), *supra*, these statements were made with scienter because LSB management hired Mr. Fuller to assist in managing rapid cost escalations in the El Dorado expansion project, and therefore Defendants must have known about those rapid cost escalations.  Moreover, as described in Section IV.B.7(a), *supra*, these statements were made with scienter because LSB directed Global to install pipes and vessels that were not cleared for

installation by engineers and inspectors, and this direction, by its very nature, reflects knowledge that the project was not on time or on budget.

173.    Additionally, these misstatements were made with scienter for the reasons stated in ¶144, *supra*, and because:

a.    If the Individual Defendants had conducted the substantial review of the cost estimates and the status of the construction that they claimed to have performed in connection with the preparation of the July 14, 2015 estimate, the Individual Defendants would have discovered (if they had not already known) that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

### G.    Defendants' False And Misleading Statements To The Public On August 7, 2015

174.    On August 7, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Operating Results for the 2015 Second Quarter; Updates Status of El Dorado Facility Expansion; Provides Chemical Business Product Volume Guidance for 2015 Third Quarter."  Therein, the Company, in relevant part, stated:

**El Dorado Facility Expansion Update**

*During the first part of August 2015, the engineering, procurement and construction contractor and other consultants we have retained in connection with the El Dorado Expansion projects advised us they are now estimating that the total cost to complete the El Dorado Expansion projects will exceed what we previously projected, due, in part, to work performed by a previous subcontractor. We have now been advised that the total cost to complete the El Dorado Expansion projects is estimated to be in the range of $660 million to $680 million ($437 million spent as of June 30, 2015 and $223 million to $243 million to be spent in the balance of 2015 with the possibility that a portion of these capital additions could occur during the first quarter of 2016).*

*It is expected that the new ammonia plant will be mechanically complete by the end of 2015 and should begin production early in the second quarter 2016.* As it

relates to the new nitric acid plant and concentrator, the concentrator went into production in June 2015 and the nitric acid plant is expected to be mechanically complete in September 2015, with production beginning mid-fourth quarter 2015.

We expect to be able to fund the cash needs for our operations and our capital expenditures, including the El Dorado Expansion projects and our other planned discretionary capital projects, from cash on hand, internally generated cash flow, working capital, borrowings under our working capital revolver, and other financings. We are currently negotiating with third party lenders for the financing for certain discrete pieces of equipment in connection with the El Dorado Expansion projects. Additionally, the Indenture governing our Senior Secured Notes allows us to incur an additional $50 million in debt. We are also in discussions with other financing providers to provide additional capital, as needed, for the completion of the El Dorado Expansion projects. If for some reason we are unable to complete these financings or there is a shortfall in our internally generated cash flow, either of which would negatively affect our ability to fund all of the discretionary capital projects we had planned to complete or initiate during the balance of 2015 and 2016, we would be required to reduce, delay the start of, or terminate at least some of these capital projects.

(Emphasis added.).

175.   Additionally, on August 7, 2015, the Company published a presentation on its website for investors and analysts entitled, "Second Quarter 2015 Update," excerpts of which are attached hereto as Ex. 6.  Therein, the Company, in relevant part, stated:

a.   That the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $405–$420 million and the total planned capital expenditure for the El Dorado expansion project was now $660–$680 million, which was at least $160 million more than was represented in the presentation for the previous quarter. Ex. 6 at 10.

b.   With respect to the ammonia plant, that (i) the installation of underground piping was 100% complete, (ii) the installation of the aboveground piping was "[i]n [p]rocess" and scheduled to be fully complete by the first quarter of 2016, and (iii) the anticipated start-up date of the plant was the first quarter of 2016, as reflected in the following chart:

[Chart on next page]



Ex. 6 at 14.

176.    On August 7, 2015, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Behrman and Rieker, and reaffirmed the Company's cost estimates announced that day in its presentation.  In particular, the Company stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $405–$420 million and the total planned capital expenditure for the El Dorado expansion project was $660–$680 million.  In addition, the Company stated that ammonia plant was "expected to be operational early in the second quarter of 2016."

177.    On August 7, 2015, the Company held a conference call with analysts and investors to discuss its 2015 fiscal second quarter financial results.  Therein, Defendant Barry Golsen, in relevant part, stated:

There is a separate situation relating to El Dorado that is important for me to discuss with you. Three weeks ago, we announced to you that we expected the overall expansion project costs to increase to as much as $575 million, and we believed we could still maintain our original targeted startup schedule during the first quarter of 2016 for the ammonia plant.

That report was based on representations made to us by our EPC contractor at that time during project review meetings which addressed the remaining scope of work, the time to complete the project, and the associated costs.

One action that was an outgrowth of those meetings was a decision by our EPC contractor to replace an underperforming mechanical and piping subcontractor with a different subcontractor already on the job working on a different section of the plant who had an excellent record of quality and performance.

As a result of the detailed physical evaluation over the past three weeks of the work previously done by the dismissed subcontractor and other work remaining to be done, we have now determined that it is likely that there will be a push out into the second quarter of 2016 for startup of the ammonia plant, and *we believe that the total investment to complete the expansion projects will increase to a range of $660 million to $680 million.*

*To develop those cost estimates, we have scrutinized all work done by the dismissed subcontractor and have reevaluated all work left to complete that part of the project together with the replacement subcontractor and our commissioning subcontractor.*

In addition, a team consisting of LSB senior corporate chemical engineering managers, all project managers for various parts of the expansion project, and El Dorado site management had extensive assessment meetings with each major subcontractor along with our EPC contractor and commissioning contractor. *We reviewed the scope of all work remaining to be done on all parts and all systems of the project and associated cost estimates and timelines. After this detailed review, we believe that the revised cost and time of completion are accurate.*

A breakdown of the total cost increase by category is approximately as follows: 75% is related to piping, mechanical, and scaffolding; 8% electrical; 7% insulation; and 10% various other items. In addition to the staff already assigned to work on this project, we have also retained an owner's representative firm to add additional oversight and control to projects schedule adherence and costs. The El Dorado expansion projects have been designed and we believe will be built to meet the highest standards of engineering and structural integrity with the goal of maximizing operational reliability, product quality, and safety.

While we are not pleased to have increased the cost estimate for the EDC expansion from what we previously announced a few weeks ago, we felt it was

prudent to announce what we knew at the time. And since then, we've worked to refine that estimate further, unfortunately to the upside.

(Emphasis added.)

178.    Additionally, during this same call, Defendant Behrman, in relevant part, stated:

*We expect to be able to fund our capital expenditures and cash needs for our operations from cash on hand, internally generated cash flow, working capital, our working capital revolver, and other additional financings*.

We currently have $100 million ABL facility that has approximately $75 million of availability. Additionally, we have the ability to incur an additional $50 million in debt under the indenture governing our senior secured notes. *We are currently negotiating with third-party lenders for the financing of certain discrete pieces of equipment in connection with the El Dorado expansion projects, and are under discussions with other financing providers to provide additional capital in order to complete the El Dorado expansion projects*.

(Emphasis added.)

179.    Additionally, on this same conference call, Defendant Behrman responded to a series of questions from several analysts concerning LSB's cash needs to complete the El Dorado expansion project and stated that while some additional financing might be necessary to complete the project if the cost were at the high end of the $660–$680 million estimate, that the additional financing that would be necessary in that scenario would be in the ballpark of $50 million and likely would not involve the issuance of additional equity:

[Analyst 1]: I was just wondering if you could give any more color regarding sort of your cash needs and your feeling going into the back half of this year and into 2016 regarding cash flow and your cash needs?

***

[Defendant Behrman]: [L]et's walk through from a cash perspective. So let's just think about it from a high level for a second. We said that the new range is now $660 million to $680 million in total cost for EDC. We've spent $437 million to-date. So, that really leaves us $223 million to $243 million to spend on the project.

We talked about how the cash that we had on hand, so after deducting about $15 million for the repayment of the Marcellus Shale working interest loan, we're left with $143 million of cash at the end of the second quarter. You subtract out $75

million under working capital line. I mentioned that we have $50 million of additional debt available under the bond indenture.

*So really that leaves us – on the low side, if the project only costs $660 million, that leaves us $45 million excess for other CapEx, or $25 million on the high side. I had mentioned earlier, and you can see it on the slide, that we have about $30 million to $50 million of other capital projects scheduled for the second half of 2015. So, when you really subtract that out, it's $15 million excess if we spend $660 million, and we have a deficit of $25 million if we spend $680 million*.

Of course, keep in mind that that excludes any expected operating cash flow for the second half of this year. So I think I'm trying to give you a roadmap as to how may be is the best way to look at.

[Analyst 1]: Yeah. No, that's helpful. So it sounds like you have some levers to pull. It sounds like you have some leeway regarding the financials.

[Defendant Behrman]: Well, *we have availability, as I said, under the working capital line. We can pull down another $50 million of debt under the bond indenture. And then I mentioned that we are in discussions with various financing sources for additional capital*.

*** 

[Analyst 2]: Doing well. So I want to run this down again covering the additional costs on EDC. You mentioned that there should be some discretionary costs that you can defer. Is that the $11 million to $14 million that you highlighted in the slide or is there more than that?

[Defendant Behrman]: No. I mean, I don't have the slide in front of me, but if you take out EDC, there's about $30 million to $50 million of other capital projects in the second half of 2015 that we outlined.

[Analyst 2]: Okay.

[Defendant Behrman]: And I'd say we're taking a look at that really hard to try and figure out what's real discretionary. Clearly, we don't want to defer things that are related to safety in our plants or things that require maintenance. But there's always discretionary capital projects. So we're looking at that now. My gut tells me there's probably $10 million to $15 million of that that we could probably defer into the second half of 2016. But I think we need to do a more thorough review than just my gut.

[Analyst 2]: Sure. Understood. Okay. And you said you were looking at other sources of capital being on this. Can you give us any color as to what you're thinking there? I mean, more debt, maybe rights offering, anything like that?

[Defendant Behrman]: Well, look, it's early in the process and I think I can't give a whole lot of details. *I would tell you that any equity issuance would probably be really low on our list*.

***

[Analyst 3]: I just wanted to come back again to the financing. And I think with the prior question, Mark, you went through some of the math relating to the cash on the balance sheet. Just real quickly, my first question is, how much cash do you need to keep for kind of operating purposes?

[Defendant Behrman]: Well, I mean I think we have it at any point in time, as I said earlier, $75 million to $80 million of working capital. So, if I had $20 million to $30 million to as much as $40 million, I think we'd be fine, but I don't think we really need any more than that.

[Analyst 3]: So, I mean how do they – so you need to run with $40 million cash on the balance sheet just to operate the business day-to-day, right?

[Defendant Behrman]: No. I'd say we need to run with $40 million of availability of cash. So, whether that's having a working capital line, that's got $40 million on it or some other availability. I don't necessarily just have to keep the cash on the balance sheet.

[Analyst 3]: Okay. So then I guess my question is kind of going through this math here. You've said that you can go out for $50 million under the bond indenture. How much additional are you looking for right now? Is it just, say, another $50 million? So you're looking to have a $100 million total financing. I mean, what are you looking for in total?

[Defendant Behrman]: Well, Bruce, I don't think I'm prepared to answer exactly what the gap is right now. I think we need to do a little bit more work to do that, and it's too early in the game. But, clearly, as outlined that if we are at $680 million instead of $660 million, we've got a cash deficit.

[Analyst 3]: *You mean the cash deficit based on what you can borrow under your revolver? The $50 million you can go out with under the bond indenture and cash on balance sheet. So you're saying the delta is if you go to $680 million instead of $660 million?*

[Defendant Behrman]: *For the most part, yes.*

[Analyst 3]: *So to me it doesn't sound like, beyond going out for the $50 million bond indenture, you'd need more than another $50 million on top of that. Am I right about that?*

[Defendant Behrman]: *I think you're in the ballpark.*

[Analyst 3]: Okay. And it could be less, right?

[Defendant Behrman]: Could be less. There are other measures that we could take and we could cut back on some of the discretionary capital spending. Yep.

180.    The statements in ¶¶174-179 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    The Triad #1 plant was disassembled in a manner that made reassembly impossible in the manner contemplated by the original estimates and work plan;

b.    Many of the pipes and vessels from Triad #1 were not usable;

c.    The 50-year-old engineering plans from Triad #1 were insufficient to rebuild the facility;

d.    As a result of (a) – (c), in the summer of 2014, when Leidos sought lump sum bids from subcontractors for the construction of the ammonia plant, no subcontractor was willing to agree to construct the ammonia plant for a lump sum amount that would have allowed the project to be completed on budget;

e.    Defendants and Leidos were in such a hurry to get the ammonia project underway that they ordered Global to begin work on constructing the ammonia plant on September 16, 2014 without a written contract;

f.    Defendants had been informed that the El Dorado expansion project, as of October 2014, was already 10%–20% over budget and behind schedule, and the project only continued to become further over budget and further behind schedule as the project went forward;

g.      In December 2014, Leidos and Global executed the Ammonia Plant Subcontract and Change Order, which together memorialized their agreement that Global would be paid on a time and materials basis for its work on the ammonia plant;

h.      The expansion project was experiencing rapid cost escalations.  For example, in April 2015, LSB hired Andy Fuller as a new Corporate Project Manager to assist with managing the El Dorado expansion project because the project was "experiencing rapid cost escalations."

i.      In the spring of 2015, Global, at the direction of Defendants and Leidos, installed pipes and vessels at the El Dorado ammonia plant that had not been cleared for installation by engineering and inspectors, and these pipes would have to be removed, repaired or replaced, and reinstalled, greatly increasing the costs and timeline for completing the project;

j.      If the true status of the El Dorado expansion project were revealed to LSB's prospective lenders, LSB would not be able to obtain financing to complete the El Dorado expansion project, except on terms that would be very onerous to LSB and dramatically more expensive than the terms LSB had agreed to for prior financings of the El Dorado expansion project;

k.      As the Company later admitted (*see* Section IV.B.8, *supra*), the cost and completion estimates for the El Dorado expansion project were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant; and

l.      As the Company later admitted (*see* Section IV.B.8, *supra*), Defendants had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

181.      The materially false and misleading statements alleged in ¶¶174-179 were made with scienter.  Defendants were deliberately reckless as to their falsity because, as explained in Section IV.B.4, *supra*, the Individual Defendants had been informed that the El Dorado

expansion was over budget and behind schedule. Moreover, as described in Section IV.B.5-B.7, *supra*, these statements were made with scienter because LSB management knew, or was reckless in not knowing, that the large bore pipes brought from the Donaldsonville facility were dismantled and relocated in a not useful manner, many of these pipes were unusable, and construction was hindered by the attempted use of almost 50-year-old engineering plans. In addition, as described in Section IV.B.7(b), *supra*, these statements were made with scienter because LSB management hired Mr. Fuller to assist in managing rapid cost escalations in the El Dorado expansion project, and therefore Defendants must have known about those rapid cost escalations. Moreover, as described in Section IV.B.7(a), *supra*, these statements were made with scienter because LSB directed Global to install pipes and vessels that were not cleared for installation by engineers and inspectors, and this direction, by its very nature, reflects knowledge that the project was not on time or on budget.

182.     Additionally, these misstatements were made with scienter for the reasons stated in ¶144, *supra*, and because:

a.     If the Individual Defendants had conducted the substantial review of the cost estimates and the status of the construction that they claimed to have performed in connection with the preparation of the August 7, 2015 estimate, the Individual Defendants would have discovered (if they had not already known) that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant, and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.

## VI.   LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

183.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

184.     During the Class Period, as a result of the open, well-developed, and efficient market for LSB's stock, the prices of LSB's stock fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of LSB's stock.

185.     Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in LSB's stock price throughout the Class Period until the truth regarding the Company's financial condition and the true status and costs of the El Dorado Facility expansion began to be revealed to the market, and/or the concealed risks materialized.

186.     The truth regarding LSB's financial condition and/or the true status and costs of the El Dorado Facility expansion was partially revealed, and/or the concealed risks materialized, on or about: July 14, 2015, August 7, 2015, and November 6, 2015.  As a direct result of these partial disclosures, the price of LSB's stock declined precipitously on heavy trading volume.

187.     On July 14, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Updates Status of El Dorado Facility Expansion."  Therein, the Company, in relevant part, stated:

> The 375,000 ton per year ammonia plant remains on schedule to be completed and operational in the first quarter of 2016. The Company's current cost estimate for the EDC expansion is now in the range of $560 million to $575 million, up from the previous estimate of $495 million to $520 million. Based on management's current project cost estimates and forecast for operating cash flow, at this time LSB does not expect to require additional financing to complete the EDC expansion other than the previously announced financings related to the installation of the cogeneration facility and the ammonia storage tank.
>
> The Company recently updated its cost estimate to complete the EDC expansion using refined estimates for specific quantities of construction materials and labor-hours based upon information provided by its engineering, procurement and construction contractor. Contributing to the increased cost estimate to complete

the EDC expansion were productivity and quality issues with a subcontractor responsible for the installation of piping in the ammonia plant.

"We are pleased to report that the timeline for completion of our El Dorado facility expansion remains intact, although we are disappointed that the total cost of the project is expected to exceed our initial cost estimates," stated Barry Golsen, LSB's President and Chief Executive Officer. "The safety, product quality, and operational reliability of the El Dorado facility are our primary areas of focus as we move forward toward the completion of the project. Even with the anticipated higher costs, we believe that the project economics remain compelling, with the new capacity expected to yield approximately $90 million of annual incremental EBITDA operating at full capacity."

188. On this news, shares of LSB declined $1.55 per share, almost 4%, to close on July 15, 2015, at $39.07 per share, on heavy volume.

189. On August 7, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Operating Results for the 2015 Second Quarter; Updates Status of El Dorado Facility Expansion; Provides Chemical Business Product Volume Guidance for 2015 Third Quarter." Therein, the Company, in relevant part, stated:

**El Dorado Facility Expansion Update**

*During the first part of August 2015, the engineering, procurement and construction contractor and other consultants we have retained in connection with the El Dorado Expansion projects advised us they are now estimating that the total cost to complete the El Dorado Expansion projects will exceed what we previously projected, due, in part, to work performed by a previous subcontractor. We have now been advised that the total cost to complete the El Dorado Expansion projects is estimated to be in the range of $660 million to $680 million ($437 million spent as of June 30, 2015 and $223 million to $243 million to be spent in the balance of 2015 with the possibility that a portion of these capital additions could occur during the first quarter of 2016).*

It is expected that the new ammonia plant will be mechanically complete by the end of 2015 and should begin production early in the second quarter 2016. As it relates to the new nitric acid plant and concentrator, the concentrator went into production in June 2015 and the nitric acid plant is expected to be mechanically complete in September 2015, with production beginning mid-fourth quarter 2015.

We expect to be able to fund the cash needs for our operations and our capital expenditures, including the El Dorado Expansion projects and our other planned discretionary capital projects, from cash on hand, internally generated cash flow, working capital, borrowings under our working capital revolver, and other

financings. We are currently negotiating with third party lenders for the financing for certain discrete pieces of equipment in connection with the El Dorado Expansion projects. Additionally, the Indenture governing our Senior Secured Notes allows us to incur an additional $50 million in debt. We are also in discussions with other financing providers to provide additional capital, as needed, for the completion of the El Dorado Expansion projects. If for some reason we are unable to complete these financings or there is a shortfall in our internally generated cash flow, either of which would negatively affect our ability to fund all of the discretionary capital projects we had planned to complete or initiate during the balance of 2015 and 2016, we would be required to reduce, delay the start of, or terminate at least some of these capital projects.

(Emphasis added.).

190.    On this news, shares of LSB declined $12.09 per share, 34.44%, to close at $23.01 per share on August 7,  2015, on unusually heavy volume.

191.    On August 11, 2015, analyst Brent Rystrom of Feltl and Company issued a report explaining that the precipitous decline in LSB's stock price was due to the sharp increase in the announced costs and revision of the timeline for the El Dorado expansion projects and the market's incredulity that these cost and completion estimates changed so dramatically after already being revised just three weeks earlier:

- ***The surprise that probably most pummeled this stock on Friday was the news that the expansions at El Dorado were now going to cost more than was updated higher just a few weeks ago, and that the plants will open a little later*. *In mid-July LXU updated this project saying it was running on time but running over budget.  At that time LXU said the project would cost $560mm to $575mm instead of the $495mm to $520mm original project estimate.  Now less than a month later the project cost has soared to $660mm and $680mm and looks to open later than previously expected.  This was astounding to us that the amount and timing could change so much in less than 30 days***.  Primarily, LXU needs to replace a piping contractor and rework much of the plant expansions.

- The incremental EBITDA on this expansion continues to be estimated near $90mm.  Now, however, the IRR has dropped considerably as the midpoint project cost has soared to $670mm from $508mm.  It is still a reasonable return and use of capital, but obviously considerably lower than we have expected.  We think that LXU will likely need to raise another $25mm to $50mm of debt beyond its present sources to fund this additional cap ex, something we believe they will accomplish.

(Emphasis added.)

192.    Further reflecting the impact of the increased cost estimates and the need to raise additional capital to complete the El Dorado expansion projects, on August 13, 2015, the credit-rating agency Moody's Investors Service ("Moody's") downgraded LSB's Corporate Family Rating ("CFR") to B1 from Ba3.  According to Moody's, the downgrade resulted from, *inter alia*, "the increased capital required to complete the ammonia plant at El Dorado."  In addition to the CFR downgrade, Moody's also downgraded LSB's Senior Secured Notes to B1, its Probability of Default to B1-PD and its Speculative Grade Liquidity rating to SGL-4 from SGL-2 and assigned a ratings outlook of Negative.[30]

193.    On November 6, 2015, the Company issued a press release entitled, "LSB Industries, Inc. Reports Operating Results for the 2015 Third Quarter; Revises Cost Estimate for El Dorado Facility Expansion to $831 Million to $855 Million; $564 Million Invested as of September 30, 2015; Announces Strategic Investment of $260 Million to Complete El Dorado Expansion; El Dorado Ammonia Plant Remains on Track to be in Production Early in Second Quarter of 2016; Provides Chemical Business Product Volume Guidance for 2015 Fourth Quarter."  Therein, the Company, in relevant part, stated:

> "Our ongoing engineering and construction review and analysis of our El Dorado Facility Expansion recently determined that the expected cost to complete the project is higher than we previously estimated when we reported second quarter 2015 results in August," stated Daniel Greenwell, LSB's Interim CEO. "The primary reason for the further cost escalation relates to mechanical and piping labor cost increases versus earlier estimates. Despite the increased cost estimate to complete our expansion project, the new nitric acid plant should be in production next week, and the ammonia plant remains on track to be in production early in the second quarter of 2016, which we expect to dramatically increase the profitability of the facility. Additionally, we are pleased to report that we have

---

[30] According to Moody's Global Long-Term Rating Scale, an obligation in the Ba category is "judged to be speculative and . . . subject to **substantial** credit risk," whereas an obligation in the B category is "judged to be speculative . . . subject to **high** credit risk" (emphasis added).  A Speculative Grade Liquidity rating of SG-2 reflects Moody's opinion that the issuer "possesses good liquidity," where a rating of SG-4 reflects Moody's opinion that the issuer "possesses weak liquidity."

signed a three-year offtake agreement with Koch Fertilizer for all of the excess ammonia the new El Dorado ammonia plant is expected to produce, above that consumed by that plant for upgrade into other products. We've worked hard to secure the financing that should allow us to complete the project with little impact to our timeline, and expect that even with the increased costs, the new ammonia and nitric acid facilities will provide a solid return and significant incremental cash flow."

*** 

Mr. Greenwell concluded, "During the third quarter, I assumed the role of LSB's Interim CEO while fellow Board member, Richard Sanders, was appointed Interim Executive Vice President of Chemical Manufacturing. I believe LSB is in the midst of an important and pivotal transition period, during which we are diligently positioning the Company for significantly enhanced long-term growth. Working with the existing leadership team, both Richard and I are committed to advancing the strategic growth initiatives that the Company has had underway, while instilling a performance oriented, accountable culture throughout the organization, and pursuing the previously disclosed strategic alternatives for both of our businesses. ***During the third quarter, our primary focus was to accurately revise the capital expenditure projections for the El Dorado project, increase the reliability and production consistency of our facilities, and secure the financing necessary to complete our El Dorado Expansion.*** We believe these three objectives have been met. Over the longer-term, our goal is to deliver significantly improved value to our shareholders, while providing excellent service to our customers, and a safe, motivating environment for our employees

*** 

Financial Position and Capital Additions

As of September 30, 2015, total cash and investments were $39.0 million, including short-term investments.

Total long-term debt was $496.4 million at September 30, 2015 compared to $457.3 million at December 31, 2014 and the borrowings on our $100 million Working Capital Revolver Loan were $13.3 million (borrowing availability, which is tied in to eligible accounts receivable and inventories, was $57.6 million at September 30, 2015). Interest expense, net of capitalized interest, for the third quarter of 2015 was $0.9 million compared to $5.1 million for the same period in 2014.

Capital additions were $139.7 million in the third quarter of 2015, including $128.6 million relating to the expansion projects at the El Dorado Facility. Planned capital additions, in the aggregate, are estimated to range from $280 million to $310 million, including $267 million to $291 million remaining for the El Dorado Expansion projects. An estimated $70 million to $75 million of the

capital additions needed to complete the El Dorado Expansion projects will occur in 2016.

***

**El Dorado Facility Expansion Update**

*Over the course of September and October, management in conjunction with the owner's representative, the engineering, procurement and construction contractor and other consultants determined that the total cost to complete the El Dorado Expansion projects will exceed what we previously projected, due, in part, to mechanical and piping labor cost increases compared to earlier estimates. We have now determined that the total cost to complete the El Dorado Expansion projects is estimated to be in the range of $831 million to $855 million ($564 million spent as of September 30, 2015 and $197 million to $216 million to be spent in the fourth quarter of 2015 and between $70 million to $75 million to be spent in 2016).*

*It is expected that the new ammonia plant will be mechanically complete by early February 2016 and should begin production early in the second quarter of 2016.* As it relates to the new nitric acid plant and concentrator, the concentrator went into production in June 2015 and the nitric acid plant is expected to be in production beginning the week of November 9th.

**New Financing to Complete El Dorado Project**

On November 6, 2015, the Company executed a commitment for financing for the purpose of completing its El Dorado Expansion project. The commitment is from Security Benefit Corporation and one or more of its affiliates ("Investor") and provides for $260 million of capital in the form of debt and equity. The details are as follows:

- $50 million in Senior Secured Notes issued at par with a 12% annual interest rate, subject to certain adjustments, maturity of August 2019, callable by the Company beginning August 2016 at 106%, August 2017 at 103% after August 2018 at par.

- $210 million in cumulative redeemable nonconvertible perpetual non-voting preferred stock ("Preferred Stock") with a 14% annual dividend rate and an economic participation right equal to 2% of the outstanding common stock before the transaction; Company will be entitled to redeem the Preferred Stock at any time without premium or penalty at the liquidation preference plus accrued and unpaid dividends plus the value of the participating right. The Investor will have the option to redeem the Preferred Stock beginning one day after the maturity date of the Company's existing Senior Secured Notes.

- Warrants to purchase 17.99% of the Company with an exercise price of $0.01 per warrant and a ten year term.

- Voting rights equal to 19.99% of the outstanding common stock before the transaction.

- The right to appoint three nominees to the Company's Board as replacements for three existing independent directors effective at the closing of the Preferred Stock.

- The Company will pay a commitment fee of 2% on the full amount of the committed financing and a funding fee of 2% upon issuance of each of the Senior Secured Notes and the Preferred Stock.

- The Company will pay a fee of 3% of the Preferred Stock commitment in the event that the Preferred Stock and Warrants are not issued as a result of the Company obtaining financing from a different entity or if the Preferred Stock and Warrants are not issued as a result of the Company's failure to satisfy conditions precedent that are solely within its control.

*Timing and Conditions of Financing*

- We expect to close the Senior Secured Notes over the next few days. We expect to close the rest of the financing prior to December 31st, subject to definitive agreements and Hart-Scott-Rodino Act approval, if required.

(Emphasis added.)

194.     Additionally, on November 6, 2015, the Company published a presentation on its website for investors and analysts entitled, "Third Quarter 2015 Update."   Therein, the Company, in relevant part, stated that the planned capital expenditure for the ammonia plant component of the El Dorado expansion project was $475–$489 million[31] and the total planned capital expenditure for the El Dorado expansion project was now $831–$855 million, which was at least $170 million more than was represented in the presentation for the previous quarter.[32] Additionally, the Company disclosed that the ammonia plant's construction was only 80% complete and that additional financing was needed to complete construction.  Moreover, the

---

[31] This was an increase of more than $90 million from the previous quarter.

[32] In fact, this new estimate ($831–$855 million) represented an increase of $335–$346 million (64%–71%) over the estimate provided at the beginning of the Class Period ($485–$520 million).

Company disclosed that the above-ground piping installation and the installation of certain vessel were still not completed.

195.    On this news, shares of LSB declined $7.04 per share, more than 44%, to close at $9.08 per share on November 6, 2015, on unusually heavy volume.

196.    Further reflecting the impact of the increased cost estimates and new debt that LSB had issued to finance the completion of the El Dorado expansion projects, on November 6, 2015, the credit-rating agency Standard and Poor's ("S&P") downgraded LSB's corporate credit rating from B+ to B- and lowered the credit rating of LSB's Senior Unsecured Notes from B+ to B-.

197.    On November 9, 2015, analyst Brent Rystrom of Feltl and Company issued a report explaining that the drastic decline in LSB's stock price was directly related to the soaring costs of the El Dorado expansion projects and the new costly and dilutive financing needed to complete the project:

- *LXU now estimates that the total cost of its El Dorado Expansion projects is expected to be in a range of $831mm to $855mm; just a few months ago expectations were closer to $500mm and this cost overrun represents about $15 per share of LXU, meaning the decline from the mid-$20s to present in the share price matches the impact of this problem.*

- *LXU has committed to raise new capital to fund this project.* It includes $50mm of Senior Secured Notes with a 12% coupon and $210mm of cumulative redeemable noncovertible perpetual non-voting preferred stock with a 14% dividend rate, and warrants to purchase 18% of LXU for $0.01 per warrant with a 10-year term. *Obviously, this is going to be expensive and massively painful for existing shareholders.* Assuming LXU is right on the remaining costs for the expansion, this likely ends the capital raise issues.

- *We are lowering our expectations to reflect LXU's weak operations, more costly expansion, and now diluted balance sheet.* We see LXU losing money through 2016 and starting to earn a small amount of EPS in 2017. *The major impact on EPS is the $29.44mm of dividends payable on the preferred stock being issued – this represents about $1.29 of EPS lost to common shareholders.*

(Emphasis added.)

198.    During the Class Period, Plaintiff and the Class purchased LSB securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

199.    The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting that construction of the Company's El Dorado ammonia plant was over budget and behind schedule; (b) their receipt of information reflecting that the Company's estimates were not engineered with a high degree of precision since they were premised on the assumption that the engineering plans from Triad #1 would be sufficient to rebuild the facility and that the Triad #1 pipes and vessels had been dismantled and relocated in a manner that would enable them to be reused at the El Dorado Facility; (c) their intentional issuance of materially false or misleading statements regarding the status and costs of the El Dorado ammonia plant expansion project; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so.  The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

200.    The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated.  The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

A.    **The El Dorado Expansion Project Was By Far The Company's Largest And Most Important Construction Project And Accounted For A Large Percentage Of The Company's Capital Expenditures**

201.    The El Dorado expansion project was by far the largest undertaking at the Company during the Class Period.  For example, according to the Company's 2014 Annual Report, the Company's planned capital additions for all of 2015 were $283–$346 million, while the El Dorado Facility expansion project accounted for $225–$260 million of this figure.  Essentially, the El Dorado expansion accounted for more than 75% of all funds that LSB was planning to spend for the year.[33]

202.    Not only was the expansion project the Company's largest, its success and/or failure had material ramifications for LSB's future profitability and success.  As Defendant Jack Golsen explained on a conference call with investors and analysts on February 27, 2014: "we expect that these projects at El Dorado will contribute approximately $90 million to $100 million of incremental annual EBITDA when they are operational."[34]   According to the Company, LSB's EBIDTA was $89.8 million for its 2014 fiscal year.  Therefore, the expansion project was projected to essentially double LSB's EBITDA.  Certainly a project that was slated to increase

---

[33] The size and importance to the Company of the expansion is similarly demonstrated by a comparison with the Company's market capitalization at the start of the Class Period.  On November 7, 2014, the Company's market capitalization was approximately $726 million while the high-end estimate for the cost of the El Dorado expansion project was $520 million.  Therefore, the cost of the expansion project was equal to 71.6% of the value of the Company at that time.  For the sake of comparison, LSB market capitalization as of March 9, 2017 was only $258 million.

[34] This expected EBITDA (earnings before interest, taxes, depreciation, and amortization) increase was reiterated by the Individual Defendants throughout the Class Period.  For example, Defendant Shelby stated on November 7, 2014 that "we have indicated that we thought we could get incremental EBITDA of about $90 million and a 15% to 70% internal rate of return."  Moreover, in response to an analyst question regarding the basis of the $90 million plus guidance on EBITDA for the expansion project, Defendant Barry Golsen stated on May 8, 2015 that "[t]he $90 million guidance is based on $500 ammonia prices and $5 natural gas prices."  Moreover, Defendant Golsen also stated on August 7, 2015 that: "Once the project is completed and operational, we expect dramatically to improve profitability at El Dorado beginning in the second quarter of 2016 with the new capacity at the plant expected to yield approximately $90 million of annual incremental EBITDA operating at full capacity."

the Company's EBIDTA by more than 100% was vital to the Company's future success and its progress would (or should) have been something that its officers keenly followed. Defendant Jack Golsen even admitted the significance of the project and that Defendants were closely monitoring its progress when he stated (as discussed below in ¶¶206-207) that "[w]e are continuing to put a high priority on making sure that we stay on track with these projects as the benefits are significant."

203.    The importance of this project to the Company was not lost on the analysts that covered LSB, who touted the importance of this project on LSB's future potential. For example, a March 3, 2015 analyst report issued by Feltl and Company stated, in relevant part: "Construction continues on the expansion at El Dorado, which will have **_massive potential repercussions for LSB's long-term profit potential_**" (emphasis added). Similarly, a May 18, 2015 analyst report issued by Feltl and Company stated "LSB Industries **_long anticipated expansions_** of its agricultural and industrial chemical businesses are nearing completion" (emphasis added).

204.    The Individual Defendants were aware of the details of the expansion project, particularly that the construction was facing a myriad of problems from attempting to disassemble a factory in another state, move it, and then reassemble it again, as it involved more than three quarters of LSB's capital expenditures and its success had material ramifications for LSB's future profitability and success; or if the Company's CEOs and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members. The most reasonable inference from these facts, however, is that the Individual Defendants were aware that the project was over budget and behind schedule as the Company later admitted.

### B.    LSB Had A Small Corporate Staff

205.    While LSB had 1,949 employees according to its 2014 Annual Report, the Company's corporate staff, which handled the Company's accounting and executives functions, was much smaller. In fact, according to Mr. Fuller, at the time that he worked as a Corporate

Project Manager at LSB from April 2015 through May 2016, LSB only had about "30 corporate staff members."  This figure is supported by the fact that the Company's corporate headquarters in Oklahoma City, Oklahoma only has 33 parking spaces in its main lot, including the overflow area.[35]  For a company with such a small corporate staff, it is simply improbable that its executives would be unaware of the particulars of the Company's largest and most important construction project.  Moreover, with such a small corporate staff, the Individual Defendants would have been acutely aware of the particulars of a construction project that constituted such a staggering amount of the Company's capital expenditures.

> C.     **The Individual Defendants Were Purportedly Monitoring The Expansion Project And Represented That They Had Conducted A Thorough Review Of All Work Performed And Revaluated All Work Left To Complete On The El Dorado Expansion Project During The Class Period**

206.     Both before and during the Class Period, the Individual Defendants represented that they were monitoring the status of the construction project and demonstrated that they had intimate knowledge of the project's construction, including its costs and progress.  For example, on August 8, 2014, Defendant Jack Golsen, on a conference call with analysts and investors, explained that "[w]e are continuing to put a high priority on making sure that we stay on track with these projects."

207.     Similarly, on November 7, 2014, during a conference call with analysts and investors, Defendant Jack Golsen reiterated that "[w]e are continuing to put a high priority on making sure that we stay on track with these projects as the benefits are significant."  During this same conference call, Defendant Shelby demonstrated his intimate knowledge of the progress of the project and its costs in a response to an analysts question:

> [Analyst]:  Okay. And then looking at your capital expenditure chart from last quarter to this quarter it looks like spending at El Dorado was $430 million to $500 million on the project for total and now it's $485 million to $520 million, yet total capital spending on the piece above that went from -- went to $388 million to

---

[35] *See* Ex. 7 (Satellite view, *available at* http://tinyurl.com/jdkrw9j & Street View, available at http://tinyurl.com/zavwrd8).

$458 million from $392 million to $515 million. I guess I'm trying to reconcile how the El Dorado project went up but total capital spending went down?

[Defendant Shelby]: A lot of it is just timing, David. We have -- we have narrowed the ranges. The progress of the construction project in El Dorado is pretty much on time, but the spending is lagging a bit. But the timing of the spending and the completion of project is somewhat separated right now, so the construction project is from a progression standpoint is on time. The spending on the other projects will fluctuate from time to time as we move things in and out, but on the El Dorado expansion project everything is on target and spending is as we have shown it there.

208.    Moreover, according to the Individual Defendants, between July and August 2015, the Company twice updated its cost estimates and supposedly carefully reviewed the status of the project in preparing those updated estimates.  For example, on July 14, 2015, when the Company first raised the cost estimate of the expansion project from $495–$520 million to $560–$575 million, the Company, in relevant part, stated:

The Company recently updated its cost estimate to complete the EDC expansion *using refined estimates for specific quantities of construction materials and labor-hours based upon information provided by its engineering, procurement and construction contractor.* Contributing to the increased cost estimate to complete the EDC expansion were productivity and quality issues with a subcontractor responsible for the installation of piping in the ammonia plant.

(Emphasis added.)

209.    On August 7, 2015, which is the date the Company further raised the cost estimate for the expansion project to $660–$680 million, Defendant Barry Golsen stated on a conference call with analysts and investors that:

One action that was an outgrowth of those meetings was a decision by our EPC contractor to replace an underperforming mechanical and piping subcontractor with a different subcontractor already on the job working on a different section of the plant who had an excellent record of quality and performance. *As a result of the detailed physical evaluation over the past three weeks of the work previously done by the dismissed subcontractor and other work remaining to be done,* we have now determined that it is likely that there will be a push out into the second quarter of 2016 for startup of the ammonia plant, and we believe that the total investment to complete the expansion projects will increase to a range of $660 million to $680 million. *To develop those cost estimates, we have scrutinized all work done by the dismissed subcontractor and have reevaluated all work left to*

*complete that part of the project together with the replacement subcontractor and our commissioning subcontractor.*

*In addition, a team consisting of LSB senior corporate chemical engineering managers, all project managers for various parts of the expansion project, and El Dorado site management had extensive assessment meetings with each major subcontractor along with our EPC contractor and commissioning contractor. We reviewed the scope of all work remaining to be done on all parts and all systems of the project and associated cost estimates and timelines. After this detailed review, we believe that the revised cost and time of completion are accurate.* A breakdown of the total cost increase by category is approximately as follows: 75% is related to piping, mechanical, and scaffolding; 8% electrical; 7% insulation; and 10% various other items.

In addition to the staff already assigned to work on this project, we have also retained an owner's representative firm to add additional oversight and control to projects schedule adherence and costs. The El Dorado expansion projects have been designed and we believe will be built to meet the highest standards of engineering and structural integrity with the goal of maximizing operational reliability, product quality, and safety.

While we are not pleased to have increased the cost estimate for the EDC expansion from what we previously announced a few weeks ago, we felt it was prudent to announce what we knew at the time. ***And since then, we've worked to refine that estimate further, unfortunately to the upside.***

(Emphasis added.)

210.    If in fact the Defendants had been monitoring the progress and costs of the project, and conducted the substantial review of the cost estimates and the status of the construction that they claimed to have performed, they would have uncovered that the cost estimates for the ammonia plant project at the El Dorado Facility were not accurate since they were based on faulty assumptions regarding the reuse of pipes and vessels and the use of engineering documents from the Triad #1 plant and that LSB had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project.   Moreover, it is implausible that a substantive review of the El Dorado expansion project by LSB would not have uncovered the substantial issues with the construction or that the ammonia plant estimate was ***more than $100 million dollars off*** due to additional construction costs, as the new management disclosed three months later.

211.    The only reasonable inference that can be made from the fact that the Individual Defendants that were monitoring the project, had intimate knowledge of certain specifics regarding the project, and had conducted "reviews" that failed to uncover the true status of the expansion project is that the Individual Defendants had knowledge of, or were reckless in not knowing, that the cost estimates were more than $100 million dollars off, that sufficient engineering had not occurred, and that substantial additional financing would be needed to complete the project.

**D.      The Need For Financing To Complete The El Dorado Expansion Provided A Motive For Defendants To Misrepresent The Status Of The El Dorado Expansion Project As On Schedule And On Budget**

212.    As detailed above in Section IV.B.7, Defendants engaged in a scheme to make the construction of the ammonia plant appear to be more advanced than it actually was in order for LSB to acquire financing needed to complete the project.  This scheme included LSB and Leidos directing Global to install pipes and vessels that were not cleared by inspectors or engineers in order to make the ammonia plant appear to be close to completion when it was inspected by representatives of LSB's prospective lenders.  Consistent with this effort to mislead these lenders, Defendants continued to publicly represent that the El Dorado expansion project was on schedule and on budget when they knew (or were severely reckless in disregarding) that it was not.

213.    LSB's need for financing to complete the El Dorado expansion project—and Defendants' desire to obtain that financing on commercially reasonable terms—provided a concrete motive for Defendants to misrepresent the status of that project to both lenders and the general public.  Defendants clearly understood that the closer to completion the project appeared to be (and the lower the amount of money needed to complete the project), the lower the interest rate that would be demanded by prospective lenders.  Conversely, Defendants understood that the further away from completion the project appeared to be (and the greater the amount of money needed to complete the project), the higher the interest rate that would be demanded by

prospective lenders.   That Defendants understood these relationships is supported by the following facts:

a.   <u>The drastic difference in terms between the August 2013 financing and the November 2015 financing</u>.  When LSB issued the Senior Secured Notes in August 2013, it sold a $425 million aggregate principal amount of the notes with 7.75% annual interest rate.  When LSB needed an additional $260 in capital in November 2015, however, the terms were drastically less favorable to LSB.  Specifically, the financing terms that LSB disclosed on November 6, 2015 that it had agreed to with Security Benefit Corporation included a 12% annual interest rate for $50 million in secured notes, a 14% annual dividend rate for $210 million on preferred stock, warrants to purchase approximately 18% of the Company, and voting rights equal to approximately 20% of the outstanding common stock.  Moreover, according to the agreement, LSB was required to pay 2% on the full amount of committed financing and a funding fee of 2% upon the issuance of the secured notes and preferred stock.[36]  These draconian financing terms were due to the fact that LSB needed a massive infusion of cash to complete the El Dorado expansion project, and Defendants were no longer able to conceal the true costs and completion status of the project from LSB's prospective lenders.

b.   <u>The credit rating downgrades that LSB received in August 2015 and November 2015</u>.   As discussed above in ¶192, Moody's downgraded LSB's Corporate Family Rating, the credit rating of its Senior Secured Notes, and its Speculative Grade Liquidity rating in August 2015, following LSB's announcement of a second increase in the cost estimates for the completion of the El Dorado expansion project.  As discussed above in ¶196, in November 2015, following LSB's announcement of a third increase in the cost estimates, S&P downgraded LSB's corporate credit rating and the rating of its Senior

---

[36] In fact, if the Company was able to find additional financing so that the financing from the preferred stock was no longer necessary, LSB would still have been required to pay a 3% fee on the entire $210 million.

Secured Notes.  These downgrades indicate that there was a clear relationship between the size of the construction budget and the market's perception (and likely the reality) of LSB's creditworthiness and liquidity.

c.    The fact that LSB and Leidos ordered Global to install the uncleared pipes and vessels.  Most compellingly, the very fact that LSB and Leidos ordered Global to install the uncleared pipes and vessels prior to the physical inspection of the ammonia plant by representatives of LSB's prospective lenders clearly demonstrates that Defendants believed that the prospective lenders were concerned about the construction status and costs of the project.  If Defendants actually believed the El Dorado expansion project was proceeding on schedule and on budget as they consistently represented to their investors, there would have been no reason for them to direct the installation of the uncleared pipes and vessels which later had to be removed and replaced.

214.    As discussed above in ¶¶212-213, Defendants' motive to misrepresent the status of the project as on schedule and on budget existed throughout the Class Period.  On November 7, 2014, LSB disclosed that it was seeking an additional $50 million in financing for three separately identifiable pieces of equipment.  On March 2, 2015, LSB disclosed that it had already secured a conditional commitment for $16 million for the natural gas pipeline, that it was in "final discussion" regarding a $21 million financing for the cogeneration facility, and that it was considering additional borrowing for a third piece of equipment (the ammonia storage tank).  And on May 8, 2015, LSB disclosed that the $16 million financing for the ammonia storage tank was completed in April 2015 and that the Company was in "final discussions" regarding the $21 million financing for the cogeneration facility and a $20 million financing for the ammonia storage tank.

215.    During these negotiations with prospective lenders concerning these financings, it was important for Defendants to represent that the El Dorado expansion project was proceeding on schedule and on budget.  It was for that very reason that Global was instructed to install the uncleared pipes and vessels in the spring of 2015.

216.    Even after LSB first increased its cost estimates in the middle of July 2015, Defendants still had a motive to minimize the apparent scope of the increased cost estimates, because if the increase in the budget was modest, LSB still might have been able to complete the financings for the discrete pieces of equipment on somewhat reasonable terms.  This ongoing motive partially explains why Defendants engaged in stepwise disclosures concerning the expanding budget for the El Dorado expansion project, rather than disclosing the entire increase at once.  Defendants first announced a relatively modest increase in the estimate on July 14, 2015 (an increase of $55–$65 million), followed by a larger increase on August 7, 2015 (an increase of $100–$105 million), followed by an even larger increase on November 6, 2015 (an increase of $171–$175 million).

217.    As discussed below in Section VII.F, the other factor explaining the sequence of the increases in the estimates relates to the Individual Defendants' precarious positions in the Company and their need to respond to an increasingly concerned Board of Directors that was demanding clear answers about the true costs and status of the El Dorado expansion project.  The Individual Defendants were forced to walk a fine line between keeping a lid on the apparent costs of the project in order to secure the financing necessary to keep the project going and having to respond to Board inquiries concerning the project with an estimate for which senior management would be held accountable.

**E.     The Golsens Controlled LSB And Were Substantial Shareholders Of The Company**

218.    According to the Company, as of February 13, 2015, Defendant Jack Golsen, and members of his immediate family, including Defendant Barry Golsen, and entities owned by them and trusts for which they possess voting or dispositive power as trustee, owned an aggregate of 2,815,064 shares of LSB's common stock and 1,020,000 shares of voting preferred stock (1,000,000 of which shares have .875 votes per share, or 875,000 votes).  Their shares, together, represent approximately 16% of the voting power (prior to conversion of the shares of voting preferred) of the Company's issued and outstanding voting securities as of February 13,

2015. Therefore, as the Company admits, the Golsens effectively controlled the company, and as a result, the ability of other stockholders to influence LSB's management and policies could be limited.

219.   It is simply illogical that Defendants Jack and Barry Golsen, who cumulatively had a financial interest in almost 4 million shares of LSB stock and controlled the Company through their stock ownership and their positions as CEO and Chairman of the LSB, were not aware of the status of the Company's largest and most expensive construction project, including the difficulties in using the piping and vessels from the Triad #1 facility and issues resulting from the Company's reliance on almost 50-year-old engineering documents.

**F.   Activist Shareholders Had Fought The Golsen Family's Entrenchment At LSB And Forced Changes To The Composition Of LSB's Board Of Directors, And The Individual Defendants Were Motivated To Maintain The Impression That The El Dorado Expansion Project Was Proceeding Smoothly In Order To Maintain Their Positions**

220.   Defendant Jack Golsen founded LSB in 1969, served as its CEO from 1969 through the end of 2014 and was the Company's Chairman of the Board through the end of the Class Period.  Over the decades, Defendant Jack Golsen treated LSB as a family-run company under his exclusive control.  To maintain this control over the Company, Defendant Jack Golsen stacked the Company's Board of Directors with his family and officers/executives that were loyal to him.  For example, by the end of 2013, six out of the Company's fourteen board members were either related to the Golsen family or were insiders of the Company.  During the Class Period, Defendants were motivated to downplay the costs and issues at the El Dorado Facility, including the need for substantial, additional financing, and maintain the impression that the construction project was going smoothly so that Defendants could attempt to maintain their control of the Company and stave off activist investors from taking control of LSB and its Board of Directors.

221.   In late 2013, activist shareholders began pressuring LSB and the Golsen family to make drastic corporate governance and structural changes, including changing the composition

of LSB's Board of Directors to remove the Golsens' complete control of the Company and spinning off the Company's climate control business.

222.    These shareholders, including Engine Capital LP, Red Alder, LCC, and Starboard Capital LP, began public campaigns against the Golsen family and LSB's Board of Directors in late 2013 and early 2014 that included the publication of public letters to LSB's shareholders and the nomination of new directors for the Company's Board of Directors.

223.    For example, on December 30, 2013, Engine Capital released an open letter to LSB's Board of Directors that was extremely critical of the Company's Board composition and corporate structure, and threatened to nominate a full slate of five directors if its demands were not addressed.  As the letter explained, the Company's Board was dominated by Defendant Jack Golsen as it included himself, his sons (Defendant Barry Golsen and Steve Golsen), his brother-in-law (Robert Brown), and Defendant Tony Shelby, who had worked with Defendant Jack Golsen since 1969, and David Goss, who had served as director of the Company since 1971. Moreover, other Board Members had long-standing personal relationships with Defendant Jack Golsen and/or financial motivations to remain loyal to him.  For example, one Board Member was a former executive of SAIC, the precursor of Leidos; another was the former President of a local bank that LSB once owned; and another was the President of Oklahoma City University, where Defendant Jack Golsen was a Trustee.  Moreover, the Company's General Counsel as well as other insider executives were related to Defendant Jack Golsen.   As Engine Capital's December 30, 2013 press release, which included the open letter, in relevant part, stated:

> NEW YORK--(BUSINESS WIRE)--Engine Capital LP ("Engine Capital"), a shareholder of LSB Industries, Inc. (NYSE:LXU) (the "Company"), released an open letter it sent to the Board of Directors of the Company, critical of the Company's corporate governance, corporate structure, communication with shareholders and repeated operational failures. Engine Capital expressed its belief that the Company's inherent value far exceeds its current stock price, and that such unrealized value could be unlocked through improvement in the composition of the Board, a sale or spin-off of the Company's climate control business, and conversion of a portion of the Company's chemical assets into a publicly-traded master limited partnership.

<u>Full text of the open letter follows:</u>

***

Dear Board Members:

Engine Capital LP, together with its affiliates ("Engine"), is a shareholder of LSB Industries, Inc. ("LSB" or "LXU" or the "Company"). LSB represents a significant investment for Engine. We invested in LSB because we think that the Company is significantly undervalued and there are opportunities within the control of management and the Board to increase shareholder value substantially. In particular, we think that the Board would be significantly strengthened by adding a number of new members with relevant backgrounds in chemical asset operations, climate control, and corporate finance, and with no ties to the Golsen family. We also urge the Company to establish a special committee of truly independent directors to analyze the Company's strategic alternatives to maximize value, including separating the climate control business from the chemical assets and converting certain of the chemical assets into an MLP structure.

***

<u>Governance - Board Composition</u>

We think that the Board could be significantly strengthened by adding a number of new board members with relevant backgrounds in chemical plant operations, climate control, and corporate finance, and with no ties to the Golsen family. Given the size of the Board (which, at 14, in our opinion is already too large for a company of this size), we would also expect a number of the current Board members to step down. The current makeup of the Board is highly unusual and probably quite unique in corporate America (unfortunately, not in a positive way). Here are just a few examples that highlight our concerns:

- Six out of the fourteen board members are either related to the Golsen family or are insiders of the Company. Most companies have only one non-independent member on their board of directors. At LXU, in addition to the CEO Jack Golsen, the following family members or insiders sit on the Board:
  - Barry Golsen – President and Chief Operating Officer
  - Steve Golsen – Chief Operating Officer of the Climate Control Business
  - Tony Shelby – Executive Vice President of Finance and Chief Financial Officer
  - David Gross [sic] – Executive Vice President of Operations
  - Robert Brown – brother-in-law of Jack Golsen (and with no relevant business experience)
- Another three board members (of the eight that are technically considered independent) have either current or past dealings with the Golsen family or the Company that in our opinion compromise their independence.

o      John Shelley – Former President of Equity Bank for Savings, a savings and loan that was owned by LSB before 1994. In other words, John Shelley used to report to Jack Golsen.

o      Robert Henry - President and Chief Executive Officer of Oklahoma City University. Jack Golsen serves as trustee of Oklahoma City University, and his family has made charitable contributions to the University.

o      Webster Benham – Former Senior Vice President of SAIC. LSB is going to spend hundreds of millions of dollars in capital expenditures using SAIC as a contractor.

•      Except for Mr. Donald Munson (who was a former COO of Lennox but retired more than 22 years ago!), none of the other seven (technically) independent board members have relevant backgrounds in chemical asset operations, climate control, or corporate finance.

•      The Board is staggered and the role of the CEO and Chairman is combined.

How can the Board members oversee, help, or challenge management when they either have no relevant experience or are conflicted because of their ties to the Golsen family? We think that the recent operational and financial challenges of the Company as well as the antiquated corporate structure that we highlight below are a direct consequence of this poor governance structure.

<u>Corporate Structure</u>

LSB is currently a holding company with two very different businesses: (1) four chemical plants, and (2) a climate control business. There are no synergies between these two businesses. We think that the market currently ascribes very little value to the climate business, which is dwarfed by the chemical assets. We frankly question whether LSB is the best owner of the climate control business or whether the business could be worth a lot more as a separate entity or in the hands of a synergistic buyer. Depending on the tax basis of the business (the CFO was unable or unwilling to provide an answer to that question), the best course of action may be a sale or a spinoff of the business. We think that the analyst community and investors in general focus on the chemical assets and value the Company using chemical assets multiples, therefore undervaluing the higher quality climate control business that deserves a higher multiple (climate control peers trade at significantly higher multiples than chemical peers). In light of the recent operational challenges at a number of the Company's chemical plants, we also think it would be positive to have LSB management exclusively focused and incented on optimizing the chemical assets.

Within the chemical division, LSB has an opportunity to improve the tax efficiency of its corporate structure by converting its agricultural-related assets into a publicly traded Master Limited Partnership ("MLP"). Because of the tax advantages of the MLP structure and the yield it provides to unitholders, MLPs trade at higher multiples than regular corporations. As an example, among the Company's peers, RNF trades at 7.5x 2014 EBITDA, UAN trades at 9x 2014

EBITDA and CF Industries (NYSE: CF) trades at 6.4x 2014 EBITDA. Both RNF and UAN are MLPs (note the higher multiple) while CF just announced that they were looking at utilizing an MLP as a financing vehicle. If it makes sense for these companies to be MLPs, why doesn't make it sense for LXU?

We think that the Board should establish a special committee consisting of only truly independent directors with a strong corporate finance background to analyze the Company's options. This special committee should be assisted by a leading investment bank and a leading law firm. The value creation potential is significant, as evidenced by the market reaction of CF Industries' stock when it announced that it was working with two leading investment banks to look at specific opportunities for utilizing the MLP structure as a potential financing vehicle.

Capital Allocation / Communication with Shareholders

One of the most important roles of the Board is to allocate capital appropriately. LSB has announced a 3-year capital expenditure ("capex") program of around $600 million. This is extremely significant for a company of LSB's size, and we question whether it is wise to start such a significant capex program and lever up the Company ahead of significant new production supply of ammonia coming on the market. When we asked Mr. Shelby to quantify the expected returns on the capex related to the expansion of the El Dorado Facility into an ammonia producer, he simply told us that the Company believes it makes sense to integrate and produce from natural gas instead of buying ammonia on the market no matter what the returns were. We disagree with this thinking, and it is quite possible that instead of levering up the Company and engaging in this capex program, shareholders would have been better served by a large repurchase of undervalued stock. The reality is that as shareholders, it is very difficult to evaluate the merits of this capex program because the Company refuses to share its assumptions and the implied returns on investment. Compare this situation with the way CF Industries thinks about return on capital and communicates this metric with its shareholders: On slide 15 of its most recent presentation at the Citigroup 6th Annual Basic Materials Conference, CF Industries shares its IRR projections for the Donaldsonville and Port Neal expansion projects under different assumptions for natural gas costs and urea pricing. This slide highlights how CF Industries thinks about capital allocation and how clearly it communicates capital allocation decisions with its shareholders. Having a Board with relevant experience in capital allocation that is focused on maximizing returns on capital opportunistically and communicating its thought process to shareholders in a thoughtful manner would go a long way to improve the market perception of this Company and help close the value gap.

*** 

In conclusion, we think that LSB Industries is significantly undervalued. In this letter, we have highlighted a number of concerns with the current situation and

have suggested steps that the Company should take to close the significant value gap between where the stock trades and what the Company is worth. Engine Capital has significant M&A, corporate finance, capital allocation, and board experience. We continue to think that the best step forward is to work with you cooperatively for the benefit of all the shareholders, and we hope to continue our discussion with you in the coming weeks. However, if significant progress is not achieved promptly, we are fully prepared to nominate five directors by the January 23, 2014, deadline.

224.     On April 3, 2014, the Company announced that it had reached an agreement with Starboard Value in which LSB agreed to the nomination of two independent board members, including Daniel Greenwell, and the establishment of a Strategic Committee to investigate strategic matters, such as spinning off the Company's climate control business.  The Company further announced that it had also entered into an agreement with Engine Capital and Red Alder whereby they agreed to withdraw their nomination of directors notice and support the Company's director nominees.  LSB's announcement, in relevant part, stated:

OKLAHOMA CITY--(BUSINESS WIRE)--LSB Industries, Inc. (NYSE:LXU) ("LSB") today announced that it will nominate Daniel D. Greenwell and William F. Murdy for election to LSB's Board of Directors at the Company's upcoming 2014 Annual Meeting of Stockholders. In addition, Richard S. Sanders, Jr. will be appointed to the Board, effective as of the date of the 2014 Annual Meeting, to fill a vacancy in the class of directors whose term expires at the 2015 Annual Meeting of Stockholders. Incumbent directors Donald W. Munson and Ronald V. Perry have informed the Company that they will not stand for reelection at the 2014 Annual Meeting and John A. Shelley, a director in the class whose term expires at the 2015 Annual Meeting, has informed the Company that he will retire from the Board, effective as of the date of the 2014 Annual Meeting.

***

In connection with today's announcement, LSB has entered into an agreement with Starboard Value LP ("Starboard"), which beneficially owns approximately 4.9% of the Company's outstanding shares. Under the agreement, Starboard has agreed, among other things, not to solicit proxies or participate in any "withhold" campaign in connection with the 2014 Annual Meeting and to vote its shares in support of all of the Company's director nominees. Starboard has also agreed to vote all of its shares in accordance with the Board's recommendation with respect to the Company's say-on-pay proposal, subject to the recommendation of Institutional Shareholder Services.

In addition, the Company will establish a Strategic Committee following the 2014 Annual Meeting, which will provide the Board with recommendations related to strategic matters. The Strategic Committee will be composed of four Board members, including Messrs. Greenwell and Murdy and two members who will be selected by the Board.

*** 

In connection with today's announcement, Engine Capital and Red Alder (collectively, "Engine"), which beneficially own approximately 0.9% of the Company's outstanding shares, entered into an agreement with the Company, whereby Engine has withdrawn its nominations notice and agreed to vote its shares in support of all of the Company's director nominees.

225.    On March 2, 2015, the Board of Directors completed is strategic review regarding the potential spin-off of its climate control business.  The Strategic Committee and the Board of Directors announced that it had determined that a potential spin-off or sale of the Company's climate control business "may be a step for consideration once the expansion projects at the Company's El Dorado Chemical facility are complete in early 2016, and that optionality for pursuit of an MLP [Master Limited Partnership] going forward should be preserved."

226.    In response to this announcement, Starboard Value submitted a notice of nomination of five director candidates to stand for election to LSB's Board of Directors at the Company's 2015 Annual Meeting of Shareholders. Additionally, Starboard Value published an open letter to LSB's Board of Directors on March 10, 2015, in which it outlined LSB's poor corporate governance, nepotism and conflicts of interest.  Specifically, Starboard Value argued that these new independent directors were needed as Defendant Jack Golsen and his faction remained in firm control over the Company and that they "continue[] to accept and condone egregious corporate governance with a complete and utter lack of management accountability for performance."  Moreover, Starboard Value criticized "the numerous questionable related-party transactions in which LSB has engaged, including real estate deals with the Golsen family and the issuance of preferred stock to members of the Golsen family," which is "solely owned by members of the Golsen family and was not offered to public shareholders, pays dividends to the

family, despite LSB's refusal to return capital to common shareholders through dividends or share repurchases."  As the letter, in relevant part, stated:

> Dear Members of the Board,
>
> Starboard Value LP, together with its affiliates ("Starboard"), is one of the Company's largest shareholders, owning approximately 7.6% of the common stock of LSB Industries, Inc. ("LSB" or the "Company").  We believe that LSB is deeply undervalued and that significant opportunities exist to create value for the benefit of all shareholders based on actions that should be within the control of management and the Board of Directors (the "Board").  However, we also believe that meaningful change is needed to the Company's operations, strategic direction, management structure, and corporate governance in order to realize the Company's full potential.
>
> LSB's operating performance, financial performance, and stock price performance have been atrocious over almost any measurement period.  Despite our repeated attempts to encourage you to address these and other issues, to date management and the Board have largely ignored our recommendations.  It is clear to us and many others that the current management team has repeatedly failed to execute in both of the Company's operating businesses and that the Board, as a whole, has done very little to hold management accountable for its poor performance or to appropriately govern LSB in a manner commensurate with best-in-class corporate governance.
>
> Since reaching a settlement with LSB on April 3, 2014, under which two directors that we had nominated joined the Board, LSB has had the opportunity to address the significant operational and corporate governance issues that have plagued the Company for years.  During this time, we have continued to privately communicate our views to the Board regarding how best to create shareholder value.  It was our hope and expectation that management and the Board would embrace the need for change and work expeditiously to materially improve LSB's operations, reform its corporate governance, and create substantial value for all shareholders.  Unfortunately, it now appears that despite the addition of two highly-qualified and independent Board members last year, the incumbent majority of the Board remains steadfastly in control and continues to accept and condone egregious corporate governance with a complete and utter lack of management accountability for performance.
>
> Given this lack of progress, we find ourselves back in the same place as last year, with both the operations and corporate governance of the Company still in need of significant reform.  While we appreciate the ongoing dialogue we have had with management and certain members of the Board, we appear to be at an impasse.  Therefore, it has become increasingly clear to us that in order to drive the level of change that is necessary at LSB, shareholders will need to express

their views through a democratic forum.  To that end, yesterday we nominated a slate of highly qualified director candidates for election at LSB's 2015 annual meeting of shareholders (the "Annual Meeting").

## Unacceptable Performance Record

Over the past three and five year periods, LSB's stock price has underperformed its closest peer group by approximately 50%.[1]  We believe this poor stock price performance is a direct result of poor operating performance.  LSB is comprised of two disparate businesses – Chemicals and Climate Control.  Each of these businesses has underperformed its closest peers dramatically.  In the Chemicals segment, despite an extremely favorable environment – input costs at close to trough levels and output prices close to peaks – LSB has failed to produce consistently positive earnings.  In fact, LSB's margins have significantly trailed competitors, due in large part to substantial downtime at several of LSB's facilities.  As shown in the table below, LSB's chemicals business is currently producing EBITDA margins that are 70% below the peer median despite similar revenue scale.

\*\*\*

While we understand that the age of the plants, the technologies used, and the relative mix of input and output products can have a substantial impact on the margins realized, we believe it is clear that LSB's Chemicals business has not performed up to expectations and that significant operational improvements are needed. ***Importantly, we believe that many of this business's repeated missteps could have been prevented with proper management and oversight.***

\*\*\*

## Unacceptable Corporate Governance

We believe LSB's poor operating performance is a direct result of the Company's long history of poor corporate governance practices, a lack of appropriate board oversight, and an unwillingness to hold senior management accountable for performance.  In case there was any question or doubt as to LSB's problematic governance, ***Institutional Shareholder Services*** (***ISS***) ***has given LSB a governance QuickScore of 10***, ***indicating the highest possible governance risk.***

We believe this is largely a result of the Company being run as if it were still a private family-owned and family-operated business despite the fact that a vast majority of the Company's equity was sold to public shareholders over thirty years ago.

LSB was founded in 1968 by Jack Golsen, who acquired and built several successful and valuable businesses, including LSB's current Climate Control and Chemicals businesses.  Over time, Jack brought in family members to occupy

various senior management positions, creating a reporting structure ripe with conflicts of interest, where there is little connection between performance and advancement and effectively no accountability.

Throughout his tenure at LSB, Barry Golsen has reported to Jack Golsen, his father.  This includes his previous role as the President of the Company's Climate Control business, when he reported directly to Jack Golsen. Then, as President and COO of the Company, Barry Golsen again reported directly to Jack Golsen, who was Chairman, President, and CEO at the time.  Despite year-after-year of poor performance in these roles, Barry Golsen has been continuously promoted to roles of increasing responsibility at LSB.  Were these promotions earned based on hard work and strong performance or were they merely a familial rite of passage passed down from father to son?  Given the obvious conflict of interests, did the Board provide appropriate oversight to ensure these appointments were in the best interests of shareholders?

***Just two months ago, when LSB announced that Jack Golsen would step down as CEO, one would have thought this to be an opportune chance for the Board to address the clear conflict of interests and put in place an improved governance structure. It would also have been an opportunity to commence a search for a world-class CEO with a record of transforming companies like LSB in order to give the Company the best chance possible to expeditiously improve its operations. <u>Shockingly, rather than initiating a CEO search process to find a proven leader and working to ameliorate the conflicts of interest, the Board only further endorsed them by naming Barry Golsen CEO of LSB while electing Jack Golsen Executive Chairman of the Board.</u>***

As it stands today, despite years of horrendous performance and shareholder concerns, Jack Golsen is Executive Chairman of the Board, tasked with leading the Board and providing oversight and guidance to management.  His eldest son, Barry Golsen, is CEO of LSB, tasked with running the Company's Chemicals business while also providing oversight for the Climate Control business.  Further yet, Steven Golsen, Jack Golsen's younger son, and Barry Golsen's brother, is President and Chief Operating Officer of LSB's woefully underperforming Climate Control business. ***Steven Golsen reports directly to Barry Golsen, who in turn reports directly to Jack Golsen.***

These appointments would be questionable even at a well-performing company, but given the long-term extremely poor performance of LSB, these decisions point to a terribly broken governance structure and a Board that is lacking enough independence to objectively evaluate the situation and make decisions that are in <u>ALL</u> shareholders' best interests, not just the interests of the founding family.

Perhaps one explanation for LSB's inability to put into place reasonable standards of governance is that conflicts exist among the very executives who should be advising the Company on such matters.  As disclosed in the Company's 2014 proxy statement, LSB's General Counsel, David Shear, is the nephew, by

marriage, of Jack Golsen. *__Given the obvious conflict of interest, how can Mr.__* *__Shear provide objective legal advice to the Company regarding matters such as__* *__board independence, succession planning, and related party__* *__transactions?__*   Moreover, Mr. Shear is married to Heidi Brown Shear, the Vice President and Managing Counsel of the Company, who is herself the niece of Jack Golsen and the daughter of Robert Brown, a recently retired member of LSB's Board.

Perhaps this explains the numerous questionable related-party transactions in which LSB has engaged, including real estate deals with the Golsen family and the issuance of preferred stock to members of the Golsen family.  The preferred stock, which is solely owned by members of the Golsen family and was not offered to public shareholders, pays dividends to the family, despite LSB's refusal to return capital to common shareholders through dividends or share repurchases.  The preferred stock also grants the Golsen family additional voting rights even without converting their preferred stock into common equity.

As for the Board itself, in addition to the obvious family relationships, several Board dynamics should give shareholders further cause for concern.  For example, the Board's Lead "Independent" Director, Robert Henry, is the President of Oklahoma City University.  Jack Golsen is a Trustee, a major donor, and a longtime member of the Finance Committee of Oklahoma City University. *__How can Mr. Henry be asked to lead executive sessions of the__* *__Board to objectively evaluate the performance of Jack Golsen as Chairman__* *__and Barry Golsen as CEO, when, as a Trustee of Oklahoma City University,__* *__Mr. Henry effectively reports to Jack Golsen, and part of Mr. Henry's job__* *__requires soliciting donations from the Golsen family?__*   In addition, according to the Company's proxy statement, the Chairman of LSB's Audit Committee, Robert Burtch, does not qualify as a "financial expert."  Moreover, Mr. Burtch has been on the Board for more than 15 years, raising the question of whether he has the independence necessary for such a critical position.

## Unacceptable Responses to Shareholders

We believe that shareholders have been frustrated by LSB's operational and financial underperformance for an extended period of time.  Starting in 2013, shareholders began publicly calling for change.  Since that time, despite significant external pressure, very little has changed.  The stock price has not moved.  The margin gap between the Climate Control business and peers has only widened.  In the Chemicals business, while progress has been made stabilizing the Pryor plant,  the Cherokee plant has now started to experience disruptions.  Moreover, the Company's valuation continues to languish.

Last year, we very clearly expressed to you, through several private letters and numerous calls and meetings, that LSB needed to substantially improve the operations of both of its businesses and consider several strategic alternatives, including a separation of its two disparate businesses and the establishment of a

Master Limited Partnership ("MLP") structure for its Chemicals business. Your response to us has been that it has not been the right time to execute those strategic alternatives, largely because of the need for substantial improvements in operating performance that would better position LSB to execute on those alternatives. When we agreed to a settlement last year that added two independent directors whom we had nominated to the Board, it was with the clear understanding that LSB would spend the year improving its operations. Concurrently, the Strategic Committee would explore several strategic options that, following the expected operational improvements, would become viable alternatives.

Now, a year later, after another year spent failing to improve the Company's operations, you are once again claiming that the strategic alternatives cannot be pursued largely due to the Company's continued operational underperformance. Yet somehow, you are asking shareholders to give you another year with the *same management team* and the *same unacceptable governance structures* that have repeatedly failed to produce results. The Strategic Committee's conclusion, in our view, was essentially that, although a separation of LSB's disparate businesses does make sense and that an MLP is worth exploring, now may not be the opportune time to execute either transaction, largely because LSB must first focus on improving its operations. We can understand this conclusion, even though we may not fully agree with it. ***What we cannot understand, however, is the Board's stubborn stance that, even though it is absolutely critical that LSB execute on long overdue operational improvements this year, shareholders should entrust this critical task to the same management team that has consistently failed to execute.*** This does not make sense to us, and we do not believe that any truly independent and objective board would permit this.

**The Time for Real Change Is Now**

It is time for accountability at LSB. It is time for real change. It is time for LSB to become a professionally governed public company....

(Emphasis in original.)

227. On April 27, 2015, the Company announced that it had again acquiesced to Starboard Value, agreeing to add five new independent directors and to separate its chemical and climate control businesses. Additionally, the Company agreed to have the Strategic Committee evaluate the Company's corporate governance and management structure, and related party transactions. As the Company's April 27, 2015 press release, in relevant part, stated:

OKLAHOMA CITY--(BUSINESS WIRE)--LSB Industries, Inc. (NYSE:LXU) ("LSB" or "the Company"), a manufacturer of chemical products for the

agricultural, mining and industrial markets and a leading manufacturer of commercial and residential climate control products, today announced that it has elected Louis G. Massimo, Andrew K. Mittag, Richard Roedel, Marran H. Ogilvie and Lynn F. White to its Board of Directors. These five new independent directors, as well as incumbent directors Richard Sanders and Barry Golsen, will stand for re-election to LSB's Board of Directors at the Company's 2015 Annual Meeting of Stockholders. Messrs. Massimo and Mittag will fill the vacancies created by the resignations, effective today, of Gail Lapidus and Robert Henry.

If re-elected by LSB's stockholders at the 2015 Annual Meeting, Ms. Ogilvie and Messrs. Roedel, Sanders, Golsen and White will have terms expiring at the 2018 Annual Meeting and Messrs. Massimo and Mittag will join the class of directors with terms expiring at the 2017 Annual Meeting. With these appointments, the LSB Board will expand to 13 directors, 11 of whom are independent and 9 of whom were appointed in the last 24 months.

***

In connection with today's announcement, LSB has entered into an agreement with Starboard Value LP ("Starboard"), which beneficially owns approximately 7.6% of the Company's outstanding shares. Under the agreement, Starboard has agreed, among other things, not to solicit proxies or participate in any "withhold" campaign in connection with the 2015 Annual Meeting and to vote its shares in support of all of the Company's director nominees. Starboard has also agreed to vote all of its shares in accordance with the Board's recommendation with respect to the Company's say-on-pay proposal, subject to the recommendation of Institutional Shareholder Services.

In addition, the responsibilities of the Strategic Committee of the Board, which was formed in June 2014, will be expanded to include an evaluation of Company's corporate governance and management structure, related party transactions and any other governance practices of the Company deemed appropriate by the Strategic Committee. The Strategic Committee will make recommendations to the Board based on its findings, and the Company intends to announce the Board's decisions with respect to these recommendations concurrent with its second quarter 2015 earnings release.

The Company also agreed to form an independent Board Committee to oversee the Company's previously announced executive search for a President of the Chemicals business; this committee will consist of Messrs. Daniel D. Greenwell, Sanders, Mittag and White. As previously announced the company is working with executive search firm Spencer Stuart to assist in the search.

The Company also announced that Mr. Greenwell was elected Lead Independent Director.

228.    In light of the activist investors constant attempts, both before and during the Class Period, to wrest control of the Company away from the Golsens and their inner circle, the Individual Defendants were motivated to conceal the escalating costs and construction issues at the El Dorado Facility and that the project was both over budget and behind schedule so that the Individual Defendants could retain control of the Company.  For example, Starboard Value was publicly against the appointment of Barry Golsen as CEO. Certainly, if the Individual Defendants disclosed that they had failed to conduct the detailed engineering work needed to properly calculate the costs of such a project, this would be used to further take control away from the Golsens, including the removal of Defendant Barry Golsen as CEO.  This is what ultimately occurred and led to the Golsens losing their long-term control over the Company.  *See* Section VII.G, *infra*.

### G.    The Full Truth Was Only Revealed After Long-Standing Executives Of LSB Were Removed From Their Positions

229.    On September 3, 2015, LSB announced that, effective immediately, Defendant Barry Golsen had stepped down as both President and Chief Executive Officer of LSB. According to the Company, the Board of Directors had appointed Daniel Greenwell, the Board's Lead Independent Director, to serve as Interim Chief Executive Officer.   Thereafter, on September 29, 2015, LSB announced that the Company had appointed Richard Sanders as Interim Executive Vice President, Chemical Manufacturing and that, effective immediately, Mr. Sanders would oversee all plant operations.  In the same press release, the Company announced the "resignations" of David Goss, Executive Vice President of Operations, and Michael Tepper, Senior Vice President of LSB International Operations.  Both Defendant Barry Golsen and David Goss had been affiliated with LSB for more than 35 years.[37]

230.    In fact, LSB's new Interim CEO Greenwell explained that one of the reasons for the restructuring of the management team was to "driv[e] accountabilty" and develop "a strong

---

[37] Additionally, Defendant Shelby, who also left the Company during the Class Period, had been a part of the Company's management team since its inception in 1969.

sense of urgency." As Interim CEO Greenwell explained, the Company had poor corporate governance practices that should have been fixed earlier and which hindered getting a complete understanding of the situation:

> What we've done since the two early cost estimates is in late August, mid to late August, we began as a Board to get uncomfortable with where we were on this project and, as I said, we made some management changes and then immediately initiated full detailed cost reviews and cost studies to get our arms around this thing. And we have.
>
> We've changed significant management, we've changed construction responsibility and reporting, we have a clear line of sight to it. We're down there frequently, every week, and we participate in all those management activities for that plant construction commissioning and startup.[38]

231.     The most logical inference from this mass departure of long-serving LSB management just prior to the end of the Class Period is that LSB's management, including the Individual Defendants, had knowledge of, or were reckless in not knowing, that the cost estimates were more than $100 million dollars off and that sufficient engineering had not occurred, and the Board of Directors wanted to bring in new management to ensure that such a debacle could not occur again.[39]

## VIII.  CLASS ACTION ALLEGATIONS

232.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the securities of LSB during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families

---

[38] The clear implication from this statement is that the prior management, specifically Defendant Barry Golsen, were not as active and involved as they needed to be in the construction process and/or in their cost reviews.  This conduct is certainly reckless as it involved the Company's largest project and hundreds of millions of dollars.

[39] Moreover, on March 16, 2015, the Company announced that it was establishing a new position of President of its Chemical Business, which would oversee the El Dorado expansion project, and had hired an executive search firm to carry out the search.

and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

233.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LSB securities were actively traded on the New York Stock Exchange (the "NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of LSB shares were traded publicly during the Class Period on the NYSE.  As of October 30, 2015, the Company had 22,811,262 shares of stock outstanding, excluding 4,320,462 shares held as treasury stock.  Record owners and other members of the Class may be identified from records maintained by LSB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

234.   Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.  Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

235.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' conduct alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of LSB; and

c.   to what extent Class members have sustained damages and the proper measure of damages.

236.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    UNDISCLOSED ADVERSE FACTS

237.    The market for LSB's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, LSB's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired LSB's securities relying upon the integrity of the market price of the Company's securities and market information relating to LSB, and have been damaged thereby.

238.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LSB's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about LSB's business, operations, and prospects as alleged herein.

239.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff  and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LSB's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant

times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## X.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

240.   The market for LSB securities was open, well-developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period.  On April 28, 2015, the Company's stock closed at a Class Period high of $45.26 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to LSB; Plaintiff and Class members have been damaged thereby.

241.   During the Class Period, the artificial inflation of the value of LSB securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members.  As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

242.   At all relevant times, the market for LSB securities was efficient for the following reasons, among others:

a.      LSB's stock met the requirements for listing, and it was listed and actively traded on the NYSE, a highly efficient and automated market.

b.      As a regulated issuer, LSB filed periodic public reports with the SEC and/or the NYSE.

       c.      LSB regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

       d.      LSB was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

243.    Based on the foregoing, during the Class Period, the market for LSB securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of LSB stock.  Under these circumstances, the market for LSB securities was efficient during the Class Period and, therefore, investors' purchases LSB securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

244.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts.

## XI.   NO SAFE HARBOR

245.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge

that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XII.   COUNTS

### FIRST COUNT
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

246.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

247.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase LSB securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

248.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LSB securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

249.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about LSB's business, operations, management, and prospects, as specified herein.

250.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of LSB's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LSB and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

251.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

252.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LSB business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's

operations and cost estimates throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

253.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of LSB securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired LSB securities during the Class Period at artificially high prices and were damaged thereby.

254.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that LSB was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LSB securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

255.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder.

256.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND COUNT
### Violation of Section 20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

257.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

258.    The Individual Defendants acted as controlling persons of LSB within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

259.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

260.    As set forth above, LSB and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: April 5, 2017

GLANCY PRONGAY & MURRAY LLP


By:   *s/ Casey E. Sadler*
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
Jason L. Krajcer
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com

-and-

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (BM-9954)
Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

*Lead Counsel for Lead Plaintiff Dennis Wilson*

LAW OFFICES OF HOWARD G. SMITH
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Lead Plaintiff Dennis Wilson*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On April 5, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 5, 2017, at Los Angeles, California.


*s/ Casey E. Sadler*
Casey E. Sadler

# Mailing Information for a Case 1:15-cv-07614-RA-AJP Wilson v. LSB Industries, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joni S. Jacobsen**
  joni.jacobsen@dechert.com,angela.liu@dechert.com,nicole.ladue@dechert.com,nycmanagingclerks@dechert.co

- **David H. Kistenbroker**
  david.kistenbroker@dechert.com,nycmanagingclerks@dechert.com,nicole.ladue@dechert.com

- **Jason L. Krajcer**
  jkrajcer@glancylaw.com,info@glancylaw.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com,info@glancylaw.com,JKrajcer@glancylaw.com

- **Rebecca Kahan Waldman**
  rebecca.waldman@dechert.com,nycmanagingclerks@dechert.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)